# EXHIBIT D

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   HAROLD C. DEYERLER and WILMA DYERLER,)
                 Plaintiffs,             )  No. 08 C 5362
 4                                       )
            v.                           )  Chicago, Illinois
 5                                       )
     GEORGIA-PACIFIC, LLC., et al.,      )  September 30, 2008
 6              Defendants.              )  1:45 p.m.

 7              TRANSCRIPT OF PROCEEDINGS - TRIAL
               BEFORE THE HONORABLE ELAINE E. BUCKLO
 8
     APPEARANCES:
 9
     For the Plaintiff:   MR. ROBERT G. McCOY
10                        MR. SALVADOR GUTIERREZ, JR.
                          MR. ANDREW S. PIGOTT
11                        CASCINO VAUGHAN LAW OFFICES, LTD.
                          220 South Ashland Avenue
12                        Chicago, Illinois 60607
                          (312) 944-0600
13
     For Georgia-Pacific: MR. MICHAEL W. DRUMKE
14                        SCHIFF HARDIN LLP
                          6600 Sears Tower
15                        Chicago, Illinois 60606-6473
                          (312) 258-5744
16
                          MR. JEFFREY S. HEBRANK
17                        HEPLER BROOM
                          103 West Vandalia Street, Suite 300
18                        Edwardsville, Illinois 62025-0510
                          (618) 656-0184
19
     For Union Carbide:   MR. RICHARD F. BULGER
20                        MS. SHEILA M. FINNEGAN
                          MAYER BROWN LLP
21                        71 South Wacker Drive
                          Chicago, Illinois 60606
22                        (312) 782-0600

23                        MICHAEL P. SNYDER
                          Official Reporter
24               United States District Court
            219 South Dearborn Street, Room 1432
25                 Chicago, Illinois 60604
                   Telephone (312) 435-5563
```

PDF created with pdfFactory trial version www.pdffactory.com

2

```
 1  APPEARANCES (continued:)

 2  For Union Carbide:    MR. TOBIN J. TAYLOR
                          HEYL, ROYSTER, VOELKER & ALLEN, P.C.
 3                        124 S.W. Adams Street, Suite 600
                          Peoria, Illinois 61602
 4                        (309) 676-0400

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

77

1          THE COURT:   They are.

2          MR. DRUME:   Okay.

3          THE COURT:   Anything else we need to deal with?

4          MR. DRUME:   Your Honor, the only point of

5   clarification is I guess we'd like some guidance from the

6   Court.   I think we have an understanding, but I'm not entirely

7   clear in terms of disclosure of witnesses and documents.   Is

8   there a standing order?

9          THE COURT:   Well, yeah.   I'd like you at least --

10  maybe the only practical way to do this, to hopefully avoid

11  interruptions, is it seemed to me that if you would disclose at

12  least your -- on all sides, your witnesses and your exhibits

13  24 hours in advance, then we could take up, like right now, any

14  objections for tomorrow's.   Who's going to testify tomorrow?

15         MR. McCOY:   Tomorrow will be Dr. Castleman.

16         THE COURT:   All right.   I've ruled on that.

17         MR. McCOY:   Right.

18         THE COURT:   I mean, I don't know that I've ruled on

19  every question, but -- is he coming here?

20         MR. McCOY:   Yes.   He's arriving -- he arrives this

21  evening.

22         THE COURT:   Okay.

23         MR. McCOY:   I can say this, Judge.   I mean, we have

24  made a disclosure -- at least my office told me we did --

25  sometime this morning of exhibits we're likely to use with

PDF created with pdfFactory trial version www.pdffactory.com

78

1 Dr. Castleman. Because these experts are so booked that they
2 only get in always the night before -- they're usually coming
3 from another trial or deposition in asbestos -- that actually
4 finalizing the list with Dr. Castleman, I'll do that; but it
5 will be basically -- it's either spelled out in his book or
6 we've given it to them

7         MR. BULGER: That's a pretty big universe, your
8 Honor.

9         MR. McCOY: Judge, I want to talk from past cases,
10 because we've done this many times with these same attorneys.

11        MR. HEBRANK: I've never had Dr. Castleman, first of
12 all; but the real rule that I need clarification on is: Are we
13 bound by the exhibit lists that we filed? Because the
14 materials that they are sending rapid-fire at this point are
15 not on their exhibit list. They're new exhibits.

16        THE COURT: I thought you just told me you were only
17 going to use about six or seven exhibits, just yesterday.
18 Isn't that true?

19        MR. McCOY: That's basically true, right.

20        THE COURT: So, what are we talking about? What he's
21 relying on? What he's relying on really should be what he
22 testified at his deposition that he was relying on, in the
23 ordinary case.

24            Now, I feel a little constrained by the fact that you
25 weren't in federal court. You know, if some other rules were

PDF created with pdfFactory trial version www.pdffactory.com

1  really being used there, then I at least have to look at it.
2  But, I mean, is he intending to testify to anything more than
3  that?
4           MR. McCOY:  If you count what's in his book, which he
5  always testifies to as part of his disclosures that that will
6  be part of his testimony.
7           THE COURT:  Did he say, "I'm going to testify to
8  what's in my book"?
9           MR. McCOY:  Right.  I mean, that's part of
10  specifically what we said he'll testify.  I don't know if
11  anybody asked him in his deposition, because he's given a
12  thousand depositions.  So, whether he said it in this case --
13           THE COURT:  Well, that might not be a fair way to do
14  it.
15           MR. McCOY:  But we always -- Dr. Castleman's book,
16  everybody here's --
17           THE COURT:  Didn't you read it?
18           MR. HEBRANK:  Not cover to cover.
19           THE COURT:  It looks like you have.  I see little
20  tabs.
21           MR. HEBRANK:  I have lots of tabs, but not cover to
22  cover, so --
23           MR. McCOY:  So, what we've done as part of our
24  exhibit list is to include all of the documents that are in his
25  book.  Now, we haven't --

PDF created with pdfFactory trial version www.pdffactory.com

80

1          THE COURT:   Oh, Lord.

2          MR. McCOY:   -- we haven't listed each one as having a

3 number in this case yet because -- because that would, you

4 know, make our list -- if we did that with every document, we'd

5 have several thousand on our list.   What we've done --

6          THE COURT:   Well, I assume you're not intending to

7 introduce all of these documents.   He's just giving a report

8 that summarizes, as I understood it, what the literature shows

9 at a given point in time.

10          MR. McCOY:   Right.   And what -- what we do with

11 Dr. Castleman is we usually disclose the several documents that

12 he will be talking about in his discussion as to the companies

13 themselves.

14          MR. BULGER:   Your Honor, I --

15          MR. McCOY:   May I finish here?

16          MR. BULGER:   Sure.

17          MR. McCOY:   Because we do this over and over again.

18 And what we -- that's what we've done already today this

19 morning is we've disclosed that.

20          In his chapters on each of these companies, he

21 probably references anywhere from 10 to 25 documents on each

22 company.

23          THE COURT:   What do you mean on each company?

24 What --

25          MR. McCOY:   He has a chapter in his book on Union

PDF created with pdfFactory trial version www.pdffactory.com

81

1  Carbide and a chapter on Georgia-Pacific specifically, or a
2  section.

3           THE COURT:  In which he says what?

4           MR. McCOY:  Talks about the documents that those
5  companies had that would go into what their knowledge was.

6           THE COURT:  How does he know what they had?

7           MR. McCOY:  Because he's been studying this for --
8  since sometime in the 1970s, I think.  I mean, he wrote his
9  Ph.D. thesis and so on, his Master's on these things.

10          THE COURT:  But on what they actually had?

11          MR. McCOY:  Yes.

12          MR. BULGER:  Your Honor --

13          MR. HEBRANK:  No.

14          MR. BULGER:  If I could, your Honor, I'd like to go
15  back a few days prior to today, when we did -- the topic of
16  Dr. Castleman first came up; and I'd like to read you what
17  Mr. McCoy represented was that he would only testify regarding
18  the general state of the scientific knowledge, and that he
19  wouldn't connect anything in the general scientific community
20  to either defendant.

21          THE COURT:  Yeah, actually, that's true.

22          MR. BULGER:  And the ruling that you gave on the
23  motion to bar Dr. Castleman relied -- refers back to the
24  representations that were made.

25          If Dr. Castleman is intending to offer

PDF created with pdfFactory trial version www.pdffactory.com

82

1  company-specific testimony, that changes -- it changes the

2  dynamic entirely, and we'd like to be reheard on it; but we

3  think it's entirely inappropriate, and it's in direct

4  contravention to what Mr. McCoy represented to the Court.

5          MR. McCOY:  What I said was he would not give

6  testimony that Georgia-Pacific knew or should have known about

7  some specific asbestos hazard.  Certainly, we will talk about,

8  as we disclosed, what's in his book chapter as to what these

9  companies had -- had in their files.

10          THE COURT:  How does he know that?

11          MR. McCOY:  Because of his research into this -- into

12  this field; and oftentimes, he was even party to some of the

13  document productions in asbestos that were done, but --

14          MR. HEBRANK:  Mr. McCoy has cited deposition

15  transcript from our company representatives that have discussed

16  these documents.  These documents are going to be admitted into

17  evidence.  These documents speak for themselves.

18          To have Dr. Castleman -- which I think is opining

19  about what these documents are and whether we had them and what

20  they should have meant is totally inappropriate and beyond what

21  Mr. McCoy told us was going to happen.

22          MR. DRUMKE:  It was the subject of the motion.

23          THE COURT:  It does sound different than what I

24  understood it to be.

25          MR. McCOY:  Your Honor, I'm happy --

83

1          THE COURT:  I understood it that he was going to
2  say -- say, I guess, really the point in time would probably be
3  1975 or earlier, this is what was known out there generally.
4  This is what was in the literature.  This is what -- and I
5  thought on that that he probably had the qualifications and
6  experience and all that to testify to that, rather than trying
7  to bring in each person to say -- I mean, I don't know how you
8  would otherwise do it.  That seemed like it was just a -- sort
9  of an historical summary.

10          Now it does sound like you're talking about him
11 testifying to something different.

12          MR. McCOY:  Well, he's always been disclosed to --
13 that's what I had him testify to before as recently as a month
14 ago is what's in his book chapters on a specific defendant.
15 But, I mean, that's always been part of what he's been
16 disclosed to talk, as well as --

17          THE COURT:  Well, what did you mean the other day
18 when you told me -- you know, I was focusing on what I thought
19 was their particular objection, which was that something had
20 not been disclosed in his report in this case; and as I read
21 what you had responded, I thought maybe we don't have an issue
22 here because he wasn't going to testify to anything particular
23 about either of these defendants.  And my understanding was
24 that you said that's correct.  And so with that, I said he
25 could go ahead and testify.

PDF created with pdfFactory trial version www.pdffactory.com

84

1          MR. McCOY:   I said he would not give opinions about

2     what these companies knew or should have known, but as far

3     as -- as far as talking about what they had in the way of

4     documents, I mean, somebody's got to run through some of these

5     company documents from the plaintiff's end and -- in some short

6     order to make it a little more clearer to the jury, and

7     that's --

8          THE COURT:   Okay.   Are you saying -- I really -- are

9     you saying in the way that really a paralegal could say, I

10    suppose, "Okay.   This was produced by this company, and,

11    therefore, we know it had it"?

12         MR. BULGER:   But your Honor can rule on the

13    objections to the documents.   We don't need him for that.

14         MR. HEBRANK:   They want to short-circuit the actual

15    evidence.   They don't want to show the documents.   They don't

16    want to take the time to show the documents.   They don't want

17    to give the jury the time to read the documents.   They want a

18    witness to get up and do shorthand about what these documents

19    are and what they meant, and he indicated that he would not do

20    that.

21         MR. McCOY:   I did not say that.

22         MR. BULGER:   Your Honor, I can quote Mr. McCoy.   He

23    said, "He was going to give a synopsis of what counts as far as

24    what information was available from a public health perspective

25    that a company could have looked at; but as far as him saying,

1 'It's my opinion that Georgia-Pacific should have known,' he
2 isn't going to say that. He's going to say, 'This is what the
3 public health field, which I'm part of, was aware of.' But
4 he's not going to talk about, 'Georgia-Pacific or Union
5 Carbide, in my opinion, knew this or knew that.' He's
6 absolutely not going to say that in my examination of him"

7 And that's exactly what he's saying. By saying,
8 "What's in your files? What's in your documents? What's in
9 your repositories," that is exactly what he is trying to
10 accomplish, and it's 180 degrees from what we heard in court.

11 THE COURT: I agree.

12 MR. McCOY: Judge, I mean, if people understood it
13 that way, here's how I view Dr. Castleman's testimony. Okay?
14 And things are taken somewhat out of context.

15 He's certainly disclosed to talk about everything
16 that's in his book, and he'll talk about what's in his book.
17 That's documents specific to these companies. As far as
18 rendering a general opinion as to these companies knew or
19 should have known about the health hazards of asbestos as of a
20 particular date and time, the answer is no, he won't do that as
21 to these companies.

22 All he will state from an opinion perspective is that
23 these -- this is what was known in the public health policy
24 field, which is his field of expertise. But that's -- the
25 question of the opinions that he will give as distinct from the

PDF created with pdfFactory trial version www.pdffactory.com

1 factual information about documents that these companies have,

2 those are -- those are two different things.

3        THE COURT:  I agree, those are two different things;

4 and I'm not understanding what -- really not understanding how

5 he would know what they had in their file and how he's -- that

6 really doesn't have to do with expertise, but how he would

7 be -- how does he know that?

8        MR. McCOY:  Okay.  I mean, I guess --

9        THE COURT:  What are you saying?  Give me an example.

10 He's going to -- he -- you would have him say -- just give me

11 something from his book --

12        MR. McCOY:  All right.

13        THE COURT:  -- I guess, if that's what you expect.

14        MR. McCOY:  Let me get the book.  Here's an example.

15 Here's pages from his books on Union Carbide, page 565 of his

16 book.  So, I'll show this to your Honor now to give you an

17 example.

18        He talks about some background on the company there,

19 and then if you go to the next page, he cites some references

20 about the company; and it's some of those references that I was

21 going to have him to discuss in this case.

22        THE COURT:  We'll give me -- just go through a couple

23 of your questions.  I mean, how on Earth would he be able -- I

24 mean, this is essentially -- this part's hearsay, anyway, and

25 okay, an expert can testify as to hearsay, but --

87

1          MR. McCOY:   This is state of the art, Judge.

2          THE COURT:   But this is fact.   This isn't as to
3  whether some Carbide occupational health specialist walked a
4  few blocks up Park Avenue from corporate headquarters to attend
5  the New York Academy of Sciences' conference on asbestos.

6          MR. McCOY:   He won't state --

7          THE COURT:   Following that, Union Carbide's New York
8  headquarters drafted an asbestos toxicology report.

9          I don't know what -- I'm really at a loss to
10  understand what you're going to be asking him or what he would
11  be testifying to in terms of fact.

12          MR. McCOY:   All right.   First off, he testifies to --
13  when you talk about most of this, it's notice, what the
14  companies had notice of, so --

15          MR. BULGER   But that's in the documents.

16          MR. McCOY:   We're not offering it for the truth of
17  the matter asserted, most of his -- a lot of his testimony, the
18  testimony about these company documents are not being offered
19  for that.

20          If the document itself is inadmissible for some
21  reason, then I'm not going to have him talk about it.   I mean,
22  the underlying document itself has to be admissible, which is
23  why I had given these to the --

24          THE COURT:   All right.   Well, whatever reports they
25  have in their files, I assume someone can testify to.

88

1          MR. BULGER:   Not him. Those are documents that can
2  be admitted and reviewed by the jury.
3          THE COURT:   Well, somebody --
4          MR. BULGER:   That's not --
5          THE COURT:   -- but it's probably not him, can
6  testify --
7          MR. BULGER:   It's hard to understand --
8          MR. McCOY:   It's what we call state of the art in
9  these cases.   In all cases -- I mean, both sides have these
10 witnesses who go through and who take specific company
11 documents or literature, just like we've seen, except -- in the
12 opening statements, except they will have a witness who
13 actually does this who's familiar with it or who's got the
14 understanding of it because they're in one of these fields of
15 industrial hygiene or some of them just have historians.   But
16 Dr. Castleman is in public health.
17          So they just go through, and they testify to a
18 summary of what information on sort of a time line basis was
19 available.   And again, it's subject to all the things your
20 Honor said.   If there's some underlying problem with that
21 document that is so objectionable that it can't -- that the
22 jury can't consider that information, yeah, I mean, that's why
23 we provide in advance what we expect him to use in this case.
24          But other than that, he's -- he's just guiding the
25 jury through what would otherwise be a mass of evidence that

PDF created with pdfFactory trial version www.pdffactory.com

89

1 would be stacked up very, very high and would take forever for

2 a jury to assess. And if they want -- they have their own

3 state of the art witnesses, the defendants, who can

4 characterize it in the way they want to.

5 In most of these documents, there's a paragraph or

6 two or three that the plaintiffs rely on and a paragraph or two

7 or three that the defendants point to. It's almost inevitably

8 that way.

9 MR. BULGER: Not through expert testimony.

10 MR. McCOY: We didn't -- you know, he's testifying to

11 state of the art in the sense that, you know, again, it's

12 primarily notice-driven, that part of his testimony. And I

13 certainly see everybody here having witnesses designated in

14 their witness list who are state of the art witnesses just like

15 Mr. -- Dr. Castleman is. It's the same on both sides.

16 THE COURT: I'm just not understanding what it is

17 he's going to testify to.

18 MR. McCOY: He's going to testify, Judge, that at

19 such-and-such a point in time, Union Carbide had a memorandum

20 that said this, which was written by their medical director.

21 And he's going to testify that at some point in time, the

22 public -- within the public policy -- I'm sorry, the public

23 health field, that there was this information available about

24 asbestos hazards.

25 He's going to testify that this information was

90

1  available about the hazards known to bystanders in the public

2  health field. He's going to testify that Union Carbide

3  received a document that provided this information to it. He's

4  going to testify -- and he's going to go through this for --

5  for -- on an historical --

6          THE COURT: Okay. Well, let me ask how he -- I don't

7  know if you're going to -- if you're disputing that there --

8  whatever the medical director -- I think, actually, you put up

9  some of that today that you were intending to introduce. So, I

10  mean, do we have documents that are not -- that are agreed that

11  they're in evidence?

12          MR. HEBRANK: Well, the question may not be about the

13  documents, although we're still getting documents as we speak.

14          THE COURT: Okay.

15          MR. HEBRANK: But the question is the editorializing.

16  What does Dr. Castleman intend to say about documents that he

17  has no firsthand knowledge of, that he got through lawyers,

18  that he, you know, doesn't have firsthand information about,

19  and that they've already represented that they weren't going to

20  talk about?

21          MR. BULGER: It's hard to understand how you could

22  say, "This is what somebody knew," and then at the same time

23  say, "I'm absolutely not going to have testimony, offer

24  testimony about what they knew." The two are irreconcilable.

25          THE COURT: Well, it -- most -- if you're saying

91

1  Union Carbide's medical director, this -- it's undisputed that
2  he wrote a memo saying such-and-such, I don't know that we have
3  an argument about that.  You can't --

4           MR. BULGER:  In that case, what is his role?  In that
5  case, he -- the document is the document, and it's the jury's
6  role --

7           THE COURT:  Okay.  I'm trying to get beyond that.

8           MR. BULGER:  Okay.

9           THE COURT:  Now, one problem I have is if you're
10  saying, "Well, this was given to Union Carbide."  I don't know
11  how on Earth he could testify to that.

12          MR. McCOY:  Unless he's got actual knowledge of that,
13  I'm not going to say that; or unless it's from the -- he can
14  say -- point out what's on the face of the document, but he
15  won't come in there and say something that he doesn't know
16  himself.  That's for sure.

17          THE COURT:  Well, I don't know how he would know it.
18  He didn't work there.

19          MR. McCOY:  Sometimes on some of these productions of
20  documents, especially through trade associations, I mean he has
21  knowledge of where exactly they came from, some of them.

22          MR. HEBRANK:  He is only a researcher, Judge.  He has
23  not worked for any trade organization.  He has not worked for
24  any company.  He has not worked for OSHA.  He is only a
25  researcher.  He is just gathering information from whatever

92

1   source he can get it from

2           Now, we're probably going to stipulate, as I'm sure
3   Union Carbide, to a number of our documents, but then the jury
4   gets the documents.   We don't need Dr. Castleman to talk about
5   it.

6           MR. McCOY:   That's part of his purpose is to talk
7   about those documents that are otherwise agreed to.   It's
8   important for us --

9           THE COURT:   To talk about them how?

10          MR. McCOY:   Well, to explain on a time line basis
11  what information that they had and to compare that also to what
12  was available in the public --

13          THE COURT:   I mean, if he is going to say, "In 1966,
14  there were -- in the literature is documented by this, this,
15  and this, this information about asbestos," I think he can
16  testify to what was in the literature.   Now, what that means, I
17  don't know.   If they say -- if they cross-examine him and say,
18  "Well, it was in some obscure library in Italy," I don't know
19  that that means it was widely disseminated.

20          But if -- I understood that what he -- his expertise
21  was that he really knew -- that he had a basis for knowing what
22  was widely known, and he doesn't.

23          MR. McCOY:   It may help to understand.   Part of his
24  testimony is to compare, "Here's what was known in the public
25  health field," which he can talk about, because that's his

PDF created with pdfFactory trial version www.pdffactory.com

1  field. "Here's what was in the Union Carbide document." And
2  from there -- he's setting up a time line. From there, you
3  know, we, as attorneys, will be arguing, you know, Union
4  Carbide didn't put in their document, which they claim they
5  sent to G-P as a warning, all the information that was known in
6  the public health policy field.

7             I mean, he's helping to create that time line picture
8  from which, you know, the attorneys are going to be the ones to
9  argue. He's not going to be saying, "Well, it's my opinion
10 that Union Carbide did not disclose all the risks because of
11 this." That was what I was trying -- that was what I was
12 saying the other day. He's not giving those kinds of opinions.
13 That -- that is what I understood about --

14             MR. DRUKE: Your Honor, that --

15             MR. McCOY: But he is -- he is painting, as state of
16 the art experts do, this time line picture of a combination of
17 what literature in their field reveals plus what is in a
18 company document at the same time so that the jury can see that
19 laid out on a time line basis.

20             MR. DRUKE: That's closing argument, your Honor.

21             MR. McCOY: He's not arguing anything from it, Judge.
22 He's just laying it out so factually this can be displayed.

23             THE COURT: Well, if you're saying --

24             MR. DRUKE: It's an appropriate subject for closing
25 argument, your Honor. When Mr. McCoy --

PDF created with pdfFactory trial version www.pdffactory.com

94

1          Let me finish, Bob.   I gave you that courtesy.

2          When Mr. McCoy stands up and says, "Here's what was

3 received by one company or another.   This is what was in the

4 medical literature."   And you can draw that time line.   The

5 attorney can draw that time line.   You don't need an expert to

6 do that.   You don't need an expert to lay things out end to end

7 to end.   He can do that, and he will do that in his closing

8 argument, I assume.

9          MR. McCOY:   I could have done in it my opening, too,

10 except I've got witnesses who do that, like Dr. Castleman.

11 That's the whole point.

12          THE COURT:   Well, it does sound like from your

13 opening statements that you people intend to have your experts

14 testify as to the same thing.

15          MR. DRUMKE:   To the same in terms of --

16          THE COURT:   Well, different conclusions, but as to

17 what was known and what wasn't known.

18          MR. DRUMKE:   What was known, but what was known in

19 the medical literature, that's different.   It's not

20 comparing -- it's not drawing inferences from company documents

21 and saying, "This is -- the company should have known or the

22 company did know or the company got this medical literature."

23          MR. BULGER:   There would be no --

24          THE COURT:   It seems to me --

25          MR. HEBRANK:   Our opening, your Honor, with all due

95

1  respect, was in reliance on what Mr. McCoy told you and you
2  ruled.  So, I knew Dr. Castleman was coming tomorrow, and I
3  knew what he was going to address on the general public
4  knowledge; and those are the only things that I addressed in my
5  opening statement, which was to rebut what I thought was
6  coming, and now there's apparently a lot more coming.
7         THE COURT:  If you're saying that he'd say based on
8  the fact that, you know, that there were all of these articles
9  out there or something that -- which really isn't saying the
10 truth of it, but saying there's all of these articles out there
11 that said this disease was caused by -- or it looks like this
12 disease is really caused by this, and there's -- and then
13 you're saying, okay, and if you look at a disclosed Union
14 Carbide exhibit, and even though this all was out there, this
15 is what was disclosed -- I don't know.  I'm not sure what the
16 point is, but why would you even do that unless you're then
17 asking him for -- so, you're going to then have him say they
18 didn't -- they didn't disclose what was in there?
19        MR. McCOY:  No, he's not going to draw that last --
20 that last conclusion, he's not going to be drawing that.  He's
21 going to just simply be saying, "Here's what the public health
22 field had in the way of information.  Here's what Union Carbide
23 wrote in its memorandum that it provided to Georgia-Pacific,"
24 or whatever.
25        THE COURT:  What would you be saying about

96

1 Georgia-Pacific?

2           MR. McCOY:   Same kinds of things.   "Here's what
3 Georgia-Pacific concluded as to its product's safety.   Here's a
4 memorandum of it.   Here's the public health information that
5 was available at the same time."

6           He's not going to be saying -- he's not going to be
7 drawing that last step of Georgia-Pacific was wrong or they
8 lied or they conspired.   I mean, that -- he's not doing that.
9 He's just simply setting up this -- it's mostly like a time
10 line comparison between the public health information and
11 specific company documents, because he is so intimately
12 familiar with these company documents.   That's what we mean by
13 a state of the art witness.

14           THE COURT:   Well, I sure didn't understand you were
15 going to testify anything really about these two companies, and
16 the issue, as I understood it, was what had been disclosed in
17 his opinion.

18           MR. McCOY:   Well, he's certainly been disclosed to
19 talk about everything in his book, and all of those documents
20 were on the exhibit list that we submitted, all the documents
21 that he has, both.   I can show that to your Honor.
22 Specifically, he's disclosed as to his book.

23           MR. HEBRANK:   We objected in total because what --
24 what I think shouldn't happen -- and your Honor has ruled
25 differently, and I understand that, but just to go back, is

1  that they say certain things existed in the medical and

2  scientific literature that should have put us on notice.  Those

3  documents should then be the evidence.  The jury should see

4  those documents.

5         THE COURT:  Well, yeah, but I mean, I think there's

6  plenty of courts have said, "Gee, that would be just too

7  consuming, and there's no reason why you can't have somebody

8  say it."

9         MR. HEBRANK:  And your Honor has said that this is a

10  way of saying that.  But now we're taking it two steps removed.

11  We're not only not going to show them the document.  We're now

12  going to allow Dr. Castleman to talk about this state of the

13  art of public health, and now we're going to let him talk about

14  our documents, which is a third hearsay reliability problem

15         THE COURT:  Yeah, I really didn't understand he was

16  going to talk about documents of either of these companies.

17  I'm going to have to go back and look at this, then, the

18  motion, because I didn't understand that.  My understanding was

19  they were saying --

20         MR. BULGER:  Your Honor, if it's helpful --

21         THE COURT:  They didn't -- that wasn't stated in his

22  opinion, and I don't think it's an opinion to say he's going to

23  testify to anything in his book, at least not ordinarily.

24         MR. McCOY:  Not an opinion.  I mean, we do have it

25  disclosed specifically in our -- in the Illinois disclosures

PDF created with pdfFactory trial version www.pdffactory.com

98

1 that we filed in state court.

2 THE COURT: All right. I'm going to have to go back

3 and look at this.

4 MR. McCOY: You know, Judge, I mean, I'll provide

5 that to you here, but --

6 THE COURT: Well, I assume I have it.

7 MR. McCOY: I don't think you have -- I don't think

8 you necessarily have the Illinois disclosures. You may not

9 have that, because we didn't do any -- on our federal, all we

10 did was disclose the names of our witnesses.

11 THE COURT: No. We're talking about the Illinois

12 disclosures. That's what they were contesting is you hadn't

13 said that he was going to say anything about these companies.

14 MR. BULGER It would be improper. This is just a

15 transcript of the argument from before.

16 THE COURT: I know, but I think I know what was said.

17 MR. GUTIERREZ: We'll get you the (f)(3) disclosure,

18 your Honor.

19 THE COURT: In the next half an hour or so?

20 MR. McCOY: The -- I thought I had seen the document.

21 It might be right here, Judge. I think I've got it.

22 So, this is it. Okay. Here it is, Judge. Borrowing

23 Georgia-Pacific's motion in limine on Dr. Longo, which attaches

24 our state court disclosures.

25 THE COURT: Yeah, I actually thought I did see that.

PDF created with pdfFactory trial version www.pdffactory.com

99

1 As I said, I thought there wasn't an issue. I cut it off. I
2 think I have it back there.

3          MR. McCOY:  It's on page 10 of that disclosure, and
4 specifically, it's item No. 15. The way Illinois breaks out
5 its disclosures, it's just subject matters required. It says,
6 "Matters discussed in the latest addition of his book,
7 *Asbestos: Medical and Legal Aspects About Asbestos*, as to
8 specific defendants and trade organizations to which they
9 belonged." So, that's --

10          MR. HEBRANK:  Our motion has never been a disclosure
11 motion, your Honor. It is what expertise does this witness
12 have and what can he bring in to this courtroom that would
13 assist this trier of fact? Mr. McCoy told your Honor what he
14 was going to do, and your Honor ruled. And now Mr. McCoy's
15 trying to expand what he could do. And we didn't even get into
16 the propriety of having this witness discuss our company
17 documents without giving them to the jury.

18          MR. McCOY:  What do you mean, without giving them to
19 the jury?

20          MR. HEBRANK:  The jury should get the documents. The
21 documents speak for themselves. There's no reason why an
22 expert should editorialize about what we knew or should have
23 known. If he's not going to do that, which you said he is not,
24 then he serves no purpose to discuss the document.

25          MR. McCOY:  But what I said -- and I didn't say

PDF created with pdfFactory trial version www.pdffactory.com

100

1  anything about giving them to the jury, your Honor.  Certainly,
2  the jury is welcome to have them.  They can have them while
3  Dr. Castleman's talking about it, as far as I'm concerned.

4          But his purpose is to guide the jury through what's
5  in these documents as far as what the defendants are getting in
6  the way of information or providing --

7          THE COURT:  Okay.  But this is not what you said.
8  You said, "He is going to give a synopsis of what" -- I'm not
9  sure what this meant -- "counts as far as what information was
10 available from a public health perspective that a company could
11 have looked at."  And then you said, "But as far as him saying,
12 'It's my opinion that Georgia-Pacific should have known,' he
13 isn't going to say that.  He'll just say, 'This is what the
14 public health field, which I'm part of, was aware of.'  But
15 he's not going to say, 'Georgia-Pacific or Union Carbide, in my
16 opinion, knew this or knew that.'  He's absolutely not going to
17 say that in my examination of him"

18         And that's why I said it's okay.  And that is not
19 what you're saying now, and I am going to limit you to what I
20 ruled on and what you said, so he is not going to say that.

21         MR. McCOY:  Judge, I think that's out of context,
22 because that's certainly not what I meant.  I mean, I was
23 referencing what I recently had him testify to in my cases.  I
24 can show you the last case he testified in.

25         THE COURT:  I can't help that.  I was dealing with a

101

1   particular motion and the argument on it.

2                MR. McCOY:   What page are we on, Judge?

3                THE COURT:   It's 49, 50 of the transcript.

4                MR. BULGER:   He's not talking about what he testified

5   to in the past.   He's talking about another portion of the

6   transcript as to what he's going to be offered to testify about

7   in this case.

8                THE COURT:   Well, while you're looking at that, I'm

9   going to run and get my copy of the motion so I don't have to

10  read it online.

11               MR. DRUMKE:   We have a copy, your Honor.   Do you want

12  ours?

13               THE COURT:   All right.

14        (Short interruption.)

15               THE COURT:   Which motion was it?

16               MR. BULGER:   I think it's Georgia-Pacific's No. 25.

17               THE COURT:   All right.   I looked back at your

18  response.   What I ruled on, what I understood that was going to

19  be his testimony, and what his testimony is going to be limited

20  to is state of the art generally at any given time.   He may not

21  talk about what these two defendants knew or supposedly knew.

22               I mean, he can talk about this is what -- this is

23  what, you know, a company of -- I mean, I suppose if you're

24  talking about state of the art, we're not talking about what

25  the person on the street should have known, but we're talking

PDF created with pdfFactory trial version www.pdffactory.com

102

1  about people versed in -- and who should be caring about

2  asbestos would have known, I guess, or what the medical state

3  of the art is.

4          But you didn't say -- I mean, the cases that had --

5  that you cited that had talked about what he'd been allowed to

6  testify to and what you said in your motion were that he was

7  going to talk about, you know, looking at the literature, this

8  is what the state of the art was.

9          MR. McCOY:  Judge, I'm -- I didn't even understand

10  there was an objection to the company documents and him

11  mentioning that these are the company documents.  I mean, we

12  disclosed him on that book, but the motion clearly says and

13  what I was responding to was opinions about those documents,

14  not the fact that there was a document written, and this is

15  what it said.

16          See, that -- that's what I mean when I say if

17  somebody's misinterpreting, I understand these -- this motion

18  to have been directed at opinions, which is what it says.  And

19  the fact that the company has a memo and this is what it says

20  was not something that I had thought or ever think to be an

21  opinion.

22          So, I mean, that -- in that sense, Judge, I'm -- he

23  was our witness to talk about these company -- put these

24  company documents in some kind of a time line.  That was his

25  main purpose for us, in addition to something about the general

PDF created with pdfFactory trial version www.pdffactory.com

103

1    medical literature and those kinds of things.

2           But as I say, when I responded to this motion, which
3    challenges his ability to render opinions, I was never
4    thinking -- and I still don't think that he gives opinions when
5    he says, "This is a document.  This is what -- that the company
6    had, and this is what was in the document."  That's just not an
7    opinion.  And that's why I say, when I was responding to what I
8    said at that time, I was thinking about an opinion as to the
9    document, rather than the fact of what is in the document.

10          I mean, that's -- so, you know, if I miscommunicated,
11   I did; but what I -- this motion is clearly directed to him
12   rendering opinions.  He's just -- when he's talking about the
13   company documents, putting it in a time line context, that's
14   just state of the art as to the fact of the document.  And it
15   just -- the purpose of that is to make it --

16          THE COURT:  I can agree that maybe that doesn't -- if
17   it's saying, "The company had this.  The company had that," but
18   that's not an expert opinion.  On the other hand, what is the
19   foundation for him being able to say, "The company had this
20   document.  The company had that document"?

21          MR. McCOY:  Okay.  Judge, if I were to put aside the
22   foundation and just -- he just says -- and there's not a
23   dispute on that document.  He just says, you know, "This is the
24   Union Carbide medical director's memorandum at that point in
25   time," assuming the document's not disputed, that's what I

PDF created with pdfFactory trial version www.pdffactory.com

104

1  would have him do.  That's --

2           THE COURT:  And then what?

3           MR. McCOY:  And then this next -- his next testimony

4  might be, "Here's what's in the public policy literature at the

5  same point in time."

6           THE COURT:  But you're not going to ask him to

7  interpret the document?

8           MR. McCOY:  No, absolutely not, Judge.  And that's

9  what I mean when I say not giving opinions about --

10          THE COURT:  So, you're just going to say, "Here is

11  document 110," which they have agreed is in evidence.  I will

12  say you can't, I think -- I think that the law is that you

13  can't really say -- dispute foundation and say this isn't

14  admissible, and then turn around and put it in in your own

15  case.

16          MR. BULGER:  I think the problem is that it's

17  automatically interpretive and suggestive and implying opinion.

18  That's the whole basis on which he's trying to slip this in.

19          THE COURT:  But he's said nothing whatsoever about

20  the document.

21          MR. BULGER:  But then the question again is why?  Why

22  is he here?  The jury -- that's the jury's job.  It's

23  Mr. McCoy's job to take the documents that we have, to fit that

24  in -- himself into the context of the general public state of

25  the art that Dr. Castleman was offered to testify about, and to

1  connect it up for the jury and for them to resolve that.

2  But he doesn't offer anything different.  The

3  documents, as Mr. Hebrank said, speak for themselves.

4  THE COURT:  Well, I'm not sure what the point is if

5  he isn't going to interpret.

6  MR. McCOY:  The point is --

7  THE COURT:  You've got the document.  You could

8  say -- okay.  He has testified that the general -- that this

9  was the state of the art.

10  MR. BULGER:  Exactly.

11  THE COURT:  And look at this document that was --

12  they sent out to Georgia-Pacific in 1968 and decide does this

13  meet the state of the art, or if the state of the art said

14  causes cancer and they just said -- and you have documents --

15  which I take it that you -- I mean, there are some of those

16  which are saying they were trying to keep people from knowing

17  that it caused cancer, if that's the case.  Decide for

18  yourself, jury.

19  MR. McCOY:  That's what ultimately his testimony

20  leaves is it's up to the jury to make the decisions, but he's

21  just giving them the time line so they can see, you know,

22  here's state of the art for the public health policy field,

23  public health field.  Here's the Union Carbide statement at

24  that point in time.  I mean, he's laying that out.

25  And we also had in this case interesting -- the

PDF created with pdfFactory trial version www.pdffactory.com

106

1  interesting phenomenon here where Union Carbide is saying, "We
2  told Georgia-Pacific everything." So, I mean, the picture of
3  these things in a time line context that he presents is
4  important for the jury to see it so they can start thinking
5  about things in that way.
6          MS. FINNEGAN:  It sounds like a closing argument by
7  an expert on the stand is what it sounds like to me.
8          MR. McCOY:  Nobody's making any closing arguments.
9  That's what I keep trying to get across here.  He's just
10 saying, "Okay.  Here's the public health state of the art at
11 this time.  Here's the Union Carbide document."
12         THE COURT:  So, you would hand him a Union Carbide
13 document, and you would just say, "And what is the date of
14 this?"
15         MR. McCOY:  Right.
16         MR. BULGER:  It sounds like he's --
17         MR. McCOY:  I would say what document -- I would
18 probably ask the question, "Was there any documents that Union
19 Carbide generated at that point in time on this -- on this
20 area?"
21         MR. BULGER:  But that --
22         MR. McCOY:  And he would just say, "Yeah, there's
23 one.  Here's what it said," and then that's the end of it.  But
24 see, that gives the framework --
25         THE COURT:  You would just have him read it?

107

1          MR. McCOY:   Yeah.   Or --

2          MR. HEBRANK:   He gets to publish --

3          MR. McCOY:   Or I'll highlight it, and show it if they

4  don't want me reading it.

5          MS. FINNEGAN:   So, he's, like, offered as the expert

6  on Union Carbide documents.   Here's the only one on this and on

7  that, and let's juxtapose it to --

8          MR. McCOY:   That's cross-examination, Judge.   They

9  can bring out anything else they want about Union Carbide

10 documents, but he's not sitting there saying this is the only

11 Union Carbide document.   He's just saying, "Here's one example.

12 Here's one," and that's it.

13         MR. BULGER:   It seems like the problem we have is

14 that Mr. McCoy wants to call this something other than what it

15 is, which is he's trying to do what he said he wasn't going to

16 do.   He's going to try and connect the public state of the art

17 to these particular companies and then to step into the role of

18 lawyer or juror, and it's -- it's not an appropriate role for

19 him

20         THE COURT:   Well, I certainly don't think under --

21 that he -- just based on what you've represented, so I haven't

22 even gotten beyond that, that he can be interpreting what a

23 Union Carbide document said.

24         MR. McCOY:   Right.   He's not.

25         MR. BULGER:   It's automatically that.

PDF created with pdfFactory trial version www.pdffactory.com

108

1          MR. HEBRANK:   The fact that he even selects the
2  document is an opinion.   The fact that he says, "This document
3  pertains to this piece of state of the art," is, by the
4  selection --
5          THE COURT:   I don't think he can say that.
6          MR. HEBRANK:   But, I mean, by selecting that document
7  to make an issue of --
8          MR. BULGER:   By dropping it in --
9          MR. HEBRANK:   -- he's connected the dots, and that's
10  the opinion.   That's the problem.
11          MR. BULGER:   And we have the additional problem, as
12  Mr. Hebrank alluded to earlier, which is relying on the
13  description that was given for the scope of his testimony, not
14  only in terms of opening argument, but in terms of preparation,
15  the scope of what the cross-examination will be.   It's only,
16  you know, 12 hours, 16 hours away, and this changes the game
17  dramatically.
18          MR. HEBRANK:   On top of the fact that we're getting
19  new exhibits hourly that are not on the exhibit list, which I'm
20  trying to get from Edwardsville and from Mike's office.   We're
21  trying to gather these documents.   It's very prejudicial.
22          MR. McCOY:   They're all on an exhibit list, every one
23  of them.   Okay?   And I can show you where it's at, you know, if
24  you want me to.
25          MR. HEBRANK:   That's not what I'm being told.   I'm

PDF created with pdfFactory trial version www.pdffactory.com

1  just getting them today, Bob, so I'm just telling you what my

2  people are telling me.

3          THE COURT:  What types of documents are you talking

4  about?  That's a mystery to me, too, because you told me you

5  were putting in very few documents.

6          MR. McCOY:  We are putting in very few documents.

7          THE COURT:  Why are these documents --

8          MR. McCOY:  We're talking -- there must be some sales

9  summaries or something that they're referring to, but the

10  numbers of documents that are being put in this case, I guess

11  there will be some sales records and so on, but they're just

12  not -- there's not that many.  So, I don't know what -- what

13  ones he's saying aren't on an exhibit list, but they all are.

14          MR. BULGER:  It's hard for us to know what not that

15  many means.  That's just --

16          MS. FINNEGAN:  Well, it's in his book.

17          MR. BULGER:  He keeps trying to leave some wiggle

18  room to try and expand or modify what's going to happen.

19          MR. McCOY:  Okay.  I mean, most firms, on their

20  exhibit list for Union Carbide or Georgia-Pacific, have several

21  thousand documents.  So, when you talk about what counts for a

22  given trial, you can go in, and you can provide, you know,

23  several thousand documents, and you provided every single one.

24          We gave them the list of those several thousand

25  documents.  Separately from that, for this case, we selected --

PDF created with pdfFactory trial version www.pdffactory.com

110

1          THE COURT:   The reason you didn't go over them--

2          MR. McCOY:   Right.   We selected a small number.   We

3    gave them specific numbers in this case as the ones most likely

4    to be used.   Then there was a couple more that we've -- that

5    we've taken off the big list and added -- added to the most

6    likely to be used list.   It doesn't mean we're going to use

7    them, but it just means that -- that they're there for their

8    purposes.

9          What's actually going to the jury is obviously a very

10   small number.

11          THE COURT:   All right.   So, tomorrow, who's the first

12   witness?

13          MR. BULGER:   Dr. Castleman.

14          MR. McCOY:   I don't know that he's the first witness.

15   I think --

16          MR. BULGER:   I think you've identified him as such.

17          MR. McCOY:   I don't think we said in any order.

18          MR. BULGER:   I think you did.

19          MR. McCOY:   We gave you our disclosure of what

20   witnesses we expect to testify.   Nobody said they're in any

21   particular order.

22          MR. BULGER:   Okay.

23          THE COURT:   Okay.

24          MR. McCOY:   So, Dr. Castleman is disclosed for

25   tomorrow and probably -- yeah, Danny Moore is disclosed also.

111

1  So, I think we're going to probably start with Danny Moore.

2  　　　　THE COURT:  All right.  Are you intending to

3  introduce any exhibits through Danny Moore, whoever he is?

4  　　　　MR. McCOY:  He's got some photos of products that he

5  had marked -- that were marked at his deposition.  He'll

6  probably use -- we'll show this drywall sanding tool.  He'll

7  show that because that was his job, part of it.

8  　　　　I have -- I don't know if we're going to need to use

9  it or not, but -- they've objected to it, but we have a -- I

10  can't pick it up.  This is a 62-pound pail -- this is the

11  asbestos-free Georgia-Pacific product that's in today's stores.

12  We may use that, unless there's an objection.

13  　　　　MR. DRUMKE:  There is.

14  　　　　MR. McCOY:  We'll use this joint tape, Judge.

15  　　　　THE COURT:  There is?

16  　　　　MR. DRUMKE:  What's the relevance of a product being

17  sold now to what happened 35 years ago?  I don't understand.  I

18  don't understand what the foundation is for this witness to

19  talk about what's available in stores today.  He's supposed to

20  be a fact witness about what Mr. Deyerler was exposed to.

21  That's the only reason he needs to be here.

22  　　　　MR. McCOY:  It's only for demonstrative purposes.

23  That's what it looked like.

24  　　　　THE COURT:  Yeah, that's okay.  That's all it is.

25  But my problem is, I don't want to say something is okay and

PDF created with pdfFactory trial version www.pdffactory.com

112

1 then it's suddenly used for a different purpose.

2          MR. McCOY:   I'm very cautious all of a sudden to make
3 sure I'm choosing every word real careful here.

4          MR. BULGER:   There's a very great risk if he says
5 it's asbestos-free, then it's very suggestive of if they have
6 it now, certinaly, they could have done it at any time.   I
7 mean, I think that's a very heavy implication.

8          MR. McCOY:   He's not saying that.

9          MR. BULGER:   But what's likely to happen is Mr. McCoy
10 will hold it up and say, "This is asbestos-free.   Don't worry."

11          THE COURT:   Yes?

12          MR. BULGER:   And then that's an implication that goes
13 into their claim about whether they could have done something
14 different back in time.

15          THE COURT:   Well, just tell me, why couldn't they
16 have?

17          MR. DRUMKE:   Why couldn't they have, your Honor?
18 There were technical problems, and there are witnesses that
19 will talk about it.

20          THE COURT:   What does the asbestos do?   What does it
21 add to the product?

22          MR. DRUMKE:   The asbestos, at the time it was used,
23 was used to retain water -- to help retain water to make the
24 product more workable.   The evidence will be that there were
25 two different types of joint compound.   One was dry mix, to

**113**

1 which water was added.  It was easier to take out the asbestos
2 out of that product earlier on in time, and that was, in fact,
3 done.  The ready-mix was more difficult.  The ready-mix came in
4 a can like that.  It was premixed.  There was no water to be
5 added.  You could just scoop it up and apply it straight on the
6 walls.

7             THE COURT:  Right.

8             MR. DRUME:  The problem is, it dried out.  It
9 cracked.  You want your walls to look right.  You want the
10 walls to last.  You don't want to keep coming back and patching
11 them.  There was also complaints from many of the tradesmen
12 that the asbestos-free substitute ready-mix compound wasn't as
13 workable, wasn't as durable, couldn't be used as well; and
14 there was a real resistance to it being used by the trades for
15 a very long time until finally the formulas were worked out so
16 that they were exactly what people wanted to use.

17             THE COURT:  All right.  Well, sure, that's going to
18 come out anyway.  I mean, you've got -- you didn't ask the
19 jurors, I guess, exactly whether they'd ever seen a wall that
20 was being put up or ever lived in a new place or place with a
21 new wall or something, but probably most people have.  I don't
22 know.  I don't know if they have or not.

23             But it's a given that it's not being sold anymore, so
24 they're going to think, "Well why -- why couldn't they do it
25 then?"  I'm sure you're intending to bring it out.

PDF created with pdfFactory trial version www.pdffactory.com

114

1          MR. DRUKE:   Yes, your Honor, we'll bring it out.

2          THE COURT:   Yeah, so, I mean, this -- surely, you've

3    always got more important things to do than argue about whether

4    he could pick up a can and say this is what the can looked

5    like, if he wants to carry it.

6          MR. DRUKE:   I just don't understand what the

7    relevance is, your Honor.   It's a product that was made 35

8    years after the fact.

9          THE COURT:   Really, we'll finish this in a month if

10   we argue about every last little one where it isn't important.

11         MR. DRUKE:   The witnesses and what they're supposed

12   to testify, under Illinois Supreme Court Rules, are -- all of

13   this was supposed to be disclosed.

14         THE COURT:   I didn't understand this was an expert.

15   Who is this, Moore?

16         MR. BULGER:   He's not.

17         MR. DRUKE:   He's not an expert.   He's a fact

18   witness.

19         THE COURT:   That's not an expert's testimony as to

20   what you'd go buy at the store.

21         Okay.   So, you're going to get through him, and then

22   who's testifying?

23         MR. McCOY:   Then Dr. Castleman.

24         THE COURT:   Okay.   And the purpose of this first

25   witness, by the way, is he'll testify about --

PDF created with pdfFactory trial version www.pdffactory.com

115

1          MR. McCOY:   He is -- his purpose is to describe what
2 is done on the drywall work; and also, he was in those
3 buildings, and what was used in those buildings, products, G-P
4 products.   And he worked for LaSalle.
5          THE COURT:   Okay.   So, he's a fact witness --
6          MR. McCOY:   Right.
7          THE COURT:   -- as to -- we'll see where it goes.
8          Okay.   Then Dr. Castleman gets up, and he says the
9 state of the art in such-and-such date, I suppose 1975 or
10 before, was --
11          MR. McCOY:   He'll start early, like my chart, 1940s
12 or earlier.
13          THE COURT:   Okay.   So, that's fine.   I don't have any
14 problem with that.
15          MR. BULGER:   I mean, maybe --
16          THE COURT:   But then you want to bring in -- see, I
17 can't see that you're not going to have him testify -- I don't
18 see what the point is of bringing in either Georgia-Pacific or
19 Union Carbide documents unless you're intending to have him
20 testify that they were not complying with the state of the art.
21          MR. McCOY:   Well, I'm not intending to have him say
22 the latter, but I am intending to have him put it -- put it in
23 a time line so the jury can figure it out for themselves.
24          THE COURT:   So, you would have 1940-some, 1950, 1970,
25 whatever, this was the state of the art.   This was the state of

PDF created with pdfFactory trial version www.pdffactory.com

116

1  the art.  This was the state of the art.  And just identify

2  this is what Union Carbide had at that point in time?

3           MR. McCOY:  Right.  Exactly.

4           THE COURT:  If it's undisputed that they put out

5  something at that point in time and you're absolutely not

6  asking him to interpret it, I don't suppose that there's any

7  problem with fitting it in in a time line, but --

8           MS. FINNEGAN:  Judge, I --

9           THE COURT:  But you can't -- I don't think he -- my

10  understanding is at least he certainly isn't going to interpret

11  one of those documents.

12           MR. McCOY:  Yes, that's right.

13           MS. FINNEGAN:  He's going to --

14           THE COURT:  So, for all we know, it could comply with

15  it?

16           MR. McCOY:  Right.  It's up to the jury to figure it

17  out.

18           MS. FINNEGAN:  He's going to pick out the sentences

19  out of particular documents that he thinks fit with his

20  conclusion of what happened.  He's not going to -- a time line

21  could be just a list of documents on a time line.  He's going

22  to -- he's not going to read the document.  He's going to

23  piecemeal and then tie it in to other things.

24           MR. BULGER:  It's exactly what Mr. Hebrank said.  His

25  selection and inclusion in a time line is his opinion about

PDF created with pdfFactory trial version www.pdffactory.com

1 compliance with the general state of the art.  That's exactly
2 what it does.  That's exactly the inference that the jury would
3 draw.  And really, it's exactly the reason that it's being
4 offered.

5                MR. DRUMKE:  Your Honor, also, if we're waiting
6 for -- if we're expecting that he's going to offer a time line
7 and we're under 24 hours, we haven't seen it.  If it's a
8 demonstrative or Power Point or something that's going to be
9 used, where is it?

10                MR. McCOY:  Well, I have a draft, and I also --
11 that's why we gave you the documents this morning that are --
12 that he might put on it.

13                MR. BULGER:  We've been here all day.

14                MR. McCOY:  Well, we gave them to you earlier today.
15 We did.

16                MR. DRUMKE:  Now we have exhibits in progress, your
17 Honor.  That's where we find ourselves.

18                MR. McCOY:  Well, when he gets here -- I mean, we did
19 this on our last trial, and you guys did it with your
20 witnesses, too.  I get their witnesses' Power Points typically
21 sometime between 11:00 o'clock at night and 10 minutes before
22 they testify from the defendants, Mr. Drumke's firm, and that's
23 been true for case after case.

24                MR. DRUMKE:  That's patently not true, your Honor.

25                MR. McCOY:  So -- so, what I'm saying here is:  We

118

1  give them the documents.   They can review his time line as soon
2  as it's ready after he gets here, because he's getting here,
3  and I'll be meeting with him.  I'll e-mail it to them.  If
4  they've got problems, then I'll fix them, or -- but it's -- the
5  material that's on there, most of it, I've already provided to
6  them.  So, that was done earlier today.
7          MR. BULGER:  He can't really fix the problem with the
8  time line and what he's intending to be offered for unless he
9  only offers general testimony and not something that's
10  company-specific.
11          THE COURT:  So, if he doesn't put in
12  company-specific -- because I don't see what he can do with it.
13  Why can't you just argue that?
14          MR. McCOY:  Judge, because that's -- the timing at
15  which the material is shown to the jury is important here.
16  They have to see it in the context of when the witness's
17  testimony about what was actually in the public health field
18  literature is fresh in their minds to be able to make the
19  comparison.  That's very important in this case.  That's the
20  point.  And if I just --
21          THE COURT:  But what are you going to do?  You're
22  just going to get -- okay.  Assuming that there's no
23  disagreement about a particular document, Union Carbide
24  document being admitted in evidence, so then you're just going
25  to hand up a document to the jury?

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. McCOY:   Or put it up on the screen, and he'll
2  point out -- he'll read the pertinent passages.
3          THE COURT:   I'd like to see an example.
4          MR. HEBRANK:   That's the opinion.
5          MR. BULGER:   That's the opinion.   Your Honor,
6  Mr. McCoy says, "Well, in cases, people do this or do that."
7  I've only -- I've only been involved with one trial, and it was
8  no problem.  What plaintiff's counsel did was he took the
9  documents that were not disputed or that were ruled on in his
10  favor, and he -- he selected the ones that he thought connected
11  up with what Mr. McCoy is trying to connect up through
12  Dr. Castleman, essentially a closing argument in the beginning
13  of the trial, and he just -- he published them to the jury, and
14  the jury could conclude what they were.
15          The jury can make its own determination.   That's what
16  they're here for.   And the problem is that he's really trying
17  to get this all done and wrapped up in a closing argument right
18  now through this expert, who he said wasn't going to do that.
19  I know he says -- he keeps trying to recast what's really
20  happening, but you know the saying, if it walks like a duck and
21  talks like a duck and quacks like a duck, it's a duck.   And
22  that's where we're at right now.
23          THE COURT:   I want to see what -- is the jury -- did
24  your client win?
25          MR. BULGER:   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

120

1    THE COURT:   Maybe he's right, then.   Maybe it wasn't
2  because of that.
3    MR. BULGER:   I don't think it can be compared that
4  way.
5    THE COURT:   Maybe it wasn't because of that, but
6  maybe that would be a reason why he'd want to change that.
7    But that's not my issue one way or the other.   What I
8  want to know is:   Okay.   So you put a document up.   What can he
9  say about it?   What's he going to read?   What do you mean he's
10  going to read parts of it?   If he's going to leave out, "Dear
11  Fred, it was nice seeing you at the golf tournament last week,"
12  okay.   But what is he going to say that wouldn't violate what
13  you said you were going to do?
14    MR. McCOY:   I didn't say -- I didn't say I was -- I
15  want to just make this clear again.   I didn't say I wasn't
16  going to use company documents with Dr. Castleman.   I didn't
17  say that.   Okay?   I said that he wasn't going to give opinions
18  as to --
19    THE COURT:   Okay.   But I tend to agree that it could
20  be -- how is he not going to give an opinion?
21    MR. McCOY:   How is he not?   Because --
22    THE COURT:   On a company document.
23    MR. McCOY:   Because --
24    THE COURT:   If you're just going to have him read it,
25  I think I agree.

PDF created with pdfFactory trial version www.pdffactory.com

121

1          MR. McCOY:   Yeah.   And that's fine, Judge, and that's
2    what I do, and that's what I was trying to indicate.   Unlike
3    some other lawyers who have Dr. Castleman testify and do give
4    opinions about -- about the significance of these company
5    documents, I don't have him do that.   I just have him read it
6    in comparison to the time frame of the public policy
7    information he's talking about.
8          MR. BULGER:   But why does the jury need a reader?
9          MR. McCOY:   That's what I -- because of the timing of
10   it, Judge.   And the timing of this is very important.   Each
11   party has some rights to control the presentation of the
12   evidence, and that's -- that's what we -- why we bring in state
13   of the art witnesses is to allow us to do that in these cases.
14          And that's very important for us in state of the art
15   presentation in an asbestos case, because there's so many
16   documents and there's so many things that juries could pick up
17   on these.   I mean, you've already seen in the opening statement
18   references to -- from the lawyers, many documents.
19          Dr. Castleman is here as our -- as our evidence -- as
20   our witness on that state of the art as to here's the time line
21   in which this should be viewed so the jury sees the evidence
22   presented in the order that we want to show it to them to try
23   to reach the conclusions we'd like them to reach.
24          Then he's subject to cross-examination as to why
25   that's all wrong, so -- I mean, that's the defendants'

PDF created with pdfFactory trial version www.pdffactory.com

122

1  prerogative at that point in time to ask him whatever they want
2  about these documents.

3          And then the defendants will bring in also witnesses
4  who may, on their own, address company documents in the same
5  way.  And then I have to -- I would cross-examine them on those
6  documents.

7          I mean, they have witnesses coming in here with
8  lengthy state of the art reports also.  But I'm just saying,
9  it's that timing of when the jury sees things that really --

10         THE COURT:  Okay.  I understand that if he really,
11 really just says -- identifies that, all right, this is what it
12 said, maybe.  I'll see the first one.  But he can't testify --
13 he can't interpret it.

14         MR. McCOY:  I understand.

15         THE COURT:  Because that wasn't disclosed that, and I
16 haven't even examined whether he would have the qualifications.
17 So, I'll see.

18         MR. McCOY:  Right.

19         MR. DRUME:  Your Honor --

20         THE COURT:  That's the most he's going to be able to
21 do on that.

22         MR. McCOY:  Judge, and I fully understand that.  And
23 that's why I was saying, I'm not asking him to do that, unlike
24 other lawyers who do.  That's my way I handle Dr. Castleman.  I
25 don't let him interpret and conclude.  So, I'm in full

PDF created with pdfFactory trial version www.pdffactory.com

123

1  agreement that I'm not going to have him do that on those
2  documents.

3          MR. DRUKE:  Your Honor, this isn't the first time
4  this has come up in the Northern District, and we cited it in
5  our motion.  Judge Grady's talked about this, and Judge Kocoras
6  talked about it.

7          THE COURT:  I know.  I mean, there are plenty of
8  other judges that have allowed him to testify; and my
9  interpretation of the way he was going to testify, I really
10 didn't agree with Judge Grady.  But, you know, it depends how
11 you see it.  I'm not sure that he would have disagreed if he
12 understood that he wasn't giving opinions about things, as
13 opposed to providing a useful sort of anthology, really, of
14 what was -- of what's there.

15         MS. FINNEGAN:  Judge, what if I put Mr. Bulger on the
16 stand as my witness and I said, "Here, take all the worst
17 things, snippets you can find in every Georgia-Pacific
18 document," if, you know, we were adverse, "and you get up on
19 the stand, and just piece them together and tell -- because
20 they're all in evidence, just get up and do it"?

21         I mean, that is closing argument.  He doesn't have
22 any -- he's not Georgia-Pacific.  They're not his documents.
23 He just was given the documents.  He looked at them, and now
24 he's going to regurgitate, in as prejudicial a way as he can by
25 stringing things together.  It's not proper expert testimony.

PDF created with pdfFactory trial version www.pdffactory.com

124

1          THE COURT:  I think all he can do is say, "Okay.  Was

2   this something that Georgia-Pacific said, did," according to

3   what it is.  He can't otherwise do anything.  But if it's a

4   document that's in evidence, I suppose if it's part of a time

5   line to just say, "Yeah, this is what they did and sent out at

6   this time," then the jury can draw its own conclusions.

7          And indeed, there may be others that say -- that go

8   beyond that.  I just hadn't believed that this person could.

9   He's not -- he wasn't disclosed, and it didn't appear that his

10  expertise went to being able to -- to go as far as you

11  wanted -- at least he hadn't been disclosed that way.

12         So, I'm not sure how this is going to work out, but

13  we'll try it.

14         MR. McCOY:  Okay.

15         THE COURT:  As far as -- but it's only, only to fit

16  in with some time line, and you'll have to show the

17  significance of any given document in some other way.

18         MR. McCOY:  I understand.

19         THE COURT:  I'm not sure where --

20         MS. FINNEGAN:  I think it will be apparent when we

21  see the time line and when you see how he's used that it's

22  not -- it's really not possible to do what he's claiming to do

23  and have it benefit anybody.  His whole point is --

24         THE COURT:  That may be.  I said we'd start it and

25  see.  If that's -- it's really factually just identifying

PDF created with pdfFactory trial version www.pdffactory.com

125

1 something that goes along with the rest of his, I think he
2 probably could be -- could do that.
3         MR. BULGER:   Can we find out what the specific
4 documents are that he intends to -- in the best-case scenario,
5 he intends to use?
6         THE COURT:   I mean, I had said that, you know,
7 everybody was supposed to identify your documents in advance.
8         MR. BULGER:   But now he's going to say, "I've got all
9 of these documents on my list."
10         THE COURT:   That's the same thing.
11         MR. BULGER:   This is a pretty late and discrete
12 argument on this point.
13         THE COURT:   You have to understand, whatever applies
14 to you -- and that goes both ways -- is going to apply to the
15 other side.   So, if you don't give them your documents, apart
16 from the fact that it's certainly liable to extend the trial;
17 but then when they turn around and do the same thing, I'm going
18 to say, "Hey, that's what you did."
19         MR. McCOY:   I understand, Judge.   And that's why I
20 say we gave them most of them already; and when Dr. Castleman
21 comes, there might be a couple more, and that's it.
22         MS. FINNEGAN:   So, we're getting them tomorrow?
23         THE COURT:   We'll see what happens on the first day
24 of trial, and we'll see how this is working.   I don't know,
25 but --

PDF created with pdfFactory trial version www.pdffactory.com

126

1    MR. DRUMKE:   Is that the only two witnesses for
2  tomorrow, or all four that were disclosed previously?
3    MR. McCOY:   All the ones that were disclosed are
4  possible.
5    THE COURT:   I don't want to say how far we'll get.   I
6  mean, I really do want to get through as many witnesses as
7  possible tomorrow.   I'm not going to stop it at 3:00 o'clock.
8    MR. DRUMKE:   Are there other documents, buckets,
9  poles, anything else we're going to see tomorrow?
10   THE COURT:   Have you given them every document that
11 you may introduce tomorrow and said, "I may introduce this
12 tomorrow"?
13   MR. McCOY:   Except for, like I say, when I see
14 Dr. Castleman, he may say there's one or two more he wants to
15 use that I didn't anticipate.   I'm reading his mind, but that's
16 it.
17   THE COURT:   Okay.   Assuming we get through
18 Dr. Castleman, who is the next witness?   Is that plaintiff?
19   MR. McCOY:   It might be Harold Deyerler.
20   MR. GUTIERREZ:   Louie Wigner, Danny Moore, Harry
21 Deyerler, and Dr. Castleman.   It's going to be Castleman,
22 Moore, and Deyerler, and Harry.
23   MR. McCOY:   Probably not Wigner.
24   THE COURT:   All right.   We'll see.
25   MR. McCOY:   But, yeah, we gave them that list

PDF created with pdfFactory trial version www.pdffactory.com

127

1   sometime, I think, yesterday or the day before.  So, they have

2   our witnesses, our experts.

3           THE COURT:  I hope you don't make me really sorry

4   that I didn't say we'll try this in six months with a proper

5   pretrial order.

6           MR. McCOY:  We're done for today?

7           THE COURT:  Yes.

8           MR. McCOY:  Okay.

9           THE COURT:  All right.  Good night.

10       (Proceedings adjourned, to continue 10-1-08 at 9:30 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com