UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF PENNSYLVANIA


THIS DEPOSITION RELATES TO: )

                              )

KRIK v. BP AMERICAN, INC.,   )

et al.,                      )MDL DOCKET NO. MDL 875

PAED Case #: 11-CV-63473     )

                              )

Krik v. AC and S Inc.,       )

et al.,                      )

PAED Case #: 08-CV-91296     )


VOLUME I

VIDEOTAPED EVIDENCE DEPOSITION OF

CHARLES KRIK

Taken on behalf of the Plaintiff

July 18, 2011


Reported by Maria E. Shockey, CSR

Illinois License No. 084-004411



EXHIBIT

A

[Examination by Mr. Beshore]

Page 210

1      A.   No, I did not.

2      Q.   You couldn't testify that it was

3  asbestos --

4      A.   I couldn't swear to it, no.  From what

5  I -- you know, over the years, I'd probably say it

6  was, but I couldn't swear to it.

7      Q.   The 25 steam unit heaters you described as

8  being in these shed-like structures --

9      A.   Right.

10     Q.   -- to keep them out of the elements?

11     A.   Right.

12     Q.   Were they in one location in the plant, or

13 were they --

14     A.   No.  They were all over the plant.

15     Q.   Okay.

16     A.   Each unit probably has one of these huts.

17     Q.   And would you remove the whole unit and

18 put in a new one?

19     A.   We'd take the old one out and put the new

20 one in.

21     Q.   You wouldn't then insulate that, somebody

22 else would come behind you to do that?

23     A.   No, we didn't insulate.  All we did was

24 remove whatever we needed to to change the unit

**Drexel**
UNIVERSITY

School of Public Health

Arthur L. Frank, M.D., Ph.D.
Professor of Public Health
Chair, Department of Environmental and Occupational Health

September 16, 2011

Robert G. McCoy, Esq.
Cascino Vaughan Law Offices
220 South Ashland
Chicago, IL 60607-5308

RE:   Charles Krik

Dear Mr. McCoy:

I am in receipt of records in the case of Mr. Krik and have been asked by you to review them and render my judgment regarding any evidence of an asbestos-related disease.

The materials sent me include records of Joliet Oncology Hematology, St. Joseph Hospital, Morris Hospital, Drs. Tomas, Schonfeld, and records of Patel and Choe. I also received two depositions of Mr. Krik's a summary of his occupation, answers to interrogatories and requirements for my report.

Mr. Krik served in the United States Navy where he was exposed to asbestos-containing pipe covering. He also worked as a pipefitter and was exposed to asbestos-containing insulation, gaskets and packing. He worked in a variety of settings.

He was a smoker up until 1982.

In November 2008, after there was a finding of a lesion in his left lung, Mr. Krik underwent a thoracotomy and lobectomy which revealed that he had developed an adenocarcinoma of the lung. An additional finding was that of pleural plaque formation. The cell type found in his lung was different that his previous penile cancer.

Radiologic exams corroborate the finding pleural changes in the lung.

Based upon my review of the materials sent me, it is my opinion, held with a reasonable degree of medical certainty, that Mr. Krik developed two asbestos-related conditions. First I believe he developed pleural asbestosis and characterized by both the radiographic and pathologic findings. Secondly, and more importantly Mr. Krik developed an adenocarcinoma of the lung that was caused by his exposures to asbestos, in combination with his habit of cigarette smoking. The cumulative exposures he had to asbestos, from any and all products, containing any and all fiber types, would have contributed to his developing these two conditions. The scientific literature clearly documents that both asbestos and smoking, independently, can lead to the development of lung cancer, but it also well documented that the addition of asbestos on top of cigarette smoking greatly increases the risk of developing lung cancer, far beyond that of cigarette smoking alone.

EXHIBIT
B

September 16, 2011
Page 2

     The hazards of asbestos have been known for more than a century, and the work of Merewether and Price in 1930 documents that asbestos was a hazard and that individuals should be protected from exposures.  There are numerous studies from throughout the world regarding the development of asbestos-related non-malignant disease, as well as lung cancer.

     Should you have any questions about this matter please feel free to contact me.

Sincerely yours,

Arthur L. Frank, M.D, Ph.D.
ALF/tmc

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


IN RE: ASBESTOS PRODUCTS          MDL DOCKET NO. 875
LIABILITY LITIGATION (NO. VI)


This Document Relates to the
following CVLO Top 10 Cases

Paul Gehrt - CA#: 08-92066
Marion Goeken - CA#: 10-68122
Charles Krik - CA#: 11-63473
Deon Wright - CA#: 11-66748
Gerald Bushmaker - CA#: 10-61116


          Oral deposition of ARTHUR L. FRANK,

M.D., Ph.D., taken at the offices of Drexel University

School of Public Health, 1505 Race Street, Bellet

Building, 13th Floor, Philadelphia, Pennsylvania, on

Wednesday, January 25, 2012, commencing at

approximately 1:13 p.m., before Barbara McKeon Quinn,

a Registered Merit Reporter and Notary Public,

pursuant to notice.

EXHIBIT
C

Case: 1:10-cv-07435 Document #: 76-1 Filed: 08/23/13 Page 6 of 30 PageID #:1089
Case 2:11-cv-63473-ER   Document 288-5   Filed 03/02/12   Page 7 of 11

Page 91

1   than not contributory, such as smoking, which we have

2   in one case, questionably in the other, and asbestos

3   which we have in both cases as being markedly elevated

4   at least enough to give them both asbestosis.

5        Q.      So, in other words, any exposure no

6   matter how small above background and now your expert

7   opinion in court is it is a significant contributing

8   factor, right?

9        A.      You've lost me.  I've never testified

10  that any amount above background is not a significant

11  contributing cause.

12              What I am also testifying there's

13  nothing different about the background fibers compared

14  to fibers from a GE product or anybody else's product.

15              What I won't testify to is that the

16  cause of an individual's lung cancer was asbestos when

17  all I have is background, because you have background

18  exposure to other carcinogens.

19       Q.      But if you have any kind of exposure, no

20  matter how small that's above that background level,

21  you will testify that that is a significant

22  contributing cause to the person's lung cancer, yes?

23       A.      Yes.

24       Q.      Why do you draw the line there?  Why do

25  you draw the line at background?  What's your

Page 94

1    When I have evidence of exposure higher

2    than background, then it becomes more likely than not

3    that that one was the cause of that person's lung

4    cancer of all the potential exposures.

5    Q.    What is the source of scientific

6    authority that says it's more likely than not as soon

7    as you get above background?

8    A.    I'm not sure that's really a scientific

9    judgment as much as it is a judgment of my

10   understanding of, you know, having done these kinds of

11   cases for a long time when I'm asked, you know,

12   Doctor, would you answer with a reasonable degree of

13   medical certainty, and my certainty has to be above 50

14   percent.

15   Q.    I understand that you testified that

16   you're certain of that.  I'm asking for the scientific

17   basis upon which that opinion is founded in the form

18   of literature or scientific authorities.  Can you name

19   one?

20   A.    Scientific studies don't look at the

21   relative risk for individuals for their causes of lung

22   cancer but look at the issue of exposure.

23         And so I would think that science would

24   allow you to say that when you have evidence of

25   multiple exposures, some being quite low and one being

1   above the low background rate that we all have, that

2   if you on a statistical basis had to say which one is

3   more likely than not to be the cause of the cancer,

4   it's the one that you have evidence for that's above

5   background, because that is the one for which you have

6   the highest dose and as the dose goes up the

7   likelihood of getting the cancer goes up.

8        Q.     You've testified in response to

9   questioning from me before that it's your opinion that

10  a job that caused a fiber year of exposure to asbestos

11  was in your personal opinion an acceptable risk; it

12  would not merit any special safety precautions;

13  correct?

14       A.     I'm not sure I testified to that.  Do

15  you want to show me where that is and --

16       Q.     Well, first of all, do you agree with

17  that statement, that for you personally --

18       A.     Oh, now that's a -- there you go.  You

19  see, you ask me a general --

20       Q.     No.

21       A.     Wait a minute.  This is what -- this is

22  what fries me, and I'm going to put this on the

23  record.

24       Q.     Sure.  Go ahead.

25       A.     You ask a question that's a generic

Page 108

1    Q.    Dr. Frank, I'm Richard Crump. We've

2  spoken before and I'm going to try to ask you some

3  questions.

4        I'm going to do kind of the opposite of

5  what Mr. Nadolink did. I am going to ask you some

6  very broad general questions to try to speed things

7  along.

8        You spoke in some detail with him

9  regarding the fact that you don't have specific

10  information about a particular plaintiff's exposure to

11  individual products and how much that exposure may

12  have increased incrementally his risk of lung cancer.

13        However, he asked you the question

14  specifically with respect to his client.

15        If I broaden that and say as to any of

16  the plaintiffs that we're here on today, as to any of

17  the products to which they claim to have been exposed,

18  do you have any information regarding the dose of

19  exposure they got from any of those products and/or

20  how much that would have incrementally increased their

21  risk of lung cancer?

22    A.    **Neither.**

23    Q.    Okay. And you've not been provided with

24  any type of dose reconstruction estimate, you haven't

25  attempted to do any type of dose reconstruction

Page 109

1    estimate with respect to any of the plaintiffs?

2         A.        Neither.

3         Q.        Okay.  You mentioned earlier the risk

4    numbers of 1, 5, 10 and 50 for lung cancer.

5         A.        Yes, sir.

6         Q.        And those are essentially the numbers

7    that come from the Selikoff insulator cohort work;

8    correct?

9         A.        Yes.

10        Q.        And would you agree with me that the

11   risk of lung cancer to a smoking nonasbestos exposed

12   person is roughly twice that of the risk of lung

13   cancer to an asbestos exposed nonsmoker?

14        A.        Yes.

15        Q.        And the numbers derived by Dr. Selikoff

16   and his group in that study were based upon the levels

17   of exposure that those insulators had in terms of the

18   asbestos risk?

19        A.        Well, nobody knew what the exact levels

20   were.  It would vary.  I mean, nobody was out there

21   measuring their levels every day.  There were

22   estimates.  There were some measurements taken.

23               But interestingly enough, when OSHA came

24   in and required that work places where asbestos were

25   used to be measured at least every six months by

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  ASBESTOS PRODUCTS )
LIABILITY LITIGATION      )
(NO. VI)                  )
                          )
This document relates to  ) MDL Docket No. 875
the following CVLO Top 10 )
Cases                     )
                          )
Charles Krik -            )
CA#:  11-63473            )

**********************************************

ORAL DEPOSITION OF

FRANK M. PARKER, III

JANUARY 4, 2012

**********************************************

ORAL DEPOSITION OF FRANK M. PARKER, III, produced

as a witness at the instance of the Defendant

Owens-Illinois, and duly sworn, was taken in the

above-styled and numbered cause on the 4th of January,

2012, from 10:04 a.m. to 4:32 p.m., before Tamara

Vinson, CSR in and for the State of Texas, reported by

machine shorthand at Caliche, Ltd., 200 Brantley Lane,

Magnolia, Texas  77354, pursuant to the Federal Rules

of Civil Procedure.


EXHIBIT

D

1   hypotheticals that you might be asked at trial, you

2   don't intend to offer any company-specific testimony

3   in this case, at least as you understand it sitting

4   here today.  Is that fair?

5        A.   **That's my understanding, right.**

6        Q.   Okay.  And we've talked about the issue of

7   causation.  Is it fair to say that your opinions in

8   this case will relate to the nature of Mr. Krik's

9   exposure to asbestos, your opinions regarding the

10  nature of Mr. Krik's exposure to asbestos?

11       A.   **In general, that's correct, yes.**

12       Q.   Even though you have some information about

13  different levels in the various exhibits to your

14  report, it's true that you have not attempted to

15  calculate what Mr. Krik's cumulative exposure was to

16  asbestos over his working career.  Correct?

17       A.   **Correct.**

18       Q.   Do you agree that it is possible to do dose

19  exposure assessments, retrospective dose exposure

20  assessments for an individual, provided you make

21  certain assumptions regarding that individual's work

22  history?

23       A.   **Oh, yeah, anybody can crunch numbers, but my**

24  **view, it becomes a house of cards because you have to**

25  **make so many assumptions.  And then the issue is, so**

Page 80

1      Q.    Just so that -- and I don't mean to interrupt

2    you, but just so I understand the context, by

3    "activity," you're talking about publications,

4    research --

5      A.    Right.  Right.

6      Q.    -- information that was being put out about

7    all this work?

8      A.    Well, it's -- some is and some isn't.  But

9    anyhow, what happens is, the Second World War comes

10   along and everything kind of goes quiet until the

11   '60s.  And Wagner and Selikoff basically bring the

12   issue back up on the table and make a big deal.

13   Selikoff is probably the number one person responsible

14   for passing OSHA.

15          So all that -- when that happened in the

16   '60s, then lots of pressure got put on the asbestos

17   exposure concentrations.  We went from being particles

18   per cubic foot to fibers.  A large extent was

19   political because nothing -- five million of anything

20   can't be safe.  Point something sounds a lot safer,

21   even though they're substantially the same.

22          So there's a lot of pressure put on these

23   regulations.  We're still at a point where the

24   regulation is based on our ability to detect, not on

25   no effect.  So, I mean, we're still working that

Page 81

1    **problem.**

2        Q.   And what -- you mentioned Wagner.  Wagner,

3    why was he part of the equation with -- together with

4    Selikoff?  What did Wagner do?

5        **A.   Well, Wagner identified mesothelioma in**

6    **miners and the community around a mine in South**

7    **Africa.**

8        Q.   And when did he do that?

9        **A.   1960.**

10       Q.   And was this a new -- some -- a new issue

11   that had not really been on the radar screen, so to

12   speak, before Wagner came along?

13       **A.   Well, it's been a long time, but he -- there**

14   **were other studies, other reports of mesothelioma**

15   **prior to Wagner, but he -- his got a lot of traction.**

16   **And then Selikoff, he got a lot of traction.  And so,**

17   **you know, we have this progression of '20s,**

18   **1920s, '30s asbestosis; '40s, '50s, lung cancers;**

19   **'60s, mesothelioma.  Since then, we've found other**

20   **ones.  It's just a progression of them.**

21       Q.   Okay.  Now, when you talk about cancer, it's

22   consistent with what I asked you about earlier in

23   terms of what you are going to testify about, as you

24   understand it, and what you're not going to testify

25   about, is it true that you are not -- you are not, as

Page 125

1        Q.    All right.   Is that the sole source of work

2    history that you have for Mr. Krik?

3        A.    Yes.

4        Q.    All right.

5        A.    I mean, as far as the table goes, not -- I

6    mean, he testifies about his history in his

7    deposition, but as far as a --

8        Q.    Okay.   Well, you have the table which we've

9    talked about in Exhibit No. 7, plus his deposition

10   testimony.   Is that correct?

11       A.    Correct.

12       Q.    And those are the -- those are the sole

13   sources of the information you have about his work

14   history.   Is that correct?

15       A.    Yes.

16       Q.    All right.   Now, with respect to the work

17   history, did you make any effort to quantify his

18   exposure at each one of his work sites?

19       A.    No.

20       Q.    Do you have the expertise and capability to

21   do that?

22       A.    Yes.

23       Q.    However, in this instance, you didn't -- you

24   didn't have the information necessary to do that.

25   Correct?

Page 126

1    A.    No.  I wasn't asked to do it.

2    Q.    All right.  Right now, as you sit here today,

3    based on what you know about the file that you have

4    before you and the file that you generated with

5    respect to this case, you have inadequate information

6    to perform that calculation, don't you?

7    **A.    To a reasonable degree of scientific**

8    **certainty, yes.**

9    Q.    All right.  For example, he worked at

10   Entenmann's Bakery.  Am I right?  I'm a big fan of

11   Entenmann's Bakery.

12   **A.    You look like it.**

13   Q.    Yeah, I understand.  That's why I said that.

14   You don't know how much asbestos exposure he had at

15   Entenmann's Bakery, do you?

16   **A.    No, I don't -- I can't -- I haven't even**

17   **tried to quantify it.**

18   Q.    Right.

19   **A.    I haven't even tried.**

20   Q.    From an industrial hygiene measurement point

21   of view, you can't do that, can you?

22   **A.    I wouldn't.  I'm sure there are people out**

23   **there who would attempt it.**

24   Q.    I understand that, but you wouldn't do that?

25   **A.    I wouldn't do it.**

# Caliche Ltd

*Solid Solutions Seeking Sustainability*

September 17, 2011

Mr. Robert McCoy
Casino, Vaughn Law Offices, LTD.
220 South Ashland
Chicago, IL 60607

Sub: Mr. Charles Krik                                        Re: 11-177

Dear Mr. McCoy;

I appreciate the opportunity to review this interesting case. My opinions are based on the information provided by your office, the scientific literature, my education and experience, and information generally relied upon by members of my profession.

## Facts Considered

### Work History

Mr. Krik entered the work force in 1954 when he entered the US Navy. He was a boilerman at first and became a boilermaker in 1957-58. A boilerman ran the boilers on ships and a boiler maker repaired boilers on the ships. He retired from the Navy in 1970.

He then became a civilian boilermaker for several years and then switched to pipefitting. He worked until 2000 for a variety of employers and at different locations. His employment record is presented as Exhibit C to his Response to Interrogatories of 6/17/11.

### Asbestos Exposure

Mr. Krik had extensive occupational asbestos exposures beginning in 1954 when he started working on and around steam boilers in the US Navy. He continued to receive frequent asbestos exposures during his career as a boilermaker and pipefitter until the early 1990s. The exposures were a combination of direct exposure whenever he was personally disturbing asbestos containing materials [ACM] and bystander exposure whenever he was in the vicinity of others disturbing ACM.

The asbestos containing materials that he was exposed to included thermal system insulation [TSI] which includes preformed pipe and block, cements [mud], cloth and mastics. Also, he was exposed to asbestos containing gaskets and packing.

The types of equipment that he worked on included at least boilers, condensers and related equipment, turbines and their related insulated steam lines, pumps, valves, vessels and blast furnaces and their supporting equipment.

### Personal Protective Equipment

No protective equipment was provided or required before the early 1990s.

---

Corporate
200 Brantley Lane P.O. Box 107
Magnolia, Texas 77353-0107
281-356-6038 • FAX 281-356-6224

*www.calicheltd.com*
*Environmental, Health and Safety Management*

Corpus Christi
PMB 200, 3636 S. Alameda, Suite B
Corpus Christi, TX 78411
361-883-7878 • FAX 361-854-



**EXHIBIT E**

### Warnings and Training

Mr. Krik was not adequately warned concerning the hazards associated with exposure to asbestosis. In the early 1990s he received some training from his union about needing to wear protective equipment including respirators.

## Opinions and Their Basis

Based on my review of the information in this record describing Mr. Krik's occupational environment and activities, and based on my special training, knowledge and expertise as a Certified Industrial Hygienist, including review of numerous scientific peer reviewed articles, publications and other relevant information, including but not limited to those summarized in the attached exhibits, I have formed the following opinions to a reasonable degree of scientific certainty concerning Mr. Krik's asbestos exposures resulting from his work as a pipefitter:

1. **The asbestos content of asbestos gaskets is substantially 95% or greater; pipe and block insulation was typically 10 – 15% although some products contained more; cements [mud] was typically 5%; and cloth was substantially 100%.** The basis for this opinion are:
   a. The EPA published a list of typical concentrations in 1985;[1] and
   b. My professional experience evaluating asbestos containing materials since the mid 1980s.

2. **Mr. Krik was occupationally exposed to significant concentrations of airborne asbestos fibers from his and his co-workers disturbance of TSI.** The basis for this opinion are:
   a. Most TSI products contained asbestos starting during World War II and lasting till the early – mid 1970s when non asbestos TSI started being manufactured[2];
   b. The TSI products described by Mr. Krik were those that most likely contained asbestos;
   c. The disturbance of TSI products, as described by Mr. Krik, released significant concentrations of respirable asbestos fibers which those disturbing it or as a bystander to others disturbing it were occupationally exposed. While the concentrations varied, there were times that they would have exceeded contemporary occupational exposure limits. See Exhibit 1 – Thermal System Insulation [TSI] and Exhibit 2 – Bystander Exposure.

3. **Mr. Krik was occupationally exposed to significant concentrations of asbestos fibers from his and his co-workers disturbance of asbestos containing gaskets.** The basis for this opinion are:
   a. Asbestos gaskets also released asbestos fibers whenever they were disturbed by scraping and/or wire brushing as Mr. Krik described. Any disturbance of these gaskets would have released significant concentrations of asbestos fibers. Picking friable asbestos packings from seal also released asbestos fibers. See Exhibit 3 – Asbestos Containing Gaskets and Packing Exposures;

---

[1] _____, *Guidance for Controlling Asbestos-Containing Materials in Buildings*, Environmental Protection Agency, EPA 560/5-85-024, July 1985, Appendix A.
[2] **Fontaine, J.H. and Trayer, D.M.,** *Asbestos Control in Steam-Electric Generating Plants*, American Industrial Hygiene Association Journal, Vol. 36, No. 2, February 1975, Table I, p.127.

    b. As a bystander to other co-workers disturbing asbestos containing gaskets and packings Mr. Krik would have also been occupationally exposed to airborne asbestos fibers. See Exhibit 3 – Asbestos Containing Gaskets and Packing and Exhibit 2 – Bystander Exposure.

4. **Mr. Krik was not provided adequate protection from occupational exposures to airborne asbestos fibers.** The basis for this opinion are:

    a. He testifies that he was not required to wear a respirator during all potential occupational exposures until the early 1990s;

    b. There is no evidence that the manufacturers of the asbestos containing materials provided instructions on the requirement for their use or the proper respirator to be used;

    c. It appears that Mr. Krik was not part of a effective respiratory protection program as set forth by OSHA [29CFR 1910.134]; and

    d. Consequently, even the respirators he used were not protective.

5. **Mr. Krik was not provided adequate warnings.** The basis for this opinion is:

    a. There is no evidence that the manufacturers of products containing asbestos provided any warnings what so ever that would have alerted Mr. Krik, his co-workers or his employers to:

        i. The hazards of asbestos including asbestosis, cancer and death;

        ii. How to recognize when they were at risk of exposure;

        iii. How to protect themselves; and

        iv. What things they should not do.

## Exhibits

No specific exhibits have been identified, other than those referenced in this report, at this time.

## Qualifications

I am the Chief Executive Officer of Caliche, Ltd, an industrial hygiene, safety and environmental consulting company located in Magnolia, Texas. I have over 40 years experience practicing industrial hygiene and environmental engineering including 7 years active duty and 17 years as a Reserve Officer with the US Air Force; 10 years experience working directly for the petrochemical industry; and over 25 years experience working as a consultant to government and industry.

I am certified as an Certified Industrial Hygienist in the Comprehensive Practice of industrial hygiene by the American Board of Industrial Hygiene; a Professional Engineer in Texas and California; a Certified Safety Professional by the Board of Certified Safety Professionals. I have been named as a Diplomat Environmental Engineer by the American Academy of Environmental Engineers. My resume is attached as Exhibit 4.

## Testimony Record

Attached [Exhibit 5] find the most current copy of my testimony record as required by the federal courts.

## Compensation

I am being compensated at the rate of $450 per hour.

If you have any questions or if I can be of further service please let me know.

Sincerely,

Frank M Parker, III
CIH, CSP, PE, DEE

*4*

STATE OF ILLINOIS

IN THE CIRCUIT COURT OF THE THIRD JUDICIAL CIRCUIT

MADISON COUNTY

| | |
|---|---|
| RONALD BUTT, Individually and ) | Case No. 08-L-0702 |
| as Special Administrator of ) | |
| the Estate of MARTIN BUTTS, ) | |
| Deceased, ) | Case No. 08-L-1182 |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Asbestos Personal Injury |
| ) | |
| A.W. CHESTERTON, INC., et al., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

DISCOVERY DEPOSITION OF ARNOLD BRODY, Ph.D.

(Taken by Defendants)

Raleigh, North Carolina

Monday, June 29, 2009

Reported in Stenotype by

Mark Rabinowitz, RPR

Transcript Produced By Computer-Aided Transcription


EXHIBIT
F

Page 28

1    was the answer to that question?  What is your answer to

2    that question?  What does it depend on?

3         A.  That is their occupational or environmental

4    exposure above background.  When I say "exposed," I'm

5    not talking about background.  Everyone is exposed to

6    background.  We have already said that's not going to

7    cause disease.  So now we have a person with disease.

8    Again, I'm assuming they are in this litigation situation

9    because there is evidence that they are exposed above

10   background.  And if that's wrong, then that will be

11   proven; I'm sure.

12        So they are exposed above background to

13   whatever they are exposed to.  That's what I'm talking

14   about when I say "they are exposed."

15        Q.  When you say "background," you are referring

16   to "background," is that a particular exposure level in

17   fiber cc's that you have in mind, or is background more

18   of a fluctuating level?

19        A.  The background we have already talked about is

20   what I'm talking about.  That's anywhere from point 0000,

21   like four or five zeros, to maybe point 01.  I mean, I

22   have never seen a background higher than point 01.  So it

23   would be -- usually it has three or four zeros when you

24   go into any setting, unless there is some kind of a

IN THE CIRCUIT COURT

OF THE THIRD JUDICIAL CIRCUIT

MADISON COUNTY, ILLINOIS

| | | |
|---|---|---|
| THERESA GUILBEAU, | ) | Cause No. 03-L-1366 |
| ROBERT BEYER, | ) | Cause No. 03-L-1509 |
| RUSSELL BRIDGES, | ) | Cause No. 02-L-1527 |
| RAYMOND CAPPEL, | ) | Cause No. 03-L-728 |
| SILSBEE COOPER, | ) | Cause No. 03-L-1364 |
| BEVERLY ELGAN, | ) | Cause No. 03-L-619 |
| SUSANNE JONES, | ) | Cause No. 03-L-963 |
| JOHN MARTINEZ, | ) | Cause No. 02-L-1501 |
| DONALD REDMAN, | ) | Cause No. 03-L-1444 |
| SAMUEL STEWART, | ) | Cause No. 03-L-582 |
| EARL TOWNSEND, | ) | Cause No. 03-L-460 |
| JOE UNDERWOOD, and | ) | Cause No. 03-L-1346 |
| DONALD WOZNICK, | ) | Cause No. 03-L-1194 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| A.W. CHESTERTON, | ) | |
| INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

DISCOVERY DEPOSITION OF DR. ARTHUR FRANK

Taken on behalf of Defendants

April 1, 2004

Kelly L. Bruhn, CSR/CCR

CSR NUMBER:   084-004436

CCR NUMBER:   921(G)

# Draft Copy

EXHIBIT

G

tabbies

Page 82

1    you -- you don't know?  You cannot say that it's

2    -- statistically speaking, one is more likely the

3    cause than the other?  I'm speaking of cause.

4    Not diagnosis, so --

5         A.   I'm not sure I could do that.  No.

6         Q.   Okay.  And it -- your -- in the past,

7    you've told us that your sole criterion for

8    relating a potential exposure as a cause of

9    mesothelioma is whether or not there's evidence

10   of exposure, correct?

11        A.   Correct.

12        Q.   Could you define exposure for me

13   again?

14        A.   Exposure above background, above

15   ambient levels.

16        Q.   And if something does not -- if an

17   exposure does not meet that definition, then it

18   is not a cause, correct?

19        A.   It's not a cause that I would state

20   with a reasonable degree of medical certainty

21   would be the cause in a given case.

22        Q.   Doctor, should asbestos manufacturers,

23   prior to 1960, have had a warning on their

24   products with respect to mesothelioma?

25        A.   I consider myself any kind of

Page 1

```
 1        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

 2             COUNTY DEPARTMENT, LAW DIVISION

 3

 4     -------------------------------

 5   HAROLD C. DEYERLER and,        X

 6   WILMA J. DEYERLER,             :

 7                                  :  Case No.:

 8          Plaintiffs,             :  2007 L 009822

 9      vs.                         :

10                                  :

11   ARVIN MERITOR, INC., et al     :

12                                  :

13          Defendants.             X

14     -------------------------------

15

16

17        TELEPHONIC DEPOSITION OF ARNOLD R. BRODY

18

19                (Taken by Defendants)

20            Raleigh, North Carolina

21             Friday, May 30, 2008

22

23

24            Reported in Stenotype by

25            Raakeebah L. Henderson
```

EXHIBIT

H

Arnold R. Brody                                                    5/30/2008

Page 30

1      Q.    You testified in the past that the background

2  rate in any city has not been proved to cause

3  mesothelioma; is that true?

4      A.    Still true.  Every time I've said it, it's

5  true.

6      Q.    And you've not seen any study which would

7  prove a causal relationship to a background rate in

8  some city that is higher than other cities; is that

9  right?

10     A.    Correct.

11     Q.    I want you to assume that we have two

12 hypothetical cities.  One city has a given background

13 rate of X.  One city has a background rate of Y, which

14 is higher.  And understanding -- I understand that both

15 of those cities then, so long as they're within the

16 range that I described for you, .01 to .00001, they would

17 not cause or contribute to the disease mesothelioma,

18 true?

19         MR. GUTIERREZ:  Object as to form.  Incomplete

20 hypothetical.

21     A.    Yes, that's true.  Go ahead.

22 BY MR. FANNING:

23     Q.    And what I want to ask you about is, assume

24 that there's a fellow in the first city, and there's a

25 fellow in the second city, both have mesothelioma, on

IN THE CIRCUIT COURT

THIRD JUDICIAL CIRCUIT

MADISON COUNTY, ILLINOIS


GEORGE MIELKE and JOANNE MIELKE,    )

)

)

Plaintiffs,    )

)

-vs-    )No. 08 L 428

)

GRIFFIN WHEEL COMPANY and NALCO    )

COMPANY f/k/a/ NALCO CHEMICAL    )

COMPANY,    )

)

Defendants.    )


DISCOVERY DEPOSITION OF

DR. CARLOS WAYNES BEDROSSIAN

Taken on behalf of the Defendants

December 4, 2008



Page 34

1   know, a level of assurances from the EPA that that

2   was safe because it was less than the mandated

3   minimum, because there are so many variables and

4   it's difficult to control all of them.

5       Q.   Are you of the opinion that exposures that

6   are less than .1 over an eight-hour period cause or

7   contribute to mesothelioma?

8       A.   No.  I'm of the opinion that there are

9   other factors that influence that, you know.  If it

10  is for a worker who is exposed to that for eight

11  years, for example, we don't know.  I don't think we

12  have the data.  That's all I'm saying.

13      Q.   You have no opinion with respect to whether

14  or not any exposures at .1, in compliance with the

15  current OSHA regulation, caused or contributed to

16  the mesothelioma; you just don't have an opinion

17  with respect to that?

18      A.   Well, I think if it's for a -- you know, if

19  the time factor is controlled, I believe that it's

20  probably safe.  But to extrapolate that to an

21  individual case, I would like to know for how long

22  that person was exposed.  And I do have skepticism

23  about the instrumentation available, about the

24  reliability of these devices to reflect the true

25  concentration in factories under different

Page 35

1    conditions, physical conditions.

2        Q.   So it sounds like --

3        A.   I think it's nice to have a number, but

4    every case has to be taken on an individual basis.

5        Q.   It sounds like, as you sit here talking

6    about it today, you know there is a current level of

7    .1, you are skeptical about the ability to measure

8    those levels in a specific site, but you don't have

9    an opinion today that to the extent a person really

10   was exposed to .1 or less for a period of time

11   contemplated by OSHA, that that would cause or

12   contribute to mesothelioma?

13       A.   Well, my opinion is if everything being

14   copasetic, you know, in an idealized situation that

15   you're describing, I think that the evidence shows

16   that it will be safe.  The skepticism is when it

17   becomes not an idealized situation in the abstract

18   but a practical situation having to do with

19   instrumentation, variations, temporal variations,

20   variations on the patterns of breathing of the

21   individual and genetic susceptibility.

22       Q.   Let me pose a hypothetical to test that and

23   better understand your opinion.  If you have a

24   person who works in a factory for one year and is

25   exposed to asbestos eight hours a day at a level of

Page 36

1   .8 and less than .1 and you knew nothing else about

2   his work --

3       A.   .08.

4       Q.   I'm sorry, .08.  Thank you for correcting

5   me.  Maybe I better restate that.

6           Given an individual who works in a factory

7   for one year's time and is exposed to a level of

8   asbestos of .08 for eight hours a day and you knew

9   nothing else about this person, it would be your

10  opinion that that work and that exposure would not

11  have caused or contributed to a mesothelioma?

12      A.   That's correct.

13      Q.   Okay.  Let's talk about your case file with

14  respect to Mr. Mielke.  I understand it's in front

15  of you.  Can we go through it?  What's on top?

16      A.   Sure.

17      Q.   Okay.  So you're handing me a pile, and the

18  first document I see is your report in the case

19  dated September 27, 2008; is that right?

20      A.   Right.

21           MR. FANNING:  Can we mark this as

22  Exhibit A?

23                   (Document marked as

24                    Bedrossian Exhibit A for

25                    identification, 12-4-08.)