Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS         MDL DOCKET NO. 875
LIABILITY LITIGATION (NO. VI)

This Document Relates to the
following CVLO Top 10 Cases

Paul Gehrt - CA#: 08-92066
Marion Goeken - CA#: 10-68122
Charles Krik - CA#: 11-63473
Deon Wright - CA#: 11-66748
Gerald Bushmaker - CA#: 10-61116

Oral deposition of ARTHUR L. FRANK, M.D., Ph.D., taken at the offices of Drexel University School of Public Health, 1505 Race Street, Bellet Building, 13th Floor, Philadelphia, Pennsylvania, on Wednesday, January 25, 2012, commencing at approximately 1:13 p.m., before Barbara McKeon Quinn, a Registered Merit Reporter and Notary Public, pursuant to notice.

Page 2

EXAMINATION INDEX
ARTHUR L. FRANK, M.D., Ph.D.
   BY MR. NADOLINK ........  7
   BY MR. CRUMP .......... 107
   BY MR. MILOTT ......... 144
   BY MR. FERGUS ......... 150
   BY MR. McCOY .......... 166
   BY MR. HARTON ......... 174
   BY MR. CRUMP .......... 176

EXHIBIT INDEX
                  MARKED
Frank
1  Letter to Dr. Frank from Tucker Eads,    7
   Cascino Vaughan, dated 1/19/12, three
   pages
2  Packet of documents labeled Gerald       8
   Bushmaker containing Dr. Frank's
   report of 9/16/11 and medical records
3  Packet of documents labeled Paul         9
   Gehrt containing Dr. Frank's report
   of 9/16/11 and medical records
4  Packet of documents labeled Marion       9
   Goeken containing Dr. Frank's report
   of 9/16/11 and medical records
5  Packet of documents labeled Larry       10
   Kinser containing Dr. Frank's report
   of 9/16/11 and medical records
6  Packet of documents labeled Charles     11
   Krik containing Dr. Frank's report of
   9/16/11 and medical records
7  Packet of documents labeled Deon        11
   Wright containing Dr. Frank's report
   of 9/16/11 and medical records
8  Curriculum Vitae of Arthur L. Frank,    12
   M.D., Ph.D., 29 pages

Page 3

EXHIBIT INDEX CONTINUED
                  MARKED
9  Statement of Arthur L. Frank, M.D.,     12
   Ph.D. regarding Federal Rule 26(a)(2)
   reports for Cascino Vaughan Law
   Offices dated 9/16/11, with
   attachments
10 Two-page Summary of Paul Gehrt's        67
   Deposition taken on June 6, 2011
   prepared 9/17/11 by Robert Underwood
11 Six pages of Consensus Report from     102
   Scandinavian Journal Work
   Environmental Health 1997, Volume 23
   No. 4

Page 4

APPEARANCES:
CASCINO VAUGHAN LAW OFFICES, LTD.
ROBERT G. McCOY, ESQUIRE
220 South Ashland Avenue
Chicago, Illinois 60607
312-944-0600
Counsel for Plaintiffs

FORMAN PERRY WATKINS KRUTZ & TARDY LLP
RICHARD M. CRUMP, ESQUIRE
crumprm@fpwk.com
City Centre, Suite 100
200 South Lamar Street
Jackson, Mississippi 39201
601-969-4272
Counsel for Owens-Illinois, Inc.
d/b/a O-I

GUNTY & McCARTHY
STEPHEN K. MILOTT, ESQUIRE (Via telephone)
stephen.milott@guntymccarthy.com
150 S. Wacker Drive
Suite 1025
Chicago, Illinois 60606
312-541-0022
Counsel for Crane Co. in
Krik and Wright only

HAWKINS PARNELL THACKSTON & YOUNG LLP
OLLIE M. HARTON, ESQUIRE
oharton@hptylaw.com
4000 SunTrust Plaza
303 Peachtree Street NE
Atlanta, GA 30308-3243
404-614-7400
Counsel for Ericsson, Goeken only

EXHIBIT 6

1 (Pages 1 to 4)

Page 5

1  APPEARANCES: (Continued)
2  HEYL, ROYSTER, VOELKER & ALLEN, P.C.
   TOBIN J. TAYLOR, ESQUIRE (Via telephone)
3  ttaylor@heylroyster.com
   124 S. W. Adams Street
4  Chase Building, Suite 600
   Peoria, Illinois 61602
5  309-676-0400
   Counsel for Bechtel Construction
6  Company and Union Carbide
7
8  JOHNSON & BELL, LTD.
   DAVID F. FANNING, ESQUIRE (Via telephone)
9  fanningd@jbltd.com
   33 West Monroe Street
10 Suite 2700
   Chicago, Illinois 60603-5404
11 312-372-0770
   Counsel for Exxon Mobil
12 Corporation, Krik only
13
14 O'CONNELL, TIVIN, MILLER & BURNS, LLC
   SEAN FERGUS, ESQUIRE (Via telephone)
15 sean@djoalaw.com
   135 South LaSalle Street
16 Suite 2300
   Chicago, Illinois 60603
17 312-256-8800
   Counsel for Cleaver-Brooks in Krik
18 and John Crane in Wright
19
20 SANCHEZ DANIELS & HOFFMAN LLP
   JOSEPH P. SULLIVAN, ESQUIRE (Via telephone)
21 jsullivan@sanchezdh.com
   333 West Wacker Drive
22 Suite 500
   Chicago, Illinois 60606
23 312-641-1555
   Counsel for RSCC Wire & Cable
24
25

Page 6

1  APPEARANCES: (Continued)
2  SEGAL McCAMBRIDGE SINGER & MAHONEY, LTD.
   JONATHAN M. LIVELY, ESQUIRE
3  jlively@smsm.com
   Suite 5500
4  233 South Wacker Drive
   Chicago, Illinois 60606
5  312-645-7800
   Counsel for The Okonite Company in
6  Goeken, Foster Wheeler in Wright
   and Weil-McLain in Krik
7
8
   WHEELER TRIGG O'DONNELL LLP
9  ERIK D. NADOLINK, ESQUIRE
   nadolink@wtotrial.com
10 1801 California Street
   Suite 3600
11 Denver, Colorado 80202
   303-244-1800
12 Counsel for General Electric in
   Gehrt and Bushmaker
13

Page 7

1      ARTHUR L. FRANK, M.D., Ph.D., having
2  been duly sworn, was examined and testified as
3  follows:
4          EXAMINATION
5  BY MR. NADOLINK:
6      Q.   Good afternoon, Dr. Frank.
7      A.   Good afternoon.
8      Q.   My name is Rick Nadolink. I'm here for
9  General Electric specifically in the Bushmaker and
10 Gehrt cases, but I understand that you are here today
11 for, it looks like, six cases.
12     A.   Yes, sir.
13     Q.   And is it correct that that's the
14 Bushmaker case, the Gehrt case, the Goeken case, the
15 Kinser case, the Krik case, and the Wright case?
16     A.   Yes, sir.
17         (Exhibit Frank 1 was marked for
18 identification.)
19 BY MR. NADOLINK:
20     Q.   All right. I've marked as Exhibit
21 Number 1 a letter to you from the Cascino Vaughan law
22 firm. What is that?
23     A.   Exhibit Number 1 is a letter of
24 transmittal sending back to me the files that you have
25 in front of you.

Page 8

1       My habit is when I do a case for an
2  attorney is I receive records, write my report, and
3  then when I finalize the case I send the report and
4  the original records they sent me back to them.
5       I asked to have those records returned
6  to me so I could have them today for your deposition
7  and then I could review them prior to your coming and
8  that's what this represents.
9      Q.   Do the lists under each case name on
10 Exhibit Number 1 accurately reflect the materials that
11 were sent to you by the Cascino Vaughan firm?
12     A.   I honestly didn't go line by line, but I
13 presume they did.
14     Q.   So that's Exhibit Number 1.
15     A.   Yes.
16         (Exhibit Frank 2 was marked for
17 identification.)
18 BY MR. NADOLINK:
19     Q.   Exhibit Number 2 is a packet of
20 documents that is labeled Gerald Bushmaker.
21     A.   Yes.
22     Q.   What does that packet of documents
23 represent?
24     A.   This is the file on Mr. Bushmaker which
25 includes my report in this case of September 16, 2011,

2 (Pages 5 to 8)

Page 9

1  a page and a little bit, the Notice of Deposition in
2  this case, and then the medical records that I saw
3  along with the interrogatories that were sent to me
4  when I was originally sent this case.
5     Q.   All right.  So that collectively will be
6  Exhibit Number 2.
7        (Exhibit Frank 3 was marked for
8  identification.)
9  BY MR. NADOLINK:
10    Q.   How about Exhibit Number 3 labeled Paul
11 Gehrt?
12    A.   That's again the same thing.
13         It's the letter that I wrote, the
14 September 16, 2011 letter, along with the Notice of
15 Deposition, and then the medical records that I've
16 seen in this case as well as an annotated transcript
17 of Mr. Gehrt done on June 6, 2011.
18         When I say annotated, they're
19 highlighted areas that I reviewed.
20    Q.   Is that highlighting done by you or done
21 by whoever provided --
22    A.   It was sent to me this way.
23    Q.   That will be collectively Exhibit Number
24 3.
25        (Exhibit Frank 4 was marked for

Page 10

1  identification.)
2  BY MR. NADOLINK:
3     Q.   Exhibit Number 4 is labeled Marion
4  Goeken.  What's that?
5     A.   That similarly is the Goeken case and
6  the exhibit again represents my September 16, 2011
7  letter, a Notice of Deposition, and the medical
8  records that were sent to me along with the deposition
9  transcript.
10    Q.   All right.
11    A.   And it looks like Answers to
12 Interrogatories.
13    Q.   That will be --
14    A.   Exhibit 4.
15    Q.   -- collectively Exhibit Number 4.
16        (Exhibit Frank 5 was marked for
17 identification.)
18 BY MR. NADOLINK:
19    Q.   Exhibit Number 5 is a packet of
20 documents marked Larry Kinser.
21    A.   Similarly, this would be my report
22 written in this case.  It has the same date of
23 September 16, 2011, plus medical records, plus
24 deposition transcript.
25    Q.   All right.  That will be collectively

Page 11

1  Exhibit Number 5.
2     A.   Yes, sir.
3        (Exhibit Frank 6 was marked for
4  identification.)
5  BY MR. NADOLINK:
6     Q.   Exhibit Number 6 is a packet of
7  documents labeled Charles Krik.
8     A.   And this would be the September 16, 2011
9  letter in this case, and then medical records, as well
10 as interrogatories and deposition transcripts.
11    Q.   That will be collectively Exhibit Number
12 6.
13    A.   Yes.
14        (Exhibit Frank 7 was marked for
15 identification.)
16 BY MR. NADOLINK:
17    Q.   Exhibit Number 7 is a packet of
18 documents labeled Deon Wright.
19    A.   Similarly, this is the packet of
20 material that I have in this case, the September 16,
21 2011 letter, the Notice of Deposition, a work summary,
22 an exposure history, list of defendants, and medical
23 records and Answers to Interrogatories.
24        That collectively will be Exhibit 7.
25    Q.   Okay.  Thank you.

Page 12

1        (Exhibit Frank 8 was marked for
2  identification.)
3  BY MR. NADOLINK:
4     Q.   And I've marked as Exhibit Number 8 the
5  curriculum vitae that you provided to us this morning
6  or this afternoon and you indicated this is the up-to-
7  date version?
8     A.   It is.  It's the most up-to-date one
9  that I have.  The date is always on the last page.
10 This is through September 2011.
11        The only significant change would be
12 I've been asked to give a talk at the research program
13 at the University of Colorado School of Public Health
14 in March and they've asked me to talk about asbestos.
15    Q.   And what's the date on that CV?
16    A.   September 2011.
17    Q.   Okay.
18    A.   If you look at the last page, there's
19 always a date.
20        No.  You passed it.
21        (Exhibit Frank 9 was marked for
22 identification.)
23 BY MR. NADOLINK:
24    Q.   Okay.  I've marked as Exhibit Number 9
25 an additional disclosure that I'll represent that we

Page 13

1  got from the plaintiffs in this case, which is
2  entitled Statement re: Federal Rule 26(a)(2) reports
3  for Cascino Vaughan Law Offices.
4      It looks like it has a short statement
5  from you regarding your prior testimony as well as the
6  rates that you charge, a little bit older version of
7  your CV, a list of prior testimony, and an example of
8  some prior testimony in the Reynolds case?
9      A.  I have no specific recollection of that
10 case.
11     Q.  Okay.
12     A.  That's Exhibit 9.
13     Q.  That will be Exhibit Number 9. All
14 right?
15     MR. McCOY: That's the Rule 26
16 disclosure that our firm put together.
17     MR. NADOLINK: Okay. Thank you.
18 BY MR. NADOLINK:
19     Q.  As I said, you're here for six cases
20 today. I'm here for only General Electric, who is
21 only in the Gehrt and Bushmaker cases.
22     A.  So I'll assume we'll do those first.
23     Q.  Yes. Yes, sir.
24     A.  And I assume before that you will want
25 to do general medicine and do general views, or we can

Page 14

1  go straight to the cases. It's your deposition.
2      Q.  Okay. Thank you.
3      Just some preliminaries. You're Board
4  certified in occupational medicine; is that correct?
5      A.  Yes.
6      Q.  You are not Mr. Gehrt's or
7  Mr. Bushmaker's treating physician?
8      A.  I'm none of these individuals' treating
9  physicians, that's correct.
10     Q.  Outside of the medical records that you
11 were provided by plaintiffs' counsel, did you review
12 any medical records in this case?
13     A.  No. The only materials I reviewed are
14 the materials that are here. I've not spoken to
15 anybody, their treating doctors, family members,
16 coworkers, or anybody else.
17     Q.  Can I see Exhibit Number 1, please.
18     So in terms of the Bushmaker case, you
19 reviewed the pathology report dated December 21st,
20 2006 and the 13 pages of medical records that were
21 provided to you by the Cascino Vaughan firm; correct?
22     A.  Yes.
23     Q.  And you did not review anything else for
24 the Bushmaker case in terms of medical records?
25     A.  Correct. Or anything else.

Page 15

1      Well, other than what's here, which is
2  the interrogatories.
3      Q.  Sure. And in the Gehrt case you
4  reviewed a pathology report dated October 6, 2008 and
5  83 pages of medical records that were provided to you
6  by the Cascino Vaughan firm; correct?
7      A.  I didn't count them. If it says 83,
8  I'll assume that there's 83.
9      Q.  Okay. And you didn't review any
10 additional medical records in either the Bushmaker or
11 Gehrt case?
12     A.  Correct.
13     Q.  You've never spoken to Mr. Gehrt or
14 Mr. Bushmaker?
15     A.  I've never spoken to Mr. Gehrt,
16 Mr. Bushmaker, their treating doctors, coworkers,
17 family members or anybody involved with their care or
18 their case other than their attorney.
19     Q.  So you were never able to take an
20 exposure history from either of those gentlemen;
21 correct?
22     A.  Correct.
23     Q.  In preparing to testify for the
24 Bushmaker and Gehrt cases, and for that matter the
25 remaining cases that you're here for today, did you

Page 16

1  speak to anybody besides the plaintiffs' lawyers?
2      A.  No.
3      Q.  In Exhibit 2 and 3, which are the
4  packets for Bushmaker and Gehrt respectively, there
5  are copies of your case specific written report; is
6  that right?
7      A.  Yes.
8      Q.  Is everything that you know about
9  Mr. Gehrt and Mr. Bushmaker's exposures that you
10 considered and relied upon in this case reflected in
11 your report?
12     A.  Yes. It may not be as detailed as the
13 information that I received. I don't recite what I'm
14 given verbatim.
15     I just need to in my own mind establish
16 that any individual, in this case Mr. Bushmaker and
17 Mr. Gehrt, or the other four, had prior exposure to
18 asbestos and that that exposure to asbestos was of
19 sufficient latency period that I could relate disease
20 that I might find in their records to such exposures.
21     Q.  Could I see Exhibit Number 1 again,
22 please.
23     A.  (Witness complies.)
24     Q.  Did you review anything for either of
25 these two cases outside of the packets of information

Page 17

1  that are marked as Exhibits 2 and 3 in the Bushmaker
2  and Gehrt cases?
3      A.  Nothing. If I had, I would have brought
4  it.
5      Q.  Now, in the Bushmaker case, it indicates
6  on Exhibit Number 1 from Cascino Vaughan that you
7  received a July 20, 2011 deposition summary from
8  Cascino Vaughan regarding the Bushmaker case. Is that
9  in that packet of information?
10     A.  It is actually not.
11     Q.  Okay. What I just handed to you a copy
12 of the summary that was provided to you by Cascino
13 Vaughan?
14     A.  If it's not in here, then I'll have to
15 rely on the fact that it was probably the same one
16 that I was sent earlier.
17         It's here. It's part of Exhibit 2.
18     Q.  Oh, is it?
19     A.  Yes. It's right here.
20     Q.  I missed it. Okay. All right. So it's
21 in there as Exhibit 2.
22     A.  It is. Then yes, it is the one that was
23 supplied to me.
24     Q.  All right. In the Gehrt case, were you
25 provided with the summary of Mr. Gehrt's deposition

Page 18

1  testimony in the Gehrt case?
2      A.  I was provided with his transcript that
3  was highlighted.
4      Q.  Did you review that transcript?
5      A.  Yes.
6      Q.  Did you review it in its entirety or
7  just the highlighted portions?
8      A.  I looked at the highlighted portions and
9  then I skimmed through the rest of it. There's a lot
10 of stuff in depositions which from my perspective is
11 not all that useful like where he lived, I mean the
12 kids he had, that kind of stuff.
13     Q.  All right. So is it fair to say from
14 your review of the materials in the Gehrt case that
15 Mr. Gehrt's employment history included being in the
16 Navy in the '65 to '69, then he went to work for a
17 company called Square D, and then he went to work for
18 a company called Remco for about ten years, and then
19 he finished his career with 27 years at the University
20 of Illinois?
21     A.  I have to see if I have that specific
22 history but, again, that's more detailed than I would
23 generally put in my report but -- does it say that I
24 got a copy of the work history?
25     Q.  It doesn't say that here, no. It would

Page 19

1  have just been from the deposition transcript or the
2  interrogatory responses.
3      A.  Well, I can't recall specifically back
4  in September or earlier where I got the information,
5  but it must be in here or it would have been some
6  source of that information.
7      Q.  All right. Well, let's put it this
8  way. Outside of Mr. Gehrt's testimony, do you know
9  anything about his employment in the United States
10 Navy from 1965 to '69?
11     A.  No.
12     Q.  How about at Square D?
13     A.  No.
14     Q.  How about at Remco?
15     A.  No.
16     Q.  How about at the University of Illinois?
17     A.  No.
18     Q.  Have you ever reviewed any documents
19 regarding the work practices or industrial hygiene
20 practices of any of those employers?
21     A.  No.
22     Q.  Do you know anything about the working
23 conditions at any of those work sites?
24     A.  Well, I don't specifically know where he
25 served in the Navy, but I have some familiarity with

Page 20

1  Navy exposure. I don't know where Square D facility
2  he worked in. I've been in some Square D facilities.
3          Don't know anything about Remco. What
4  was the other? Oh, the University of Illinois. I
5  don't think I've ever visited there.
6      Q.  Do you know anything about the
7  industrial hygiene practices or other occupational
8  safety practices that were employed or not employed at
9  any of those work sites?
10     A.  No.
11     Q.  Do you know anything about any of the
12 safety training that Mr. Gehrt did or did not receive
13 at any of those work sites?
14     A.  No.
15     Q.  Do you know anything about the safety
16 procedures that were in place at any of those work
17 sites?
18     A.  No.
19     Q.  Do you know anything about any of the
20 equipment that was installed at any of those work
21 sites?
22     A.  No.
23     Q.  With respect to the Bushmaker case, your
24 understanding that Mr. Bushmaker, in addition to also
25 being in the Navy at the time, worked as a pipefitter

Page 21

1  at Consolidated Paper in Wisconsin at various sites
2  from roughly 1946 to 1991.
3  **A.  I don't have the dates, but I know that**
4  **he worked at a paper company in Wisconsin.**
5  Q.  Have you reviewed any documents with
6  respect to the working conditions at any of the
7  Consolidated Paper facilities?
8  **A.  No.  Nor at any of the facilities where**
9  **any of the plaintiffs are today.**
10 Q.  Do you know anything about the working
11 conditions at any Consolidated Paper facilities in
12 Wisconsin during the relevant period for this case?
13 **A.  No.**
14 Q.  Do you know anything about the
15 industrial hygiene practices or training that
16 Consolidated Paper used in the '40s through the '90s?
17 **A.  No.**
18 Q.  Do you know anything about the safety
19 training or other safety procedures that were in place
20 at Consolidated Paper during that time period?
21 **A.  No.  But whatever they were weren't**
22 **sufficient because the man ended up with two asbestos**
23 **related diseases.**
24 Q.  Do you know anything about the --
25     COUNSEL ON PHONE:  Excuse me.  Can the

Page 22

1  phone be placed closer to the deponent, please.
2      MR. NADOLINK:  Let's go off the record.
3      (Discussion off the record.)
4      MR. NADOLINK:  Can you guys hear us on
5  the phone?
6      COUNSEL ON PHONE:  Yes.  Thank you.
7  BY MR. NADOLINK:
8  Q.  Do you know anything about the equipment
9  or other products that were installed at any
10 Consolidated Paper facilities in Wisconsin during the
11 relevant period?
12 **A.  No.**
13 Q.  Going back to the Gehrt case
14 specifically, can you tell me what GE products are at
15 issue in the Gehrt case?
16 **A.  No.**
17 Q.  Can you tell me anything about how
18 Mr. Gehrt alleges that he was exposed to any GE
19 products?
20 **A.  No.  I'm sure it's in his transcript,**
21 **but I didn't recall those details.**
22 Q.  So as you sit here today, can you tell
23 me anything about that alleged exposure?
24 **A.  Well, I could -- if there's an index I**
25 **can start looking up -- no, there's no index.  So I**

Page 23

1  **would have to go through the whole thing to see what**
2  **he talks about with regard to GE, but I don't keep**
3  **track by company by exposure.**
4  **    So Mr. Gehrt's record will speak for**
5  **itself.**
6  Q.  So you don't know whether there's any
7  evidence in the transcript that Mr. Gehrt ever
8  actually worked with an asbestos-containing product
9  manufactured by GE; correct?
10 **A.  Well, I don't recall.  I mean, you know,**
11 **there's a lot of material here.  I didn't try to**
12 **remember, you know, in going through this transcript**
13 **which companies' products he necessarily worked with.**
14     MR. McCOY:  You all can go ahead and
15 continue.  I need to step out for a moment.
16     (Discussion off the record.)
17     THE WITNESS:  I did find a reference
18 here where he talks about General Electric switch
19 gear.
20 BY MR. NADOLINK:
21 Q.  All right.  And what you're looking at,
22 does it say anything about what Mr. Gehrt claims to
23 have done with any General Electric switch gear?
24 **A.  There was a flood at the University of**
25 **Illinois and he answered a question, We tore out the**

Page 24

1  **switch gear, which was old Westinghouse gear, and by**
2  **doing that we pulled all the feeder wire into a tunnel**
3  **and temporated (sic) it -- that's what it says --**
4  **while we put in new Square D or new General Electric**
5  **switch gear.**
6  **    And during that time the tunnel flooded**
7  **and everything was under water.**
8  Q.  Anything about that description that
9  would suggest that Mr. Gehrt was exposed to asbestos
10 from General Electric switch gear?
11 **A.  No.**
12 Q.  All right.  As you sit here today, do
13 you have any knowledge or recollection of how often
14 Mr. Gehrt claims that he was working on or around
15 General Electric switch gear?
16 **A.  No.**
17 Q.  Do you have any recollection of how --
18 of what work practices that Mr. Gehrt claims he used
19 by which he alleges he was exposed to General Electric
20 switch gear?
21 **A.  I don't understand the question.  Work**
22 **practices has no relationship to allegedly exposed to**
23 **GE switch gear.  Either you have to ask me do I know**
24 **about his exposures to GE switch gear, which I do have**
25 **information on.**

Page 25

1  While he worked for Remco he answers
2 that he generally or typically used General Electric
3 or Square D switch gear. I don't know how often that
4 was.
5  And then if you ask me about work
6 practices, you've asked me about that already, and I
7 don't know the work practices at Remco.
8 Q. Is there anything about that description
9 that you just read from his testimony that would
10 suggest that Mr. Gehrt was ever exposed to asbestos
11 from GE switch gear?
12 A. No.
13 Q. All right. Do you know how long
14 Mr. Gehrt spent around GE switch gear?
15 A. No. That information isn't here.
16 Q. If Mr. Gehrt was around others who were
17 working on GE switch gear, do you have any knowledge
18 about what those people were doing?
19 A. No.
20 Q. Or how long?
21 A. No.
22 Q. Or how often?
23 A. No.
24 Q. Do you know how many GE switch gear are
25 at issue in this case?

Page 26

1 A. No.
2 Q. Do you know what other companies besides
3 General Electric may have provided switch gear to any
4 of Mr. Gehrt's job sites?
5 A. Square D.
6 Q. Any others?
7 A. Well, he talks about ripping out old
8 Westinghouse, but that's not supplied.
9 Q. Any others?
10 A. Not that I'm aware of.
11 Q. Do you know where any of the purported
12 GE switch gear were located at Mr. Gehrt's job site?
13 A. I've not been there.
14 Q. Do you know when they were installed?
15 A. No.
16 Q. Do you know how big they were?
17 A. No.
18 Q. Do you know if they contained any
19 asbestos?
20 A. No. That's not my role in this case.
21  I have to assume that at the time of
22 trial it will be proven or not proven to the
23 satisfaction of the jury that GE products to which he
24 was exposed had or did not have asbestos in them.
25  And to my mind it doesn't really matter

Page 27

1 how much, how often, with what frequency, directly or
2 indirectly he was exposed; just that he was exposed.
3  And if that is the case, then I can
4 render an opinion as to what I think caused his
5 disease, but I'm not here to tell you about the issues
6 of how much exposure he had, the frequency, or how
7 long it lasted, or what the dose was on any occasion
8 that he may have been exposed to such switch gear of
9 yours or anybody else's company.
10 Q. All right. As you just described, the
11 factors that you just listed aren't important to you
12 in rendering your expert opinions; correct?
13 A. They're not important to me
14 scientifically or medically to make the connection
15 between exposure to asbestos and the development of a
16 disease, in this case two diseases, which I believe he
17 developed as a result of exposure to asbestos.
18 Q. Do you know what parts of a GE switch
19 gear supposedly contain asbestos?
20 A. No.
21 Q. Do you know how much asbestos is
22 supposedly in a GE switch gear?
23 A. No.
24 Q. Do you know what type of -- what fiber
25 type of asbestos is used supposedly in a GE switch

Page 28

1 gear?
2 A. No.
3 Q. Let's move to the Bushmaker case.
4  Do you know what GE products are at
5 issue in the Bushmaker case?
6 A. I do not, nor do I know what other
7 products of any other company are at issue in this
8 case.
9 Q. All right. So do you know how often
10 Mr. Bushmaker claims to have worked on or around --
11 I'll tell you --
12 A. If it's the same set of questions,
13 you'll get the same set of answers. I know nothing
14 about any of those factors.
15 Q. I appreciate that you want to -- and I
16 would love to be able to short-circuit it as well, but
17 I'm going to go ahead and ask them again.
18  I'm going to tell you that the products
19 that are at issue in the Bushmaker case are GE
20 turbines. Okay?
21 A. I have a little more familiarity with
22 turbines than I do with switch gear, so I've been
23 involved with GE turbines in other cases or have seen
24 GE turbines.
25  So the potential areas where they would

7 (Pages 25 to 28)

Page 29

1 have asbestos would be asbestos wiring, the covers,
2 the inside covers of the turbines sometimes had
3 asbestos.
4       There might have been asbestos paper in
5 the turbines, but I do not know specifically which
6 turbines Mr. Bushmaker worked with, on what occasions,
7 what frequency, what he did, or what asbestos may or
8 may not have been there at any time that he worked on
9 a GE turbine.
10    Q.   Do you know how many GE turbines were at
11 any of the Consolidated Paper facilities at issue?
12    A.   No.
13    Q.   Do you know where they were located
14 within the facility?
15    A.   I know nothing about the facility.
16    Q.   So no?
17    A.   No.
18    Q.   Do you know when the turbines were
19 installed?
20    A.   I do not know when they were installed,
21 I do not know their age, I do not know their size, I
22 do not know their number, I do not know how much
23 electricity they put out.
24    Q.   Do you know whether they use asbestos?
25    A.   No.

Page 30

1     Q.   Do you know how much asbestos, if there
2 was any, that were used in connection with any GE
3 turbine at any of the Consolidated Paper facilities
4 that Mr. Bushmaker worked at?
5     A.   I know as much about that as I knew
6 about the other things you asked me about those
7 turbines.
8     Q.   Which is none?
9     A.   Right. Other than what I testified to
10 already.
11    Q.   Okay. So fair to say you're not here to
12 testify regarding either the quantity or the quality
13 of Mr. Gehrt's or Mr. Bushmaker's alleged exposure to
14 asbestos from any GE product; correct?
15    A.   Correct. That's not my role in this
16 case.
17    Q.   There are professionals called certified
18 industrial hygienists who are experts in doing
19 measurements and assessments of workplace exposures
20 and you're not an industrial hygienist?
21    A.   I'm not an industrial hygienist
22 certified or otherwise and unless there was a
23 certified industrial hygienist each and every day
24 present when Mr. Bushmaker or Mr. Gehrt was doing his
25 work, nobody will ever know, nor could they know, nor

Page 31

1 is it possible to know, what the cumulative dose is
2 that either of these gentlemen got from working on GE
3 or any other products that might have contained
4 asbestos.
5     Q.   You don't have the skill set of an
6 industrial hygienist; correct?
7     A.   No.
8     Q.   I'm not correct?
9     A.   You are correct. No, I do not have such
10 a skill set.
11    Q.   Plaintiffs in this case have retained
12 industrial hygiene experts, and you're not here to
13 testify about or contradict anything that they've
14 said, right?
15    A.   I'm here to answer your questions.
16    Q.   Okay. So you may disagree with some of
17 the plaintiffs' industrial hygienists in this case?
18    A.   Potentially it's possible.
19    Q.   Okay.
20    A.   I keep my own counsel. I don't adopt
21 somebody else's views if I don't agree with them.
22    Q.   What typically happens in these cases
23 with you, Dr. Frank, is that the plaintiff's lawyer is
24 going to ask you to assume that Mr. Gehrt and
25 Mr. Bushmaker worked on various GE products, either GE

Page 32

1 switch gear in the case of Mr. Gehrt, turbines in the
2 case of Mr. Bushmaker, and that it released asbestos
3 dust while he was working on or around it, right?
4     A.   That is what I would expect. It's
5 called a hypothetical and it's given to me at the time
6 of trial.
7     Q.   And then when you're given that
8 hypothetical you'll then testify that that exposure
9 was a significant factor in the development of their
10 diseases; correct?
11    A.   Correct.
12    Q.   In this case both of their diseases in
13 this case, Mr. Gehrt and Mr. Bushmaker both have lung
14 cancer?
15    A.   Yes.
16    Q.   And as you described to me before, you
17 really don't care how much exposure Mr. Gehrt or
18 Mr. Bushmaker got from any GE product, as long as it
19 was above background level, right?
20    A.   Correct.
21    Q.   And the reason that you can give your
22 causation opinion in the absence of evidence regarding
23 how much exposure Mr. Gehrt or Mr. Bushmaker got from
24 a GE product or the product of any other defendant in
25 these cases is because it's your opinion that any

8 (Pages 29 to 32)

Page 33

1 exposure above background levels, no matter how small,
2 is going to be a significant cause of any ultimate
3 lung cancer, right?
4     A.    No. That is what I would say, but it's
5 not because of that. There is no one who will be able
6 to say or answer how much exposure they got from any
7 product on any given day.
8         They may guesstimate it, they may do
9 some calculations, they may make certain assumptions,
10 but unless somebody was out there measuring it every
11 day that either of these gentlemen was working with a
12 GE or any other product containing asbestos, no one
13 will ever really know exactly how much exposure they
14 had.
15     Q.    But it is your expert opinion in this
16 case if asked that any exposure above ambient
17 background levels, no matter how small, was a
18 significant cause of Mr. Gehrt's and Mr. Bushmaker's
19 resulting lung cancer, right?
20     A.    That's a different question. Yes, I
21 would answer in the affirmative.
22     Q.    Okay. And we've talked -- you and I
23 have talked about this before. It's like the analogy
24 that I made before with you is with cigarette smoking
25 for example.

Page 34

1         If somebody had smoked a pack of
2 Marlboros every day for 40 years, but on one day in
3 1968 didn't have their Marlboros with them and bummed
4 a Camel off of one of their friends and smoked that
5 Camel on January 25, 1968, and then 40 years later he
6 got lung cancer, that one Camel in your opinion would
7 be a substantial contributing factor toward his lung
8 cancer; correct?
9     A.    Yes. It's certainly wouldn't have
10 contributed the same amount as 40 years of smoking
11 Marlboro, but the answer I've given you before and
12 given others before, let us for argument sake say --
13 I'm not saying that this is accurate.
14         But let us for argument sake say that
15 you could smoke a pack of cigarettes for a year and
16 not get lung cancer.
17         And if someone decided every year to
18 switch which brand of cigarettes they smoked and over
19 30 or 40 years smoked 30 or 40 different brands of
20 cigarettes, each of them for one year, and then they
21 got lung cancer, you'd either have to say that
22 cigarettes didn't cause the lung cancer because one
23 pack year doesn't cause lung cancer.
24         And so each of those 30 or 40 different
25 brands gets a pass.

Page 35

1         Or that the cumulative exposure, even
2 though it was a different brand, the cumulative
3 exposure to 40 years of cigarette smoking was the
4 cause of the lung cancer.
5         Similarly, it works that way with
6 asbestos exposure and the development of lung cancer
7 or mesothelioma or anything else.
8         There may be different amounts of
9 exposure, but no individual exposure can be said not
10 to have been contributory, because we know that all of
11 these diseases are dose response diseases and that it
12 is the cumulative exposure that gives rise to the
13 disease.
14         And the cumulative exposure in the case
15 of your analogy would be 40 years of Marlboros and one
16 day of Camels, they're certainly not equal, they
17 certainly didn't contribute the same amount, but they
18 are the same product giving off the same carcinogen or
19 set of carcinogens and would have to be said to have
20 been partially responsible, though obviously the level
21 of responsibility would be very different.
22     Q.    And in your opinion indeed that one
23 Camel is a substantial contributing factor toward that
24 gentleman's lung cancer -- the hypothetical
25 gentleman's lung cancer, right?

Page 36

1     A.    Yes.
2     Q.    Despite the fact that he smoked
3 literally millions of Marlboros over the course of his
4 life?
5     A.    Yes. Because let's say every week he
6 forgo to bring his own cigarettes and one week he
7 bummed a couple or three Camels and the next week he'd
8 bum a couple of Kents and the next week he bummed a
9 couple or three something elses and over his lifetime
10 he would bum a, you know, small numbers of each of,
11 you know, 20 different brands.
12         Again, I wouldn't give them a pass
13 either.
14     Q.    And in the hypothetical that you set up
15 there, I just want to be clear. In your opinion,
16 there is no threshold level of cigarettes that you can
17 smoke where the risk of lung cancer goes to zero,
18 right?
19     A.    Correct.
20     Q.    All right. So there's no safe level of
21 cigarette smoking; correct?
22     A.    There's no safe level of any carcinogen
23 exposure.
24     Q.    All right. Now, away from the
25 hypothetical to Mr. Gehrt. Mr. Gehrt smoked

Page 37

1 cigarettes regularly for 25 years; correct?
2   A.  He certainly was a cigarette smoker. I
3 don't -- I'm not sure I recall the specifics.
4       And I certainly attributed his lung
5 cancer in part to his cigarette smoking.
6   Q.  All right. So Mr. Gehrt smoked
7 regularly for 25 years, yes?
8   A.  And then he gave up the cigarettes about
9 20 years before he developed his lung cancer.
10  Q.  And smoking tobacco is far and away the
11 leading cause of lung cancer in this country?
12  A.  Well, that's because more people are
13 exposed to the carcinogens in cigarettes than they are
14 exposed to the carcinogens that we also know cause
15 lung cancer, like arsenic or isopropyl oil or
16 radiation or asbestos.
17      So it's not surprising that most lung
18 cancers are caused by the thing that most people are
19 exposed to.
20  Q.  So you agree that tobacco is far and
21 away the leading cause of lung cancer in this country?
22  A.  I agree with the surgeon general that
23 about 85 percent of lung cancers are attributable to
24 cigarettes.
25  Q.  And you agree that smoking caused

Page 38

1 Mr. Gehrt's lung cancer?
2   A.  In part.
3   Q.  How did you go about excluding
4 Mr. Gehrt's smoking as the primary cause of his lung
5 cancer?
6   A.  I didn't say it was his primary cause.
7 I said the two together were the cause.
8   Q.  Do you agree that the primary cause of
9 his lung cancer was smoking?
10  A.  Absolutely not.
11  Q.  So how did you exclude the idea that
12 Mr. Gehrt's 25 years of cigarette smoking wasn't the
13 primary cause of his lung cancer?
14  A.  Because I don't claim that I know what
15 the primary cause is. The primary cause of his lung
16 cancer was the combination of asbestos and cigarettes.
17  Q.  Did you make any effort to exclude his
18 25-year smoking history as the primary cause of his
19 lung cancer?
20  A.  I just said I don't ascribe either one
21 of his known exposures as the primary cause. Together
22 they caused his cancer.
23      You can't say that there was a primary
24 and a secondary. It would also imply that I would be
25 able to, which nobody should be able to do, though

Page 39

1 people do it all the time, say which exposure was the
2 cause of someone's cancer.
3       I mean I've seen, you know, defense
4 doctor reports when somebody's been a smoker and
5 they've worked with asbestos; that the asbestos had
6 nothing to do with it and it was all 100 percent from
7 cigarettes.
8       So, obviously, they -- they believe the
9 primary and the only cause.
10      I can't give you the relative
11 contribution of either one, so I can't say which one
12 is primary.
13  Q.  Did you make any effort to determine
14 which type of carcinogen, whether it be tobacco or
15 otherwise, contributed the most to Mr. Gehrt's risk of
16 getting lung cancer?
17  A.  I did not, because I have no basis on
18 which to do that.
19  Q.  Did you use any methodology whatsoever
20 to try to determine that Mr. Gehrt's exposure to
21 asbestos from a GE switch gear, if there was such, was
22 significant in light of the fact that the man had a
23 25-year smoking history?
24  A.  One has nothing to do with the other. I
25 ascribed his lung cancer to the combination of his

Page 40

1 smoking and his asbestos exposure.
2       So any source of cigarettes and any
3 source of asbestos together, and I can't rule out
4 either one or a GE product or a Westinghouse product
5 or a Square D product, or anybody else's product, if
6 they had asbestos in them.
7   Q.  But generally speaking, you agree, do
8 you not, that large exposures to carcinogens
9 contribute more to a person's risk of getting lung
10 cancer than small exposures to carcinogens?
11  A.  We just had such an example, the one
12 Camel and the 40 years of Marlboro. Of course I agree
13 to that.
14  Q.  All right. So --
15  A.  But I don't know what the relative risk
16 is from cigarettes versus tobacco. And if anything,
17 tobacco has been called a rather weak carcinogen and
18 asbestos has been called a rather strong carcinogen.
19      So on the basis of that, which I don't
20 necessarily ascribe to, I do believe that there is
21 that evidence, one could logically say that asbestos
22 is a more powerful carcinogen than cigarettes.
23      Let me give you a reason why. You can
24 be exposed to asbestos for one day and come down with
25 cancer.

10 (Pages 37 to 40)