```
1                 IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
2                          EASTERN DIVISION

3    CHARLES KRIK,                 )  Docket No. 10 C 7435
                                   )
4                   Plaintiff,     )
                                   )
5           v.                     )  Chicago, Illinois
                                   )  April 8, 2014
6    BP AMERICA, INC., et al.      )  2:30 o'clock p.m.
                                   )
7                   Defendants.    )

8            TRANSCRIPT OF PROCEEDINGS - ORAL ARGUMENT
               BEFORE THE HONORABLE JOHN Z. LEE
9
     APPEARANCES:
10
     For the Plaintiff:           CASCINO, VAUGHAN LAW OFFICES
11                                LTD, by
                                  MR. ROBERT GEORGE McCOY
12                                MR. JIN-HO CHUNG
                                  220 South Ashland Avenue
13                                Chicago, Illinois 60607

14   For Defendant Crane:         K&L GATES, by
                                  MR. DAVID FUSCO
15                                210 Sixth Avenue
                                  Pittsburgh, Pennsylvania 15222
16
                                  GUNTY & McCARTHY LAW OFFICES, by
17                                MR. JAMES PAUL KASPER
                                  150 South Wacker Drive
18                                Suite 1025
                                  Chicago, Illinois 60606
19

20

21                    ALEXANDRA ROTH, CSR, RPR
                        Official Court Reporter
22                    219 South Dearborn Street
                            Room 1224
23                    Chicago, Illinois 60604
                         (312) 408-5038
24

25
```

```
1   APPEARANCES:   (Continued)

2   For Defendant Exxon Mobil:     JOHNSON & BELL, by
                                   MR. H. PATRICK MORRIS
3                                  MR. DAVID FRANCIS FANNING
                                   33 West Monroe Street
4                                  Suite 2700
                                   Chicago, Illinois 60603
5
    For Defendant Owens-           SCHIFF HARDIN LLP, by
6   Illinois:                      MR. BRIAN O'CONNOR WATSON
                                   MR. EDWARD M. CASMERE
7                                  233 South Wacker Drive
                                   Suite 6600
8                                  Chicago, Illinois 60606

9   For Defendant Marley-          SEGAL McCAMBRIDGE SINGER &
    Wylain:                        MAHONEY, LTD., by
10                                 MR. SHAWN PATRICK BABIUCH
                                   233 South Wacker Drive
11                                 Suite 5500
                                   Chicago, Illinois 60606
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (Proceedings had in open court:)

2        THE CLERK:  10 C 7435, Krik versus BP America, for

3    oral argument.

4        MR. McCOY:  Bob McCoy and Jin-Ho Chung for the

5    plaintiff, your Honor.  And this is Sebastian Baere.  He is a

6    legal assistant for our firm.

7        MR. CASMERE:  Good afternoon, your Honor.  Edward

8    Casmere and Brian Watson on behalf of Owens-Illinois.

9        MR. MORRIS:  Good afternoon, your Honor.  Pat Morris

10   and David Fanning on behalf of Mobil.

11       MR. BABIUCH:  Good afternoon, your Honor.  Shawn

12   Babiuch on behalf of Weil-McLain.

13       MR. FUSCO:  Good afternoon, your Honor.  David Fusco

14   and Jamie Kasper on behalf of Crane Co.

15       THE COURT:  All right.  So who will be arguing?  Let

16   me ask you this:  How have the defendants decided to proceed

17   with their collective argument as to the single exposure

18   motions?

19       MR. CASMERE:  Your Honor, I will go for -- between

20   five to seven minutes.  And the remaining defendants have

21   divided up the initial time as well.

22       THE COURT:  So what you are telling me is that

23   everyone is going to say something about this motion.

24       MR. CASMERE:  I think in the first motion there will

25   be three defendants that speak.

1          MR. MORRIS:  I think the hope is that we obviously

2   don't duplicate anything, try to cover discrete topics that

3   pertain to our clients particularly when taken as a whole.  We

4   think it's the whole motion.

5          THE COURT:  Okay.  Very well.

6          Mr. McCoy?  What about for the plaintiffs?  Will you

7   be arguing?

8          MR. McCOY:  Yes, I will argue, Judge.

9          THE COURT:  Who will be doing defendants' rebuttal?

10          MR. CASMERE:  I think it depends on what issues they

11   raise in their -- in their response, your Honor.

12          THE COURT:  Okay.  Very well.  Everyone else can take

13   a seat except for the attorney who's arguing.

14          MR. McCOY:  Your Honor, is it all right if I just stay

15   seated here at the corner until they finish?

16          THE COURT:  That's perfectly fine.

17          MR. McCOY:  Thanks.

18          THE COURT:  You may proceed.

19          MR. CASMERE:  Thank you, your Honor.  Edward Casmere

20   on behalf of Owens-Illinois.

21          I think, your Honor, that we should use Dr. Frank's

22   own words to frame the debate.  And it's Dr. Frank's opinion,

23   your Honor, that the only exposure to a product that is not a

24   substantial contributing factor is the exposure to a product

25   that did not occur.

1      So every exposure, regardless of how much, how long,

2  what kind of asbestos, you name it.  If there is an exposure

3  above one fiber, it's a substantial contributing factor,

4  according to Dr. Frank.

5      THE COURT:  A substantial contributing factor to what?

6      MR. CASMERE:  Causing whatever disease the plaintiff

7  has.  It's a one-size-fits-all opinion that's specifically

8  designed to leave the door open to implicate whatever defendant

9  is left standing at trial.  That's the reason why Dr. Frank's

10  report is only a few sentences past one page.

11      That opinion, the every exposure is a substantial

12  contributing factor opinion, reads out the word substantial of

13  the substantial factor test.  It negates the legal standard

14  that's applicable in this case, which is maritime law as to

15  Owens-Illinois.

16      The root of the opinion is based on an unreliable

17  methodology that is not based on science.  It's not based on

18  epidemiology.  It's not based on medicine.  It's based on Dr.

19  Frank's personal belief that every fiber is guilty until proven

20  innocent.  And you can never prove them innocent.

21      The fundamental issue in front of the Court with this

22  opinion is, will an expert witness be allowed to rewrite the

23  legal standard and write the word, substantial, out of the

24  substantial factor test.

25      THE COURT:  Mr. Casmere, what particular ailment, can

1    you remind me, is the plaintiff alleging?

2          MR. CASMERE:  Lung cancer.

3          THE COURT:  Okay.  And so would you agree that at some

4    dosage level -- and I know that those words have particular

5    meaning.  But at some dosage level, that asbestos fibers can be

6    seen as a substantial contributing factor to lung cancer?

7          MR. CASMERE:  If other conditions are present, yes.

8    If the person is not a smoker, if the person has asbestosis, if

9    they have a substantial exposure to asbestos that's measured in

10   fiber-years, there are criteria that exist.

11         THE COURT:  Okay.  So let's assume that the facts are

12   such that all of those other contributing factors don't exist.

13   Okay.  This is hypothetical.  I'm just trying to figure out the

14   overall framework of the argument.

15              And so let's say that the plaintiff has exceeded the

16   dosage level and to which that the asbestos fibers can be

17   construed to be a substantial contributing factor.  Okay.  And

18   then with regard to every fiber after that, okay, how would you

19   characterize the impact in legal terms of every fiber after

20   that dosage level?  After this specific dosage level, would

21   every fiber be considered a substantial contributing factor or

22   no?

23         MR. CASMERE:  I don't think you can measure it in that

24   way, your Honor. I think that --

25         THE COURT:  Well, I mean, it's -- I don't know whether

1   legally you can.  But factually one has to, right?  If you look

2   at exposure over the course of several years, say, and let's

3   say that this hypothetical plaintiff, where it's all agreed --

4   not that any of the defendant -- not that you all would agree,

5   but let's say defendants in that case for whatever reason

6   agreed that the plaintiff was exposed ten years to asbestos

7   fibers, and that year five the dosage level was such that

8   asbestos fibers became a substantial contributing factor, okay?

9           And so what you are saying is that the first fiber

10  can't be.  And my question to you is then, is there a point in

11  time where a particular fiber, a single fiber, can be construed

12  as a substantial contributing factor?

13          MR. CASMERE:  No.  And, your Honor, the issue here in

14  these cases is defendant-by-defendant specific.  This jury is

15  going to have to decide whether the exposure to my client's

16  product, if it existed at all, was a substantial factor in

17  causing the disease.  If you have an individual, let's say they

18  have a hundred fiber-year CC -- a hundred fiber-year exposures.

19  And 80 percent, 80 fiber-years come from his or her work at the

20  Johns Manville facility in Waukegan.  And one fiber-year comes

21  from alleged exposure to my product.

22          Is that a substantial factor in causing that disease?

23  My answer would be no, because it's not substantial in terms of

24  the cumulative dose.  And if you look at it defendant by

25  defendant, is my client's product a substantial factor in

1    causing that disease?  First you have to get a disease that's

2    caused by exposure to asbestos.  Then you have to break it up

3    and say, okay, as to these defendants in this case, is the

4    exposure to their product -- put aside proximate cause, just on

5    actual was -- is the exposure to their product a substantial

6    factor?  And that's where the analysis is.

7            THE COURT:  Okay.  I understand that.  And I am just

8    trying to figure out kind of the best way to apply the

9    substantial contributing factor test, which is where the rubber

10   meets the road, right?  And so let's go on with this

11   hypothetical of mine.

12           Say that the plaintiff worked at a particular factory

13   for, round numbers, let's say 20 years.  Okay?  And the parties

14   have agreed for whatever reason that the plaintiff's exposure

15   to asbestos fibers during those 20 years -- and he worked at

16   the same job, same exposure, nothing changed over 20 years.

17   That on year 15 that the exposure to asbestos fibers rose to a

18   dosage level where it would be considered a substantial

19   contributing factor.  Okay?

20           MR. CASMERE:  Okay.  In the aggregate.

21           THE COURT:  In the aggregate, right.

22           And so say that -- that's year 15.  Say that at year

23   five and ten, the ownership of the factory changed hands.

24   Okay?  And so there is three defendants in the case.  There

25   were prior owners from years one to five, six to ten, and ten

1     to 15.  Would all three be considered -- would the exposure

2     from the period that all three owned the plant be considered a

3     substantial contributing factor?

4            MR. CASMERE:  I think it would depend on the expert.

5     It would depend on the fibers, whether they are amosite,

6     whether chrysotile, whether they are crocidolite.  I think it

7     would depend on the type of dose you can get from the different

8     products.  There is lots of different things that when you

9     break it down just from the aggregate into the individual

10    defendants, that experts would look at those and they would be

11    able to look at them and say, well, this is a X number of

12    fiber-year per CC exposure.  The aggregate is 85.  And this is

13    .5.  That in my expert opinion is not a substantial factor to

14    the overall aggregate dose.

15           THE COURT:  So what you are saying is that what --

16    because I am trying to figure out what exactly Dr. Frank is

17    saying here.  Because he uses the words, cumulative, and, any

18    fibers, in the same sentence, right?  And so I am trying to

19    figure out -- you know, the reason why it's called obviously

20    the single-fiber theory or what have you, single-exposure

21    theory, is that you are focusing on that initial exposure, the

22    one fiber, right?  And yet in his report he talks about the

23    cumulative exposures plaintiffs had to asbestos, from any and

24    all products.

25           To me cumulative at least seems to suggest, right,

1    some sort of dosage level, right?  Some sort of -- some sort of

2    accumulation of all different fibers, to the point where they

3    contributed.

4            But that's not how you read it.

5            MR. CASMERE:  Well, I mean, I don't have to guess what

6    his opinion is.  His opinion is right here.  And the reason he

7    has that opinion is because for Dr. Frank he needs two things

8    to attribute lung cancer to asbestos.  No. 1, is there any

9    person anytime, anywhere who's ever said that this person was

10   ever exposed to a single fiber of asbestos?  Yes.  Next

11   question.  Does he have lung cancer?  Yes.  I'll give you a

12   causation opinion.

13           And so everything else is just a wolf in sheep's

14   clothing.  They can -- they can camouflage however they want.

15   I suspect that Mr. McCoy will tell the Court that he is not

16   going to ask Dr. Frank whether a single fiber can cause it, or

17   whether it's -- he's going to give him some elaborate

18   hypothetical.

19           The problem is that once Dr. Frank hears the word,

20   there is one fiber of exposure, his answer is always yes.  It

21   doesn't matter what comes after that.

22           THE COURT:  So the way you construe the Dr. Frank's

23   opinion is that any single exposure to a single fiber of

24   asbestos would be considered a substantial contributing factor.

25           MR. CASMERE:  As long as the person has an asbestos-

1   related disease, that's Dr. Frank's opinion.

2          The last point I'd like to make, your Honor, is that

3   although the plaintiffs didn't respond to it in their brief,

4   the Lindstrom decision, which is maritime law, is directly on

5   point here that says, this type of opinion is not acceptable in

6   maritime law cases.  And I suppose I -- I was incorrect.

7          One other point I want to make is, this is exactly the

8   type of situation that the Seventh Circuit in the Schultz case

9   had said is this ill-defined floor.  You cannot do.  And all he

10  is saying is, give me one and I'll give you the opinion.

11         And it's not based on any epidemiology.  It's not

12  based on anything, other than his own personal belief, which he

13  is entitled to have.  He's just not entitled to say it up there

14  as expert witness.

15         Thank you, your Honor.

16         THE COURT:  Thank you.

17         MR. FUSCO:  Your Honor, David Fusco on behalf of Crane

18  Co.

19         I just want to start out following up on Mr. Casmere's

20  last point regarding the Schultz decision that the Seventh

21  Circuit came down with last year.  And I think it's important

22  particularly to your hypothetical.

23         One of the things that the Schultz decision stated

24  towards the end of the decision was, it noted that Rule 702

25  committee notes discussing whether the expert has adequately

1   accounted for obvious alternate explanations.  And the Court

2   goes on to conclude that that consideration should show why a

3   particular alternative explanation is not in the expert's view

4   the sole cause of the disease.

5         One thing that is completely missing from Dr. Frank's

6   report is any explanation to why cigarette smoke, the leading

7   cause of lungs cancer in the United States, is not sufficient

8   to be the sole cause of Mr. Krik's lung cancer.  Our expert

9   will testify that it was the sole cause.

10        Dr. Frank's opinion, as Mr. Casmere stated, is that

11  every exposure contributes.  He doesn't consider anything else.

12  He's testified specifically that it -- it doesn't matter what

13  the source of the exposure was, what the product was, what the

14  type of fiber was, or particularly where the person was

15  exposed.

16        His opinion is being put forth without a consideration

17  of whether the cigarette smoking alone was sufficient to have

18  caused the disease.  I think as it goes to your hypothetical in

19  when do you get to that point, when the exposures are

20  sufficient to cause disease, what does the next exposure mean?

21  What does the next fiber mean?

22        I think that the reality is, it's a comparative

23  assessment of exposures that has to be done to determine what

24  is substantial.  If an expert is going to come in the courtroom

25  and say that they had sufficient expertise and performed a

1   scientific methodology to determine that something was

2   substantial, they must show the Court that they have endeavored

3   in a scientific process that there is a comparative assessment

4   of exposures, looking at each company's individual -- the

5   exposure to each company's products, the individual's total

6   exposures, other possible causes.  And that they have

7   determined in their expert opinion that it's substantial.

8           If the expert cannot do that, they should not be able

9   to provide that testimony from the stand.  And in your example

10  of the one year to five year, five to ten, ten to 15, that's

11  left for plaintiff's counsel to argue to the jury.  They can

12  argue to the jury that they should -- the jury should consider

13  those exposures substantial contributing factors based on the

14  testimony of the plaintiff and the evidence in the case.  But

15  that should not allow an expert to take the stand and say, in

16  his professional expertise, it is a substantial factor.  That's

17  reaching the ultimate issue, and that's providing the ultimate

18  issue from someone in a doctor's coat that the jury is

19  obviously going to give credibility to.

20          THE COURT:  Can an expert say it's a contributing

21  factor or a medical cause?

22          MR. FUSCO:  I think it depends on the context in

23  which -- within which they say that.  If they say, the exposure

24  to Crane Co.'s products was the medical cause of the disease,

25  then I'd say no.  If they're saying that the simple -- if he

1    crosses the first threshold that this is not just a smoking-

2    related lung cancer, he somehow had an analysis to demonstrate

3    that asbestos somehow contributed, then to say that all of his

4    exposures were -- was that -- that asbestos exposure would be

5    one thing.

6         That's not saying that any individual defendant's

7    exposure was a significant exposure or a substantial

8    contributing factor.  They should not be allowed to take that

9    step unless they can -- the expert can demonstrate the

10   scientific methodology that supports it.

11        THE COURT:  Okay.  The Schultz case came out of

12   Wisconsin, right?  And --

13        MR. FUSCO:  I believe so, yes.

14        THE COURT:  And it dealt with -- it was based upon

15   Wisconsin state law.  And as I recall, is the liability

16   standard that the Court was -- under which the Court was

17   opining in the Schultz case the same as the liability standard

18   that the Court should apply here?

19        MR. FUSCO:  I think the short answer is that it should

20   not matter to the Daubert motion.  I don't think the Court

21   incorporated Wisconsin law into its analysis.  I'm glad your

22   Honor raised that point because for Crane Co. the exposures are

23   both land-based and maritime-based.  So we have the potential

24   for maritime law applying some claims and Illinois law applying

25   to other claims.

1    At this stage of the litigation, the Court's role in

2  its gatekeeper analysis is to determine whether the methodology

3  is reliable and whether the testimony will assist the trier of

4  fact.  That's independent of any liability standard under state

5  law.

6    Our argument would be that your Honor should analyze

7  the admissibility and the reliability of the methodology to

8  determine if any testimony or any position of the testimony is

9  admissible from Dr. Frank or any other medical expert.  And

10  then if that testimony makes it to the jury, the jury is the

11  one evaluating whether the evidence in its totality, the

12  experts' testimony, the evidence from fact witnesses,

13  documentary evidence, whether that meets the individual state's

14  liability standard.

15    So I don't think the Court's analysis in Schultz was

16  dependent on Wisconsin law.  It was focused on the Daubert

17  analysis.  And I think the same should be done here.  And I

18  would add that even if the liability standard is -- factors

19  into your Honor's analysis, Illinois law as it relates to Crane

20  Co. is still a frequency regularity proximity standard that

21  would be the same as the maritime standard in the Lindstrom

22  decision, which discusses how each and every opinion really

23  nullifies the substantial factor standard.

24    One other thing I wanted to touch on briefly is that

25  from the Schultz opinion, I think its noteworthy that in that

1    opinion they're debating which expert's threshold was

2    sufficient and whether they had sufficient scientific

3    foundation.  I think it's noteworthy that the plaintiff's

4    expert in that case testified in his -- in his personal opinion

5    you couldn't rule out -- there is no way to say whether -- what

6    level exposure to benzine might cause cancer.  But his expert

7    opinion was, I believe, at eight to 16 parts per million years

8    of the exposure to benzine would have had a six-fold increase

9    in leukemia.  And that's why he said that number is significant

10   because it's based on the literature.

11        If you take the only piece of literature cited in

12   plaintiff's briefing, it's the Helsinki criteria.  And that

13   even taking it on its face says, as relates to lung cancer, 25

14   fiber per CC year exposure only increases the risk of lung

15   cancer two-fold for asbestos.

16        As it relates to Crane Co., which is in this case for

17   allegations related to gaskets and packing, the scientific

18   literature demonstrates exposures from gasket and packing are

19   far lower than many other types of exposures.  I think everyone

20   would agree that exposure one receives from any particular

21   product varies wildly depending on the product, the asbestos

22   content, the type of work involved, the duration of the work.

23        Plaintiff's experts didn't do what was done in

24   Schultz.  In Schultz they had industrial hygienists evaluate

25   the level of exposure to benzine.  They had a medical doctor

1   compare that to the scientific literature.  Plaintiff's

2   industrial hygienist in this case did not even attempt to

3   estimate what exposure levels might occur from a product made

4   or sold by Crane Co.  He said gaskets and packing generally.

5   He gave a wide range of exposures, which don't even get to this

6   number that would cause a twofold increase.  I think that's

7   significant.

8           And the one last point I would make is that they --

9   plaintiffs bring up in their motion the various government

10  standards that have stated or government organizations that

11  have stated, no known safe level regarding asbestos and very

12  other -- various other carcinogens.

13          That relates specifically to that same I think the

14  Court called it collateral issue in Schultz that didn't -- you

15  know, that general statement that is, you can't tell what the

16  significance at these very minute levels would be.  And I think

17  it is noteworthy is that what plaintiffs ignore is that after

18  9/11, when the federal government was inspecting air quality

19  surrounding Ground Zero, OSHA released a statement, a press

20  release, that said, asbestos for level -- asbestos levels

21  remain safe and acceptable ranging from non-detected to .086

22  fibers per CC.  That's .14 below -- or .014 below the current

23  PEL.

24          Despite OSHA's statement of no known safe level, I

25  think OSHA's own press releases demonstrate that there is a

1    safe and acceptable exposure to asbestos.  Dr. Frank fails to

2    consider that, fails to consider the significance of Mr. Krik's

3    smoking history, and he fails to consider the significance of

4    the volume of scientific literature in his analysis which

5    demonstrates there is no methodology to his opinions.

6         THE COURT:  So what you are saying is that basically

7    there is a difference between an opinion or position that there

8    is no safe level of something, versus on the other hand saying

9    that at a certain level, a certain level of exposure, there is

10   a substantial risk being that someone might be harmed by the

11   particular type of exposure.

12        MR. FUSCO:  Precisely.

13        THE COURT:  Okay.

14        MR. FUSCO:  Thank you, your Honor.

15        MR FANNING:  Good afternoon, your Honor.  Okay.  I am

16   David Fanning here for Mobil Corporation.

17        And just as introduction, I'm going to talk mostly

18   about Frank Parker, although Arthur Frank is going to come into

19   play.  There is really an interaction between the two that

20   plaintiff relies upon to create this overarching opinion that

21   we are challenging on the basis of Daubert.

22        The specific opinions we want to bar here with respect

23   to Frank Parker is that sentence that Mr. Krik was

24   occupationally exposed to significant concentrations of

25   airborne asbestos while at Joliet.  There are subparts to that.

1    And one is, what were the asbestos concentrations at Joliet;

2    No. 2, what were the inhalation levels; and, No. 3, what was

3    the asbestos content of any material at Joliet.

4            With respect to Arthur Frank then, we discussed this

5    any exposure above zero opinion.  And the subset of that was,

6    we expect there to be testimony that Arthur Frank is going to

7    come to trial and say that some specific defendant like Mobil

8    was the cause.

9            And so what happens here is that there is this

10   self-serving circular reason where he assumes that we're all

11   exposed at all times.  He says, here is a magic word:

12   Cumulative.  And if I use this word --

13           THE COURT:  By he, are you saying Frank or saying

14   Parker?

15           MR FANNING:  Well, it's a good question.  It's Frank

16   who says that, but he relies upon I guess Frank Parker to say,

17   we're all exposed, or to say what is the exposure level, which

18   is really to say, anything, anything more than zero, even if

19   you can't measure it with modern science.

20           So this is how they get here.  But I will just briefly

21   go over what are the steps.  And it starts with a report from

22   Arthur Frank.  This is the kind of report we have seen

23   literally thousands of times.  It's two pages.  It says, I

24   understand this gentleman has a disease, and I understand that

25   he claims exposure.  Therefore, it's a cause.

1          This particular report, obviously no mention of Mobil,

2   nothing about the facts related to Mobil, nothing about any

3   defendant-specific opinion, certainly nothing about

4   methodology.

5          Then they put in the Frank Parker report.  Here is the

6   typical Frank Parker report.  Here again, there is no reference

7   to the word Mobil.  There is nothing about what an actual work

8   activity at Mobil was.  This is an industrial hygienist, by the

9   way, who's job it is to evaluate exposure levels.  He doesn't

10  look at the work activities, the layout, the design,

11  measurements, specifications of the equipment, ventilation air

12  flow, composition of the insulation materials.

13         Plaintiff's expert reports were due October 19, 2011.

14  That should be the line in the sand.  Anything thereafter is

15  late.  Frank Parker then gave a deposition.  And we asked him,

16  do you have any case-specific, defendant-specific opinions?

17  What did you rely upon?

18         He said, well, my universe is Mr. Krik's deposition

19  testimony.  I wasn't asked to evaluate specific defendants.

20  And I wouldn't do so because -- well, other people would, but I

21  just wouldn't do it.

22         Okay.  So then we're left with Parker dep goes.  He

23  says nothing about Mobil.  Obviously he doesn't talk about

24  underlying factual basis, and obviously he doesn't talk about

25  any methodology whatsoever.

1       Mobil then files its motion for summary judgment.  We

2  attach to it an industrial hygiene report, a gentleman named

3  Bruce Larson.  His report goes into great detail about the

4  specific work -- work activities.  He reads the transcript.

5  But then he does what an industrial hygienist does:  He

6  analyzes the work.  He obtains specific information, reviews

7  the specs.  He calculates operating temperature.

8       THE COURT:  So the sole basis of Mr. Frank's opinions,

9  according to Mobil, was the deposition of Mr. Krik?

10      MR. FANNING:  Frank Parker?

11      THE COURT:  I'm sorry.  Parker.

12      MR. FANNING:  There is two different names.

13      So Frank Parker, yeah, the sole basis that he has to

14  testify about anything in this case is the deposition of

15  Charles Krik, which he says was insufficient for him to

16  formulate any defendant-specific opinion at all.  And

17  coordinately he didn't testify any -- about any specific

18  defendants.

19      And so we put up a report.  And we did have expert

20  testimony.  And he described the method.

21      THE COURT:  So hold on for a second.  For example, in

22  Parker's letter, report, dated September 17, 2011, the second

23  page states, top of second page under warnings and training:

24  Mr. Krik was not adequately warned concerning the hazards

25  associated with exposure to asbestosis.

1           So that statement is based entirely upon Mr. Krik's

2   deposition.

3           MR. FANNING:  It has to be.  There is no other

4   information that he would have.

5           THE COURT:  Okay.  Okay.

6           MR. FANNING:  What it doesn't say is, to whom does it

7   apply?  Where are you talking about?  And that's information

8   that he could have provided at a deposition at best, or he

9   should have provided in his report if it indeed was specific.

10          And so we issued the industrial hygiene report.  We

11  also had a medical doctor.  And together what they did was,

12  they linked specific asbestos concentrations airborne with

13  epidemiology, where we said, okay.  Go find me a cohort that

14  has that kind of exposure level.  See if they have an increased

15  rate of disease.  If they do, then that's how you formulate

16  general causation.  And if you want to talk about specific

17  causation, not the cumulative type stuff where everybody is

18  involved, it's the defendant-specific questions, specific

19  causation.  That's how you do it.

20          We take Arthur Frank's deposition.  Likewise like his

21  report he says nothing about Mobil.  He provides no basis for

22  anything.  At the end of the deposition, plaintiff's counsel

23  asks him to agree to five different states.  And here is where

24  we have run off the rails.  This is different than any other

25  litigation that we have seen.  And this is where for the first

1    time we see the any exposure above zero formulation.

2            And so he says, once you have the general causation

3    question, each exposure is a substantial contributing cause.

4    Yep, I agree.  Okay.  Well, given that it's cumulative,

5    asbestos for each and every product and all fiber type

6    contributes?  Sure, I agree.

7            It's virtually never possible to know the exact dose.

8    And it's recognized that any exposure above zero is a

9    contributing cumulative exposure.  Okay?  Since the exposures

10   are cumulative, individual exposures cannot be ruled out as a

11   cause.  Of course he agrees and finally he says:  Now there is

12   no minimum duration that's required.  I don't care.

13           THE COURT:  Hold on.  Go back.  Can you go back?

14      (Brief pause.)

15           THE COURT:  When the questioner -- I don't know who

16   the questioner is.  Who was the questioner, do you know?

17           MR. FANNING:  Mr. McCoy.

18           THE COURT:  When Mr. McCoy asked him, if cancer is

19   attributed to the cumulative exposure, what does he mean by

20   attributed?  Does he mean that determination is made that

21   cancer was substantially caused by the cumulative exposure, or

22   that cancer is a possible ramification of, can be caused by,

23   asbestos exposure.

24           MR. FANNING:  I interpret that to mean with respect to

25   the general causation question, this is where he says, I assume

1   this is an asbestos-related disease because somebody somewhere

2   has claimed he has been exposed.  Therefore, now I categorize

3   it as something totally different.

4              THE COURT:  And what is the page cite for that

5   transcript?

6              MR. FANNING:  It's in our brief.

7              THE COURT:  I know it's in your brief.

8              MR. FANNING:  I'm sorry about that.

9              THE COURT:  That's okay.  We will find it.  Go ahead.

10             MR. FANNING:  Near the end.

11             MR. CASMERE:  Starts on page 167.

12             MR. FANNING:  So now the Frank deposition is January

13  25, 2012.  On that -- two days prior, I should say, January 25,

14  there was a Frank declaration that was signed on the 25th but

15  it was admitted in the 27th.  And this is -- this is the first

16  time we saw it.  We saw it as an exhibit to plaintiff's

17  response to our motion for summary judgment.  Brand new to us,

18  longer after the expert discovery closure date, now for the

19  first time Frank Parker, industrial hygienist says, okay, I

20  have been asked to generate this declaration in response to

21  your motion.

22             THE COURT:  I am going to ask you to slow down for the

23  sake of my court reporter.

24             MR. FANNING:  Oh, yeah.

25             He says, now I have an opinion because I've been asked

1   to do something case specific.  And he says, with respect to

2   Mobil, Mr. Krik was occupationally exposed to significant

3   concentrations of airborne asbestos fibers each time he had to

4   distribute the asbestos-containing insulation in order to break

5   the steam lines, connecting the steam units that he worked on

6   at the Mobil facility.

7          And so it's a -- it's a defendant-specific opinion.

8   It's based upon the same basis that at his deposition he said

9   was insufficient to render any opinion with respect to airborne

10  concentrations.  And moreover, he uses this curious term,

11  significant.  And then he provides a definition of it.

12         He says, by significant what I mean is -- remember

13  this is four hours after Arthur Frank's deposition.  What I

14  mean is, anything that adds to the cumulative dose, which adds

15  to the exposed individual's overall asbestos dose.  Exhibit to

16  plaintiff's deposition.  Of course, this declaration likewise

17  has none of the factual bases that an industrial hygienist

18  should use as part of any recognized methodology.

19         We know how to evaluate industrial hygiene reports.

20  It's done so in Schultz.  We've talked about how it's a Daubert

21  opinion.  And there the fellow said, okay, I select Monte Carlo

22  as a model.  He interviewed workers.  He reviewed deposition

23  testimony.  He evaluated the specific products.  He went to go

24  find out if the product actually contained the alleged toxin

25  there, benzine.

1          Nothing that Mr. Parker did.  He entered data into the
2   formulation, and he came out at the end of the day to establish
3   an airborne concentration.  And I'm not saying that plaintiff
4   has to do a number here.  But he's got to evaluate so that he
5   can pair up exposure levels with known epidemiology to say
6   something, anything, about the specific defendant at issue.

7          Remember there were two products there.  One the Court
8   said, insufficient ID, insufficient concentration.  Never
9   linked up with epidemiology.  But with Akzo I guess we'll let
10  it in because that was the opinion that was provided as a basis
11  in accord with the epi.  Parker didn't do any of this.  And he
12  didn't provide a methodology which then bars us, it prevents
13  us, from asking these questions of him.  Okay, what's your
14  opinion about ExxonMobil?  How did you get there?  What are the
15  facts?  What's the method?

16         We could ask him these -- we could ask him about these
17  topics, which we're all well aware of.  Has it been tested?
18  Has his opinion been subject to peer review?  The error rate
19  and all that good stuff.  And really does it fit the question
20  here at issue?

21         THE COURT:  Counsel, I'll give you a couple more
22  minutes to conclude.

23         MR. FANNING:  In that same vein, Schultz talked about
24  the causation opinion.  As I mentioned, he paired up then
25  exposure concentrations in the area of benzine with epi to come

1    up with an opinion.

2            And so we talked about what Arthur Frank did.  What he

3    did was, answered yes to these five things, which continuously

4    resolved around themselves and served themselves.

5            It's important to remember we don't even know what

6    Frank's opinion with respect to Mobil would be, but we want to

7    bar it.  We obviously couldn't ask him and didn't ask him the

8    facts of the opinion about Mobil because he hasn't told us yet.

9    He hasn't supplied it anywhere.  And obviously we have nothing

10   about the method or the fit.

11           What plaintiff says is, well, I'm entitled to ask him

12   hypothetical questions.  We have reviewed the case law in the

13   briefs about hypothetical questions.  Of course, they are the

14   historical antecedent.  And I don't want to get deeply deep

15   into the Rule 26 issues.  But with respect to the Daubert end

16   of the analysis, it's got to be facts in the record and have to

17   be dependable.

18           He says, well, I can ask him to assume asbestos

19   content or exposure levels.  Well, that's -- that's the opinion

20   that they're trying to get from him.  And so both are asked to

21   make voluminous assumptions.

22           Be happy to answer any questions.  Thank you.

23           THE COURT:  Thank you.

24           Mr. McCoy.

25           MR. McCOY:  I am going to start with Arthur Frank,

1    your Honor, and his background, which is relevant to a Daubert

2    analysis, here.  He started studying back in mid-1970s under

3    Irving Selikoff.

4              THE COURT:  Mr. McCoy, let me ask you some questions.

5              MR. McCOY:  Sure.

6              THE COURT:  I am well aware of his background.  In

7    your view, okay, when he gets up there on the stand, right?

8              MR. McCOY:  Yes.

9              THE COURT:  Once if he is qualified as a witness, you

10   ask him, have you arrived at any opinions in this case?  He

11   will presumably say, yes, he has.

12             And then your next question would be, what are those

13   opinions.  Okay?  I am assuming he will say, one, two, three,

14   perhaps four things.

15             What are those things?

16             MR. McCOY:  Well, he is going to say that, first off,

17   Mr. Kinzer's cancer, lung cancer, is attributed to asbestos

18   exposure and tobacco smoke.  That's the overall cause, which

19   that was the question your Honor asked.  What does attribution

20   mean?  That means the condition itself is caused by certain

21   specific toxins, here asbestos and tobacco.

22             He is also going to say that the exposures to each

23   defendant, whoever is left in this case, would be a significant

24   cause providing the testimony comes in as we have expected in

25   Mr. Krik's deposition that he saw, that the exposures for

1   whoever is left would be a significant contributing cause to

2   that cumulative asbestos exposure, which caused the attribution

3   in the first place.  So he's going to say those two things.

4           THE COURT:  Can you -- I'm sorry.  I was trying to

5   catch up.  Can you repeat for me what the second thing is going

6   to be?

7           MR. McCOY:  Second opinion is that for whichever

8   defendants are left at trial, assuming the evidence comes in as

9   we have expected through Mr. Krik's deposition, he is presented

10  with a hypothetical on what the jury has heard, that those

11  hypothetical facts about the exposure would mean it's a

12  significant or substantial contributing cause to the lung

13  cancer being attributed to asbestos and tobacco.

14          THE COURT:  Okay.  So let me ask you this:  Looking at

15  the September 16, 2011 expert report.  The last paragraph there

16  is a sentence, a rather not particularly lengthy but a rather

17  dense sentence, which states:  The cumulative exposures he,

18  meaning Mr. Krik, had to asbestos from any and all products

19  containing any and all fiber types would have contributed to

20  his developing these two conditions.  Okay?

21          MR. McCOY:  Yes.

22          THE COURT:  Do you have that?

23          MR. McCOY:  Yes.  I don't have the report, but I know

24  what the language is.

25          THE COURT:  So does he mean as part of this opinion

1    that any exposure to asbestos should be considered a

2    substantial contributing factor to Mr. Krik's ailment?

3            MR. McCOY:  Yes, Judge.  That's right.  That's how

4    Dr. Frank would say, any exposure.  All exposures contribute.

5    And I forgot to mention, he also would attribute the fibrosis

6    or scarring as a non-malignant disease caused by asbestos, same

7    way as an opinion, based on the cumulative exposures.  And he

8    will say that, Judge, for anybody's product which the defense

9    wants to present the same hypothetical too also.

10            THE COURT:  So even before -- because looking here at

11   the expert report of Arnold Brody?

12            MR. McCOY:  Yes.

13            THE COURT:  One of the statements he has is:  All of

14   the diseases have long latency periods of ten to 50 or more

15   years, largely dependent on asbestos dose and individual

16   genetic susceptibility.  So I just want to make sure that I

17   understand the interaction and exactly what each expert is

18   going to say.

19            So Dr. Frank's opinion will be that regardless of

20   dosage, that any -- as you say, any exposure, even the first

21   exposure, to asbestos is the substantial cause of Mr. Krik's

22   illnesses?

23            MR. McCOY:  Yes.  He won't say a single fiber but

24   he'll say exposures, right.

25            THE COURT:  Because a particular exposure may have

1    more than one fiber, I'm assuming.

2             MR. McCOY:  Yes, it will be impossible to have an

3    exposure to asbestos without literally thousands or millions of

4    fibers basically.  In a sugar cube size piece of asbestos,

5    Judge, the testimony will be that the number of fibers would be

6    ten to the 26th power, ten followed by 26 zeros.  That's how

7    many fibers in like a sugar cube or a one centimeter size piece

8    of asbestos.

9             THE COURT:  Okay.

10            MR. McCOY:  So the number of fibers to each exposure

11   is going to be a lot of fibers, no matter what.

12            THE COURT:  All right.

13            MR. McCOY:  I'll also add this, Judge:  In reference

14   to Dr. Brody's testimony, he'll explain that the mechanisms --

15   which is important to understand, Dr. Frank could do the same

16   ones, but Dr. Brody himself has done the research.  He's the

17   best witness on this.  The mechanism is that for the

18   non-malignant disease it's a build-up of scarring from the

19   fibers inside the body, inside the lung, or related tissue,

20   lining.  And that build-up of fibers is like scarring.  That's

21   the mechanism.

22            Now said, for the lung cancer it's different.  For the

23   lung cancer, a single fiber will cause a genetic mutation.

24   When the cells divide, the fiber is there at the time of the

25   division, it will -- you know, like sticking a point into

1    something as they're trying to separate.  It will screw up that

2    cell division.  Of course, our cells are dividing all the time,

3    millions and millions in any given moment.  And so they'll

4    screw up that -- one fiber will screw up and cause mutation.

5           Now to get lung cancer the process is that you have to

6    have a sufficient number of mutations.  One mutation will not

7    give you lung cancer.  But if you get five or six or in some

8    people it's the susceptibility issue, 20 or 30 or 40 takes --

9    mutations to get lung cancer.  The asbestos fibers will have

10   contributed a single fiber to some of those mutations.  The

11   tobacco smoke will also.

12          THE COURT:  Mr. McCoy, I think that kind of your

13   explanation is a bit helpful to my next question, which is, as

14   I look at these two opinions, one Dr. Brody saying that the

15   diseases have long latency periods, largely dependent on

16   asbestos dosage.  And Dr. Frank says, any exposure can

17   substantially cause the diseases that Dr. Brody is talking

18   about.  Are those two opinions inconsistent with one another?

19   That is, is Dr. Brody, saying, look, you know, the development

20   of these diseases is largely dosage dependent.  And yet, Dr.

21   Frank is saying, well, you know what?  Regardless of dosage.

22   Any exposure can be considered a substantial cause of the

23   diseases.

24          At least on its face it seems somewhat inconsistent

25   with one another.  And I am wondering if you could kind of

1    unwrap that for me.

2           MR. McCOY:  Well, what your Honor said could certainly

3    be understood that way.  I think that's part of the scientific

4    debate that the plaintiffs and defendants have in all these

5    cases.

6           But what goes on from the plaintiffs' experts always

7    is that, and the science is I think unquestioned, that the

8    cumulative exposure is considered the cause from the scientific

9    and medical perspective.  You don't open up scientific

10   publications and read these articles, and the articles saying,

11   well, this two days doing this is a cause, and this two days

12   doing this is a cause of whatever person or group is being

13   written about.

14          What they always say is that the cumulative exposure

15   is the cause.  So that's why Dr. Frank is saying, each exposure

16   is substantial contribution to that cumulative total.  That's

17   what he's saying.  And that's what -- that's what his testimony

18   will be.

19          THE COURT:  Now, I understand that each exposure

20   provides a contribution to the cumulative total.  But I think

21   the question is whether or not each exposure is a substantial

22   cause in the legal sense of the disease that we are talking

23   about, disease or diseases.

24          MR. McCOY:  That is for the jury to determine.  I

25   wouldn't be able to contest the question.  Should be presented

1    to the jury for determination.  What -- what -- and let me put

2    it this way, Judge:  We're not bringing exposures of two

3    minutes or one minute to the jury here.  We're bringing

4    exposures of days or weeks or months to the jury.  And that's a

5    different proposition when you go to evaluate substantial

6    exposures because these are not, like I say, so short that you

7    can't just simply dismiss.  And I think that's important here.

8              They might have been knocked out of summary judgment,

9    but they didn't get knocked out of summary judgment stage as

10   being insufficient to support substantial exposure.

11             THE COURT:  I guess, perhaps my questions just aren't

12   very good ones.  I am still trying --

13             MR. McCOY:  They are fine.  They are fine.  I mean --

14             THE COURT:  Let's take cigarette smoke.  Okay?  And

15   let's say cigarette smoke -- for the purpose of argument let's

16   say that cigarette smoke also contributed to Mr. Krik's

17   ailments.  Okay?

18             MR. McCOY:  Yes.

19             THE COURT:  So then is Dr. Frank's opinions akin to

20   basically saying that each cigarette that Mr. Krik smoked

21   contributed to his lung cancer?

22             MR. McCOY:  I don't know.  The principle of what

23   you're saying is right.  I don't know if he would say each

24   cigarette did.  I never asked him that question.  But he will

25   say smoking was a cause.

1          THE COURT:  Okay.  But when you talk about asbestos

2     exposure, that's exactly what he's saying.  He's saying that

3     each exposure to asbestos, kind of like each cigarette that he

4     smoked and inhaled, contributed to the overall cumulative

5     nature of asbestos exposure, or the overall smoking that he

6     did.  And in that way it was a contributing factor.

7          MR. McCOY:  Right.

8          THE COURT:  So Dr. Frank -- then I am a bit puzzled.

9     Dr. Frank is not testifying, or is not opining, that any

10    exposure was a substantial cause of the diseases, is he?  There

11    is a difference --

12         MR. McCOY:  He -- he's only going to be opining as to

13    the exposures that are going to be presented in this case.  So

14    he is not opining as to anything that's less than the -- I

15    think we had about a minimum of week or more in this case of

16    exposure for any one defendant, which it's not every day that

17    Mr. Krik worked with asbestos.  So, you know, if you add -- if

18    you add up the total number of the days with asbestos, the

19    question goes to the jury, you know, is one percent or whatever

20    it might boil down to in the jury's thinking going to be

21    enough?  I think that's how they assess it.

22         But that's -- but the point of it is is from a medical

23    opinion perspective Dr. Frank is saying that each exposure in

24    this case is a substantial contributing cause.  Not that each

25    one can cause it by itself, but it's a cause.  And that's

1  Illinois jury instructions, a cause.  Seventh Circuit even is
2  the same, a cause.

3          So it's up to the jury.  I mean, they may not believe
4  Dr. Frank.  They may believe the defense witnesses or the
5  defense attorneys arguing.  But that's for the jury to resolve.
6  And as I say, he won't be saying, a single fiber caused it.
7  That's for sure.

8          And I will also add this, Judge, that when you talk
9  about smoking cigarettes --

10          THE COURT:  Let's go back to the notion of cause.
11  Okay?  And this brings us all back to our tort classes in law
12  school about proximate cause, substantial cause, but-for cause.
13  So he is not saying that any exposures is a but-for cause of
14  Mr. Krik's disease, right?

15          MR. McCOY:  That -- that's correct.  He is not doing
16  that.

17          THE COURT:  Okay.  So is he saying then that any --
18  that a particular exposure, regardless of dosage, right, was
19  a -- and you say a contributing cause to the disease that Mr.
20  Krik is suffering from.

21          MR. McCOY:  He will say, each one is a contributing
22  cause, as to the defendants in this case, yes.

23          THE COURT:  But is each one a contributing cause in
24  and of itself or only cumulatively?

25          MR. McCOY:  Is any one of these sufficient in and of

1    itself to be a cause?  Yes, some of them would be in his

2    opinion, sure.  And he said that before.  I just marked a

3    couple of passages.  Let me see what he said on here.  He

4    said --

5          THE COURT:  So --

6          MR. McCOY:  -- on that point that -- that the studies

7    show that -- and this is his own study of Dr. Selikoff, that if

8    you had two weeks of exposures, you doubled your risk of lung

9    cancer.  So any exposures of two weeks, he would certainly say

10    alone are sufficient to be a cause.

11          THE COURT:  Okay.  What about anything less than that?

12    I mean, is he testifying that it's his opinion that any

13    exposure, even a -- you know, let's say that a hypothetical

14    plaintiff had one day of exposure.  He was a temporary worker,

15    one day of exposure, eventually developed lung cancer.

16          MR. McCOY:  Okay.

17          THE COURT:  In that case, would Dr. Frank's opinion be

18    that that exposure was a substantial cause of the lung cancer?

19          MR. McCOY:  I am sure he would say one day would be

20    sufficient to be a substantial cause because if two weeks is

21    enough, that's ten days, then one day is one tenth of it.

22          THE COURT:  Is there any amount of exposure at which

23    Dr. Frank would draw the line and say, that's not enough?

24          MR. McCOY:  I never really asked him that question.

25    We never presented a case which I think would take it down that

1    low even.

2            THE COURT:  So then I guess my question is, his

3    opinion that any exposure is a substantial cause, would a

4    corollary of that be that the first exposure, no matter how

5    limited, in and of itself would be a substantial cause?

6            MR. McCOY:  Sure.

7            THE COURT:  Okay.

8            MR. McCOY:  The earlier exposures, at least to some

9    doctors -- I don't know if Dr. Frank has this opinion, but the

10   earlier exposures are more likely to be contributory because

11   those fibers are in longer.  That's -- again, I didn't ask Dr.

12   Frank that question here, but that can happen.

13           But I will say this about smoking:  Smoking, the

14   testimony will be, binds the nicotine with the asbestos.  So

15   the nicotine -- the asbestos fibers are delivering the nicotine

16   smoke.  So there is that synergistic effect between the two,

17   which is probably more significant in a lung cancer case with a

18   smoking history than anything else.

19           And that synergistic effect can -- is so dominant in

20   terms of its increase in the risks.  The earlier studies going

21   back to the era of Mr. Krik showed a 50-times increased risk if

22   you smoked and were exposed to asbestos, compared to a ten-

23   times increased risk if you only smoked, and five-times if you

24   only breathed asbestos.

25           So the real primary causation factor here is the

1    combination of the two together, and not one or the other.

2            THE COURT:  So getting -- I don't want to beat a dead

3    horse.  But I don't know whether perhaps -- again perhaps I am

4    just not understanding it clearly enough.

5            So according to Dr. Brody, when we say that a disease

6    is dosage dependent, right, it means that at some point the

7    amount of asbestos fiber would accumulate, right, cumulative,

8    to the point where it would meet a certain dosage or range of

9    dosage, at which point if something is dosage dependent, there

10   is a threshold dosage, or as in the Schultz case some sort of

11   opinion that there is a threshold dosage by which or at which

12   the risk of causing a particular disease is sufficiently high

13   that a scientist or an expert can say, okay, well, that amount

14   of accumulated exposure caused, is enough to cause, this

15   illness.

16           MR. McCOY:  Attribution.

17           THE COURT:  Right.

18           MR. McCOY:  Attribution.  Dr. Frank will say the same,

19   yes.

20           THE COURT:  So that's what I would call dosage

21   dependent theories, right?

22           MR. McCOY:  Right.

23           THE COURT:  Is Dr. Frank saying that, you know, all of

24   these different exposures are added up together, and they reach

25   this level.  And it's when they reach that level that they all

1  become contributing factors?  Or is he saying, regardless of

2  this threshold level, at the moment that Mr. Krik was exposed

3  on day one, that exposure was sufficient to establish

4  substantial cause for his eventual illness?

5          MR. McCOY:  I don't think I can answer that question

6  for Dr. Frank because -- and that wouldn't come up here, but --

7  because there is such a substantial history of asbestos

8  exposure, Mr. Krik, well beyond the defendants in this case.

9          THE COURT:  I am just trying to --

10         MR. McCOY:  Yeah, I know --

11         THE COURT:  -- I am just trying to understand what

12  exactly he means by --

13         MR. McCOY:  If you have enough to -- I'm sorry to cut

14  you off, Judge.  I know you told me not to do that.

15         If you have enough to attribute it, which he'll start

16  by saying, the disease is attributable to lung cancer to

17  asbestos and cigarette smoking, or the scarring is attributable

18  to asbestos, the non-malignant, if you have enough to

19  attribute, then for these exposures that we're talking about

20  here, each one is a substantial contributing cause, in his

21  opinion as expressed in the courtroom.

22         THE COURT:  Does he have an opinion as to when -- what

23  level is high enough where he can opine an attribution?

24         MR. McCOY:  Again, I don't know what his minimum level

25  would be for attribution.  I just haven't discussed that with

1    him because he said in this -- in this testimony, two weeks for

2    lunch cancer.  So that doubles the risk.  That's obviously

3    enough for attribution scientifically, as a standard.

4            THE COURT:  And you are distinguishing attribution

5    from substantial cause.

6            MR. McCOY:  Yes, when it comes to breaking out the

7    different exposures amongst defendants, which you have to do in

8    a courtroom.  You don't do that in the scientific publications

9    again.  But in the courtroom he's called on to do that.  So

10   that has -- that's how it's -- I distinguish it, yes.

11   Attribution is the first opinion.  Second opinion is that

12   something is -- some portion of that is a substantial cause.

13           And that -- that's the debate that goes on when he

14   testifies every single time on cross-examination, which is how

15   this should be dealt with.

16           THE COURT:  Okay.  I've been peppering you with

17   questions.  I'll go ahead and let you get back to your outline.

18           MR. McCOY:  Okay.  My outline is now all chopped up.

19   We've gotten into most.  Let me see what else is left.  But --

20           THE COURT:  You wanted to address Parker.

21           MR. McCOY:  Right, yes.  And I was looking at that

22   one.

23           So Mr. Parker, whose practice -- worked in asbestos

24   for decades and decades.  His opinions focus on the types of

25   activities and types of products involved.  And -- and in his

1    opinions in this case, he is -- and he looked at -- again at

2    Mr. Krik's deposition and his exposures.  But did he give an

3    opinion on the asbestos content of these gaskets that he was

4    using?  And he gave an opinion on the concentrations from the

5    work involving the gaskets.  And he gave opinions on the

6    significance of those exposures, which is the industrial

7    hygiene term that basically is similar to what your Honor was

8    just talking about.  But industrial hygienists don't assess

9    cause.  They just say, based on what we studied, these

10   exposures are significant.  And then they leave it up to the

11   medical experts to link the cause up.

12           But he's talking about that for those asbestos gaskets

13   and for the thermal systems insulation.  Now, those are the two

14   major exposures, and those are stated in his opinions.

15           So when you go to each of these defendants and the

16   evidence about these defendants and what happened at their

17   places or with their products, those are the two main types of

18   product, thermal systems insulation.  And Mr. Parker reports a

19   number of pieces of literature and attaches these to his

20   report.  Section called thermal systems insulation.  These are

21   the exposures that have been measured out in the field or

22   studies independently that that relies on to say those would be

23   significant exposures from an industrial hygiene perspective,

24   meaning that they are the type that would be capable, based on

25   the literature, of producing disease.

1          But he doesn't give causation opinions.  He just talks

2     about how these exposures are created and that they are

3     significant.  And he'll give numbers and data, meaning

4     exposures have been measured to show five fibers per CC,

5     meaning five fibers per cubic centimeter, which is a

6     significant -- very significant exposure given that the current

7     threshold in the American Conference Governmental Industrial

8     Hygienists, which is the organization that industrial

9     hygienists -- it's their top-level organization.  Everybody

10    goes by that one, including the defense.  I think the current

11    standard on asbestos is point -- either .2 or .02.  It's very,

12    very low for threshold of creating a risk that should be

13    avoided in the workplace.

14          And in any event, so five fibers would be very high.

15    Some of these exposures are higher than that.  He goes through

16    the data, and he'll testify about that data based on the types

17    of activities and operations that Mr. Krik did concerning these

18    gaskets and concerning the thermal insulation.  So the gaskets

19    are -- are scraped off and so on, creating a lot of dust.

20    Pounded out if necessary, creating dust, to form new ones.

21          The thermal systems insulation is typically the pipe-

22    covering materials or around the equipment like heaters and so

23    on that are connected to the steam systems, thermal piping

24    systems.  The taking off of those creates a lot of dust.

25    Putting on takes a lot of dust.

1    Mr. Krik personally used both types of materials.  And

2    Mr. Parker's testimony will relate the significance of those

3    exposures.  He also, as was pointed out, will also state that

4    no adequate warnings will be -- were provided, and that here is

5    what should have been provided in the way of an adequate

6    warning.  And he'll go through as part of the field industrial

7    hygiene -- because their job is to set up the workplace

8    exposures to be protective for the employees, and what warnings

9    would be provided as a matter of good industrial hygiene

10   practices, but Mr. Krik did not get.

11    Again, he's not going to tell you -- he's not a

12   personal eyewitness to what Mr. Krik did or what happened to

13   him.  He is again going to have to rely on hypotheticals based

14   on what evidence comes before the jury.  So that's how his

15   testimony will come in.  But it will be about those things.

16    He's not going to say that Mr. -- that at Mobil, the

17   industrial hygiene program, I studied it.  I looked at it, the

18   written program that they have, and that that program in and of

19   itself is sufficient.  That's what he means when he says, I

20   have no company-specific opinions as to Mobil.  He hasn't

21   looked at documents about the company Mobil.  He just knows

22   what Mr. Krik's activities and products that he was exposed to

23   were at Mobil.  And that's what he'll be talking about.

24    See if there is anything else.  And, your Honor,

25   please, tell me if you have more questions.  I'm happy to go

1    back over this as necessary.  I didn't learn it overnight.

2         But it's important.  Remember too this medical

3    literature.  It's out there that there has never been a safe

4    level determined of exposure to asbestos, particularly for

5    cancer.  That in part has to do with the concept that mutation

6    can be caused by one fiber.  So as a matter of science, they

7    are not able to really say this is a safe level.  They can't do

8    that.

9         And so that's part of where the testimony comes from

10   that every exposure contributes.  But as I say, the only

11   exposure we're talking about here are much greater than -- than

12   a day.  They are all significantly higher than that.

13        Looking to see what else.  I think it's important in

14   this instance, Judge, being an MDL, which our cases came

15   through, has -- has held that the every exposure testimony is

16   admissible by a medical doctor.  And that was held in the

17   Schumacher case that's cited in our brief.

18        THE COURT:  Wasn't he applying different law in that

19   case?

20        MR. McCOY:  I don't -- I don't think he was applying

21   law that would materially differ from Illinois.  Illinois

22   follows pretty much the common law of negligence.  Maritime law

23   adopts the common law of negligence.  So it's -- there is

24   nothing unique about the law that he was assessing it under,

25   that I remember in the case.

1   THE COURT:  But you are not arguing that his decision

2   somehow is binding upon this Court?

3   MR. McCOY:  No.  I mean, I think it -- it's not.  I

4   don't believe that your Honor can render a dispositive motion.

5   We already had that discussion before that it can't be

6   dispositive.

7   But as I say, there is no question we will agree that

8   Dr. Frank will not say a single fiber causes lung cancer.  He's

9   not going to say that.  That's agreed upon.  So --

10   THE COURT:  But he is going to say --

11   MR. McCOY:  He will limit himself to the evidence --

12   to the hypotheticals based on the evidence that we will hear in

13   this courtroom.

14   THE COURT:  He will testify that in his opinion any

15   exposure is a contributing factor or a contributing cause to

16   lung cancer.

17   MR. McCOY:  Yes, providing that there is sufficient

18   attribution in the first instance, right, meaning -- meaning

19   like, you know, here we got -- he said at leasts two weeks

20   doubles the risk.  So we got way more than that here.  A lot of

21   it may not be the defendants in this courtroom.  He's got --

22   THE COURT:  Thank you, Mr. McCoy.

23   Who's going to be speaking on behalf of the

24   defendants?

25   MR. CASMERE:  I will, your Honor, as briefly, as I

1    can.

2            THE COURT:  So the issue of cause is always kind of a

3    tricky's question, right?  And so to me in very simplistic

4    terms, in the most simple terms possible, for a disease to be

5    dosage dependent, to me what I envision is a pendulum, right,

6    or seesaw.  And at one end is a bucket.  And in that bucket we

7    put in the different exposures over time.  And at some point

8    the weight of that bucket is so great, which is a level at

9    which the pendulum will then swing.

10           To me simplistically that's what the dosage -- when

11   you say a disease is dosage dependent, that's kind of what it

12   means.

13           So is Dr. Frank, what he is saying, it seems to me, is

14   that, well, you know, once you assume that that happens, right,

15   in other words once I can attribute the disease to the

16   exposure, in other words once I can say that that kind of

17   pendulum has swung, then every additional thing that you put in

18   there, in that bucket, before the pendulum swung, contributed

19   to the fact that in the end on balance the pendulum did swing

20   the other way.

21           Is that what he's opining?

22           MR. CASMERE:  No.  That's not how asbestos and cancer

23   works.  But that's not what he is saying anyway.

24           THE COURT:  Why don't --

25           MR. CASMERE:  What --

1    THE COURT:  Hold on.  Hold on for a second.

2    So first talk to me about how asbestos and cancer

3    works then.  Second of all, then you can go on to what you

4    think he is saying.

5    MR. CASMERE:  So depending on the disease, but as

6    Mr. McCoy was saying, what Dr. Brody will say, cancer in

7    general is genetic defects that accumulate over time.  The

8    daughter cells continue to grow.  The body has a lot of defense

9    mechanisms.  Depending on the type of cancer, you need anywhere

10   from -- they think currently I think seven to ten genetic

11   charges that are inherited that continue to grow before a

12   cell -- sorry -- will grow into uncontrolled growth, right?

13   So you have that.  You have one cell begins to grow.

14   The body kills it.  Some daughter cells will grow.  Then maybe

15   there will be a second mutation ten years later for that one.

16   And so they accumulate over time.

17   It's not as simple as filling a bucket.  The body also

18   takes in asbestos fibers, actually works these asbestos fibers

19   out of the body.  So in that analogy you'd have to drill some

20   holes in the buckets to let the stuff come out.

21   THE COURT:  So then what does it mean when the

22   literature says that or when defendants argue that these

23   diseases are dosage dependent?  The dose makes the disease,

24   right?  What does that mean?

25   MR. CASMERE:  What it means is, based on the

1    epidemiological studies, when they look at populations of

2    people, and we all have asbestos fibers in our lungs, millions

3    of them.  And we're not all dying of asbestos-related disease.

4           So when you look at the epidemiology, and they will

5    categorize people and their exposures, and they start to see,

6    well, you know, we see an increased incidence of certain

7    disease in this population of people, and they have this type

8    exposure.  And so they draw sort of a threshold and say, looks

9    like you have a risk of getting this disease if your threshold

10   goes above this, for whatever reason -- they don't really know.

11   Nobody knows exactly how asbestos causes these diseases, just

12   like we don't know for the majority of cancers how they are

13   caused.  We just know that from a population basis, you can

14   look at groups of people and look at their exposures and see

15   there are certain thresholds.

16          Now I will tell you that the evidence in the case will

17   be that there was a threshold they thought was safe in the

18   1940s and 1950s.  Turned out in the '70s they were wrong.  They

19   keep adjusting it.  We are still in the process of trying to

20   figure that out.

21          But in Dr. Frank's opinion the attribution, that

22   threshold, is, is there any?  He will attribute -- the answer

23   to your Honor's question is, will he say one day is enough?  If

24   that's all there is, his answer will be, yes.  That's the

25   beauty of his opinion.  It's -- answer is always yes.

1              And what they do is now cloak it, say, you know what

2       your Honor?  We're not going to ask him was it a single fiber,

3       Dr. Frank?  Then give you this elaborate exposure history, this

4       hypothetical.  Is that enough?  His answer is always going to

5       be, yes, because as soon as he hears it's one, that's all he

6       needs.

7              So that's a fake -- it's a strawman argument.  It

8       doesn't exist.  It's not a threshold in any way.  At the end of

9       the day, the methodology is, is there an exposure?  Do they

10      have the disease?  If the answer to both those questions is

11      yes, then I'll give you a causation opinion.

12             And what -- you will not find that in any medical

13      textbook.  You will not find that published in any peer review

14      literature.

15             THE COURT:  So he doesn't care about dosage or

16      thresholds or how much exposure there has been over the history

17      of this particular patient.  He just determines, yes, this is

18      the type of disease that is asbestos related.  And, yes, he was

19      exposed to asbestos.

20             MR. CASMERE:  That's right.

21             And the answer to your -- your Honor's other question

22      was, in the Schultz case it was Wisconsin law.  But they do

23      apply a substantial factor test.  So it's a similar -- it's a

24      similar test, which of course is a compromise because they

25      don't want to go forward with a but-for causation.  So you have

1    the substantial factor test.

2            And I think that my co-defendants want to at least

3    address the Parker issue.  So if your Honor would allow them a

4    minute or two, I am happy to answer any other questions.

5            THE COURT:  Okay.  That will be fine.

6            I will give you two minutes.

7            MR. FANNING:  I only need one.

8            THE COURT:  Okay.  Then you get one.

9            MR FANNING:  Mr. McCoy said something just now that

10   surprised me, I haven't heard it before; and that is that Frank

11   Parker has apparently reviewed some documents about Mobil.

12   First we ever heard about it.  It's not in the report.  I don't

13   know what documents those would be.

14           But certainly, if he had them and if they were the

15   basis of any opinion, they should have been disclosed months

16   and months ago.  They never were.  And we still don't know what

17   his opinion is about Mobil, except for that declaration, the

18   sham affidavit, that we filed a motion to bar in the form of

19   the exhibit to the motion for summary judgment.

20           That's it.  I just didn't want there to be some

21   confusion about some bases because it isn't there.

22           THE COURT:  Mr. McCoy, one follow-up question to you.

23   Going back to my very simply particular pendulum analogy.  So

24   Dr. Frank does attribution and states, yes, Mr. Krik has a

25   disease, asbestos-related diseased, caused by asbestos.  Okay?

1          MR. McCOY:  Yes.

2          THE COURT:  And his opinion is that a single exposure,

3    any exposure, would be sufficient to kind of tip that scale to

4    cause the disease that Mr. Krik has, is that correct?

5          MR. McCOY:  Would -- right, could be one of the

6    causes, right.  Doesn't have to be the cause, the cause --

7          THE COURT:  Well, it would be --

8          MR. McCOY:  -- a cause.

9          THE COURT:  -- a substantial cause.

10          MR. McCOY:  Right.

11          THE COURT:  Okay.

12          MR. McCOY:  A cause, yes.  And I'll say, he certainly

13   begins his testimony by talking about dose response

14   relationship to get to attribution, yes.

15          THE COURT:  All right.  We will now proceed to Crane

16   Company's and Owens' motion regarding Castleman.

17          MR. MORRIS:  Which I think Mobil joined, your Honor.

18          THE COURT:  Mr. Watson, will you be arguing on behalf

19   of all defendants?

20          MR. WATSON:  Your Honor, I will spend the majority of

21   time.  Crane Co. has asked for a minute's worth of time in the

22   15 minutes to make sure that they -- their clients are

23   protected in arguments today.

24          Your Honor, yesterday Owens-Illinois circulated a

25   presentation that would be an aid for today's argument.  I'd

1    like to, if I could, approach and provide you with a copy?

2            THE COURT:  That's fine.

3        (Document tendered.)

4            MR. WATSON:  And, your Honor, if it's possible to

5    switch over to the computer that is available at the defense

6    counsel's table?  Thank you, your Honor.

7            This Daubert motion is to exclude plaintiff's expert,

8    which is the disclosed number six of 11 of plaintiff's experts.

9    Next slide.

10           Your Honor, as Mr. Morris just indicated,

11   Owens-Illinois and Crane Co. have moved to exclude Mr. -- Dr.

12   Castleman.  And Weil-McLain and Mobil were granted leave to

13   join these motions.  So every defendant on this record is

14   moving to exclude Dr. Castleman.  Next slide.

15           Your Honor, as we note in the papers, and I won't

16   delve deeply at this point into the reasons because its

17   important to deconstruct why it was that Dr. Castleman was

18   excluded.  But it is most certainly important to know that Dr.

19   Castleman has been excluded at least three times in this

20   district and nationwide.  Next slide.

21           And as we unpack this, we find that Dr. Castleman does

22   fail every Daubert requirement.  He is not a qualified expert.

23   He is not reliable.  His testimony fundamentally is not

24   relevant.

25           THE COURT:  Mr. Watson, how would you define a

1    historian?

2            MR. WATSON:   I would define a historian as someone

3    that's trained academically to be a historian, that knows the

4    principles of history.

5            If you look at what Dr. Castleman has done and you

6    compare it to what an actual historian would do, you would look

7    at what methods you used to prevent your biases that exist in

8    present-day review literature.   You would look at external

9    criticisms.   You would look at internal criticisms.   You would

10   apply historical method through your academic training to

11   review the literature, to review the primary source documents,

12   to understand what was existing, what the response was, given

13   the historical context.

14           And what's important here is, it's not simply that Dr.

15   Castleman doesn't have a history degree.   That's not what

16   Owens-Illinois is arguing.   What Owens-Illinois is more

17   importantly arguing is that Dr. Castleman does not apply a

18   historical method.   In fact, as I will show you later on, when

19   asked to define a historical method, Dr. Castleman's answer is,

20   that sounds like lawyer speak.   Dr. Castleman doesn't apply any

21   methodology to go back and review the materials in order to

22   offer an opinion about the historical context of the events.

23   Next slide.

24           And I think, your Honor, this is where you were going,

25   is, if you look at the Daubert standard and you look at the

1   area in which the witness has superior knowledge, and you look

2   at the subject matter of the witness' testimony, and you ask

3   whether that expert can answer the specific question, we

4   fundamentally run into the problem with Barry Castleman.  Next

5   slide.

6           He is not a medical doctor that can review the medical

7   literature and understand what a medical article meant, what a

8   doctor meant while writing the article, what the medical

9   significance is.  He is not an industrial hygienist to

10  understand that.  He is not a historian either in the trained

11  or applying the art that you would use in historical analysis.

12  He is not a government regulator.  He is not an ethicist.  He

13  cannot decide whether government, corporate, business conduct

14  satisfied the standards.

15          He is more fundamentally, as this Court has found, the

16  librarian, as other courts have called him; a bibliographer, as

17  other judges in this district have said.  He is a middleman.

18  He is fundamentally an expert for hire.  Next slide.

19          Your Honor, this isn't the first time that you heard

20  the discussion about Barry Castleman.  Your Honor recognized

21  the issue very early when we were going through the exhibit

22  lists and posed the question to Mr. McCoy, representing

23  plaintiff, what is Barry Castleman's opinion?  And the answer

24  was, I don't think we are offering any opinions to him in this

25  case.  And then followed up and said, given the fact that he's

1    not a fact expert, everything that comes out of his mouth other

2    than qualifications has to be an opinion.  What are his

3    opinions in this case?

4          Mr. McCoy's response on behalf of plaintiff was, he

5    doesn't necessarily -- an expert doesn't have to have an

6    opinion.

7          Your Honor, contradicts federal rules, contradicts

8    Daubert.  What plaintiff is struggling to do is place Barry

9    Castleman into a category to answer a specific question.  What

10   they would choose to have Barry Castleman do is select

11   documents and act as a middleman about what documents should be

12   important in the case without applying a methodology to do so,

13   or without having a qualification in order to do the selection,

14   which is where this fundamentally breaks down on the first

15   prong of Daubert of what his qualifications actually are.  Next

16   slide.

17         THE COURT:  With regard to selection, though, if he

18   selectively reviewed certain things and excluded others, can't

19   you cross-examine him on that at trial?  Why is that a Daubert

20   issue at this preliminary stage?

21         MR. WATSON:  There are plenty of people that would

22   enjoy lining up to cross-examine Dr. Castleman.  The issue is,

23   how has he selected that article from the body of literature?

24   And it's not fundamentally cured by cross-examination.

25         You have put an expert in that has selected out of

1    what plaintiff says are thousands of articles.  And if you are

2    offering that expert to do the selection, you don't have a way

3    to cross-examine him on his methodology, because he hasn't

4    applied the methodology.  He hasn't reviewed all of the

5    literature to find out, if I take this body of literature,

6    what's the most significant for me to select?

7            There is no methodology for him to do so.  He has

8    chosen through his subjective view an article that he views as

9    significant.  And the fact that he's selected it as significant

10   as an expert from the stand, the jury's reaction is, apparently

11   this individual is qualified to select this article as the most

12   significant article in thousands of articles, when really

13   Dr. Castleman has not done a thorough review of the complete

14   literature, applied the methodology, and came out with an

15   outcome that is subject to cross-examination to find out how it

16   was that he came to that conclusion.  He has just selected an

17   article and wants to put it before the jury.

18           THE COURT:  I guess it's, you know, the issue of

19   selection seems to me it's a bit of a continuum, isn't it?

20   Because if you consider, let's say take another type of expert,

21   a medical expert, okay, or damages expert, say.  And damages

22   experts typically will rely upon things like annual reports,

23   P&L statements, financial documents, things of that sort.

24   Okay?

25           So we can all agree that documents of that sort are

1   typically relied upon by damages experts.  And so if expert,

2   you know, say Dr. Jones, says, I have looked through financial

3   records.  I don't think there will be much disagreement as to

4   his clinical methodology.

5         But then let's say you find two or three years of

6   financial records that he omitted, and those years were

7   substantial and they undermine his overall opinion.  That's not

8   really the subject of a Daubert motion.  That's a cross-

9   examination issue, right?  Because the methodology, depending

10  on how broadly you define methodology, is that he looked at

11  historical financial documents.

12        Here, seems to me that Castleman looked at historical

13  documents.  His methodology was, he went back and looked

14  through historical documents and various studies and articles

15  and trade documents, to come to some conclusions with regard to

16  his, quote unquote, historical or state of the art or state of

17  knowledge analysis.

18        Why isn't that similar?  If you have articles that,

19  you know, are contrary to his conclusions, why don't you bring

20  it up at cross and say, have you looked at this?  And if his

21  answer is, no, the jury can make up its own mind.

22        MR. WATSON:  Dr. Castleman will do two things.  Not

23  only will he select it, but he will say, it's important in his

24  view.  So he's expressing the opinion that I have selected this

25  because this article is important.  And he has not started with

1    a methodology to say, here is the complete body of literature.

2    I reviewed all these annual reports.  And when I reviewed all

3    these annual reports, I found that this annual report is most

4    significant determining my damages analysis because he has

5    instead viewed his world as whatever evidence has come to him.

6    He doesn't go out and independently find contrary evidence.

7            In fact, he hasn't even read the testimony of the

8    Owens-Illinois witnesses that plaintiff designated in this

9    case.  He hasn't done the analysis to begin which document is

10   selected, which document is most important.  He simply wants to

11   say, in my personal view, ladies and gentlemen of the jury, I

12   view this document as important, and I have selected this

13   document as important for you.

14           That's not subject to cross-examination.

15           THE COURT:  Mr. Watson, that's the case for any

16   expert, though, whenever an expert selects a document.  I mean,

17   presumably the expert doesn't select it because the expert

18   thinks it's unimportant.  The expert selects it because it's

19   important.

20           I guess it might be worthwhile to -- I mean, I see his

21   opinions kind of have two facets, right?  One is kind of purely

22   historical.  The other one is what I would call, for lack of a

23   better word, knowledge attribution, right?  So one is, this is

24   the type of article that was out there, knowledge that was out

25   there, to the world.  The second is, Owens-Corning knew about

1   this, or MobilExxon knew about this.

2          You know, to me those are two different types of

3   opinions.  And I guess my question is, with regard to -- and

4   perhaps part of our discussion here might be worthwhile to

5   clarify those two types.  With regard to the first type, that

6   is the more what I would call historical type, if he goes out

7   and selects historical documents and he has purportedly spent a

8   lot of time doing it.  He's written books on it, right?  You

9   know, with regard to those opinions, if you think that there

10  are particular studies that he omitted, again can't you cross-

11  examine him on that?

12         MR. WATSON:  You can cross-examine him on his omission

13  of studies, that is right.  The difficulty you have in

14  cross-examining him on studies that he's selected is, he has

15  selected the studies without determining the significance of

16  the study.  So he has just omitted them without your ability to

17  say, now why did you find this insignificant or significant in

18  your methodology or in your scientific review?

19         If you go to slide 14 of this, you will see that, you

20  know, it's fair to say, doctor, you haven't looked for the

21  material either.  That material has a way of finding me.  My

22  question, however, is whether you've done anything

23  independently to go out and search the information that would

24  have added the body of knowledge about Owens-Illinois'

25  perspective when it manufactured and sold Kaylo in 1940 and

1   1950.  And the answer is, no.

2        It is difficult to cross-examine someone who has

3   selected something without any methodology whatsoever.  He has

4   selected it based on a subjective review and said, it's

5   important to me.  And the reason it's important to me is

6   because I found it or it was given to me without doing a

7   thorough review of if I place this in historical context of

8   what Owens-Illinois knew, what Owens-Illinois could have known,

9   what study Owens-Illinois could have gone out and found.  He

10  doesn't want to do that independent analysis because he is

11  afraid it might contradict his opinion, and it might come back

12  to him and say, you have never actually applied a methodology

13  whatsoever to tell the ladies and gentlemen of the jury what

14  this study is, how it is important.

15       And more importantly, if you go back to the

16  qualifications question, he doesn't have the qualifications to

17  know whether it's important in the medical literature.  He is

18  not a doctor.

19       THE COURT:  I mean he relies on other things other

20  than just medical articles, right?  You know, if it's a matter

21  of selection bias, right, we see selection bias.  That's an

22  issue that comes up all the time at trial, right?  You looked

23  at this deposition but ignored this.  You looked at this

24  testimony but you ignored this.  You looked at this document

25  but you ignored this.  And all that goes to weight.  It goes to

1   bias, right?

2          But as far as the protocol goes or the procedures, you

3   know, as far as the actual notion of collecting historical

4   documents to review them to come to a conclusion, it seems that

5   why hasn't Castleman done what you think he should do?  In

6   other words, what else could he have done?

7          MR. WATSON:  Sure, your Honor.  This makes plain.  He

8   could have read the testimony that plaintiff's think is

9   critical to their case in terms of Owens-Illinois' employees.

10  We've given him that testimony, and he's refused to read it as

11  soon as March of this year.  He has refused to do it.  And it's

12  important to know if he is going to offer the opinion about

13  what was knowable at the time is to understand, No. 1, what

14  Owens-Illinois knew.

15         But No. 2, if you place that knowledge subject to

16  external and internal criticisms, and you're wanting to opine

17  about what Owens-Illinois could have known given the historical

18  past, to have methodology to say, I find that Owens-Illinois

19  should have known of this document.  If I do a complete review

20  of the literature and if I don't purposefully exclude documents

21  that would be contrary, because that negates the historical

22  method.  If you don't start with the methodology of what's his

23  historical method to find a document that would be selected and

24  important in his view, you are simply applying the Barry

25  Castleman view of important documents.

1    And that is not subject to cross-examination because

2 all he's done fundamentally is not get past the gatekeeping

3 role, have not done a historical review, have not done a

4 complete review of the literature.  He has done the, I have

5 gotten certain things from the plaintiff's attorneys.  Those

6 are the only things I look at.  I am not willing to view

7 contrary evidence.  And because I have got it from plaintiff's

8 attorney, it's important.  I have selected it.  Ladies and

9 gentlemen, of the thousands of articles over the past century,

10 I view this as important.

11    THE COURT:  Okay.  Thank you, Mr. Watson.

12    MR. FUSCO:  Your Honor, David Fusco on behalf of Crane

13 Co.

14    I just want to briefly focus on that Crane Co. is also

15 moving to -- in the event Dr. Castleman is permitted to

16 testify, either we still think -- we have objections to the

17 scope of his testimony.  We think proper limitations need to be

18 placed on it.

19    First and foremost, his report in this case doesn't

20 reference anything about Crane Co., any knowledge he would

21 attribute to Crane Co. or anything of that nature.  We would

22 seek to exclude his testimony as to Crane Co. on that ground,

23 on that basis.

24    The second basis is that from past --

25    THE COURT:  But if he is being offered for just, say,

1    historical kind of state of knowledge witness, and if he

2    doesn't opine on what Crane Co. knew or didn't know, what's the

3    basis for -- are you saying that in order for him to be

4    relevant, he has to specifically attribute knowledge to Crane

5    Co.?

6              MR. FUSCO:  No.  My intent was to defer the argument

7    on his general admissibility to Mr. Watson and not rehash that

8    ground.  I just wanted to add that even if your Honor finds

9    that his testimony is admissible, and he does testify, that we

10   still have concerns that he be limited to the areas which he

11   can lay a proper foundation.  We know from past experience in

12   his testimony related to Crane Co. is often based on a lot of

13   speculation.  Crane Co. employee was on a membership list of an

14   organization.  That organization published this thing.

15   Therefore, it comes back to Crane Co.  And we don't think he

16   can connect those pieces and lay appropriate foundation.

17             So -- and none of those opinions were actually

18   disclosed in this case.  We don't know what they would intend

19   to call him for, if anything.  So our point is to add, if his

20   testimony is admitted generally in areas which your Honor finds

21   he does have a foundation, we would still seek to limit it

22   appropriately.

23             THE COURT:  Okay.  Thank you.

24             MR. MORRIS:  Just briefly one point.  I think there is

25   one area that I'd like to address just briefly.

1    THE COURT:  You have a minute, given the amount of

2  time we have.

3    MR. MORRIS:  You asked the right question when you

4  asked Mr. McCoy the very first time, what are his opinions

5  going to be?  And you identified today the history and sort of

6  the knowledge to the companies.

7    But there is another very insidious thing that Mr.

8  McCoy does, has done, with Mr. Castleman.  I think 37 days or

9  so after you asked him that question, when he said he wasn't

10  going to give opinions -- can we turn the Elmo on?

11    He asked Dr. Castleman this, and I don't know if you

12  can see that, your Honor.  I will read it.

13    THE COURT:  I can see.

14    MR. MORRIS:  What is your opinion as to in this case

15  Westinghouse?  This was in a case called Kinser.  Mr. McCoy

16  referred to Krik earlier.  He called him Kinser, and that's

17  why.  Because he was thinking about Kinser.

18    "What is your opinion as to what Westinghouse should

19  have done out in the field, like in the power house, as far as

20  safety precautions, testing the air and warnings?

21    "Answer:  Well, they should have done what Mereweather

22  recommended in his report on asbestos in 1930, get the workers

23  to have some sane appreciation of the risk and take seriously

24  all of the measures they can apply to limit their exposures to

25  asbestos dust.

1          How does that get used in the case?  It gets used, for

2  example, by Mr. McCoy in his closing argument, where he said in

3  Kinser:  There is a difference between the board room where

4  these corporate offices are and this field.  The message

5  doesn't go out.  And Dr. Castleman explained why, because

6  oftentimes in these companies back then, there was no

7  budgetary -- no budget set aside to make that message conveyed.

8  It's denial again to know it here and not let the people know

9  there.

10          That's exactly how he uses Barry Castleman.  What

11  Barry Castleman says among other things in terms of historical

12  articles and anecdotes and what company know -- companies knew,

13  he says that the medical director had this knowledge, and he

14  couldn't get the corporate executives, the people in the board

15  room, the CEO with the company, the premises owner -- he

16  couldn't get them to implement it because of monetary

17  constraints, budgetary constraints, whatever.

18          That falls nowhere within his training, expertise.  It

19  falls nowhere within the scope of allowable testimony based on

20  any kind of thing other -- that I've ever seen other than

21  possibly an ethicist, who has studied the issue.  And Castleman

22  is not qualified to do that.

23          THE COURT:  Thank you.

24          Mr. McCoy, you're up again.

25          MR. McCOY:  Yes.  Judge, Mr. Castleman, or Dr.

1    Castleman, will not be offing an opinion that Mobil knew

2    something or that any of these defendants in the courtroom knew

3    something specific.  Just want to make that clear.

4              THE COURT:  Is he --

5              MR. McCOY:  If he did that --

6              THE COURT:  Hold on for a second.  Is he going to be

7    offering opinion that they ignored something or they should

8    have known something?

9              MR. McCOY:  Not in my direct examination.  That's for

10   sure.  He will be -- he will be providing the jury a synthesis

11   professionally from his public health background, environmental

12   engineering background, chemical engineering background, what

13   was available in terms of the literature during the particular

14   time periods that would be relevant.

15             So essentially in this case you got pre-OSHA

16   exposures, which -- where state-of-the- art testimony is

17   especially important, although it has bearing later on.

18   Pre-OSHA means before the OSHA regulations came out, and

19   everybody supposedly should have known what to do, although the

20   testimony will be not everybody did it.  I'm just saying the

21   pre-OSHA period is very important for state-of-the-art

22   testimony.  That's what makes him an important witness for us

23   in this case.

24             THE COURT:  So he is going to draw no conclusions as

25   to a particular defendant, what they knew or should have known

1   from the information that was available?

2          MR. McCOY:  That's correct, not in my direct

3   examination.  That's for sure.

4          THE COURT:  You keep saying that, not in your direct

5   examination.  Presumably that the defendants aren't going to

6   ask him that question --

7          MR. McCOY:  I -- I'll instruct him, you know, like I

8   say, that he's -- that he shouldn't do that in cross-

9   examination either.  I've told him that many times.  And the

10  example they just showed up here, that was a different case,

11  and it was one question.  We are not doing that here in this

12  case.  I said that.  And I'll tell him that.  We're not going

13  to go there.

14         So other people may sometimes in that examination of

15  him.  But for me, I found it's better just to let him provide

16  the literature, statements, summaries to the jury, and let them

17  make their own conclusions.  Jury has got to have something

18  they decide.

19         And I'll point out, Judge, that Mr. -- Dr. Castleman

20  has these qualifications.  He's also been a consultant very

21  recently for the World Bank on a big construction product on

22  asbestos safety issues.  That's a large commercial

23  organization, of course.  World Health Organization, he

24  continues to be recently consultant for them.  He lectures

25  internationally.

1    I think the question of his qualifications is rather

2 clear from his background.  It's hard to find somebody who's

3 got these different areas of chemical engineering,

4 environmental engineering, and public health together.

5    THE COURT:  What about defendants' argument that he is

6 not a trained historian?

7    MR. McCOY:  He is a trained historian, Judge, because

8 the best answer to that is, there is nobody else who published

9 a book like he has on the history of things.  And this is a

10 book that's in his fifth edition.  It's 800, 900 pages long.

11 And it's about a lot of different areas of company documents,

12 trade organization documents, the published literature.  He

13 spent --

14    THE COURT:  Can I see that book, Mr. McCoy?

15    MR. McCOY:  Sure.  Spent his whole live studying.

16 This is called Asbestos, Medical Legal Aspects, for the record.

17    (Document tendered.)

18    MR. McCOY:  He's the sole author of that book.

19    What's -- what's amazing about Dr. Castleman in terms

20 of his training is that he can literally take any one of those

21 citations in there and recitate in great detail what exactly

22 the -- that particular publication or article or company

23 document was about, because he's dedicated his life to this.

24    Owens-Illinois' witness, in contrast, on the same

25 issues, who we are not contesting, Judge, because state of the

1  art testimony is important in these cases, as I say, especially

2  when you got pre-OSHA exposures.  That -- his background is, he

3  is a historian.  His degrees are in history, including his

4  Ph.D.  He's going to testify to the same things.  He says --

5  Dr. Nushul is his name, N-u-s-h-u-l -- is expected to testify

6  concerning state of the art, the history of science and

7  technology applicable to these cases, and the cultural history

8  of the United States as applicable to these cases.

9       I don't know that Dr. Castleman will cover cultural

10  history.  But he'll certainly cover state of the art and it

11  ties in history of science and technology.

12       Then it says, Dr. Nushul will also testify about

13  Owens-Illinois' actions in the 1940s and 1950s, including the

14  Saranac Lake documents, among other things, in the context of

15  medical, scientific and regulatory state of the art at the

16  time.  Very, very similar disclosure by someone who has no

17  training in the fields of public health or environmental

18  engineering.

19       But again, somebody has to testify to state of the

20  art, has to study these many, many publications.  The jury

21  can't be expected to absorb in the course of one of these

22  trials that's in the over a hundred seventy publications that I

23  think were out there alone by 1956, which is kind of a key date

24  in the literature.  And that's a date by which Mr. Krik has

25  started being exposed.

1    So that's the purpose of the state of the art

2 testimony.  And everybody has to have a witness on that, or

3 we're going to have a long time for jurors pouring through

4 medical articles.  And instead we're going to have lawyers

5 picking out what's most important rather than people who

6 were -- who were trained in these fields or trained in the

7 arts.

8    So that's the basic purpose.  I'll add this one case

9 here that I think is important.

10    One other thing I wanted to comment on, Judge, is, the

11 testimony goes really to this question of the element of proof

12 of what the company should have known.  And the jury can

13 formulate its own opinions based on what's available in the

14 literature at the time.

15    But what's important in these companies is that the

16 decision-making process on what -- what they will do with the

17 information that's available as to health hazards is typically

18 not involving the medical directors of these companies.  Those

19 functions about the decisions on how to protect users with

20 warnings or with changes in designs or substituting something

21 for asbestos, those decisions -- and the evidence will be in

22 this case that those decisions are made by engineers.  They are

23 made by product development managers.  They are sometimes made

24 by risk assessment department of companies, which are lawyers

25 primarily.

1          They are made by people who are not medical doctors,

2    is the point.  And so the audience and what these people are --

3    need to appreciate and what their action should be in response

4    to that, that audience is not medical directors of the company,

5    but it's the nonmedical people.  This is not like a malpractice

6    case where somebody has to testify to a medical standard of

7    care.  Very different than that.

8          This is a question of what people who are nonmedical

9    people would have done in terms of product safety things or

10   warnings or safe workplaces, premises construction managers,

11   people like that, given the information that company -- the

12   company should have known about, not medical department

13   necessarily but the company.  Some of these companies didn't

14   even have medical departments.

15         But the law is -- in Illinois, of course, is what is

16   the duty of reasonable care, not what is the medical standard

17   of care, when you talk about a product liability case.  So I

18   say that because, yes, there were a couple of opinions that

19   excluded Dr. Castleman because he wasn't a medical director.

20   But those opinions didn't look at this question of what is

21   Dr. Castleman's testimony really going toward, as well as I

22   don't think they properly gave fair statements of what his real

23   credentials are.

24         But just very importantly is what is the issue that we

25   have to prove here, and that is what this company should have

1 known in the way of people who were making decision.

2 THE COURT: Mr. McCoy, with regard to his recitation

3 of the medical literature, I take it that he is -- let me ask

4 you. Is he opining that those articles are, in fact, reliable

5 and true? Or is he just saying that these are articles that

6 were just out there?

7 MR. McCOY: It's not the former. It's the latter.

8 It's that they're out there. And your Honor can give a

9 limiting instruction, we often had it, that the testimony is

10 not being offered for the truth of the matter asserted. It's

11 being offered again because these -- this is the documentation

12 that again would have been available to the company, to its

13 engineers, to its product safety people, to its industrial

14 hygiene department, to the -- to the nonmedical personnel, who

15 are the ones that would affect the protections of the workers

16 or users or the property owners.

17 THE COURT: So with regard to his opinion, it doesn't

18 really matter to him whether or not the medical articles in

19 particular -- whether they are correct, accurate, reliable.

20 What he is saying is that this is the type of literature that

21 was out there?

22 MR. McCOY: I think he would -- he would not talk

23 about it unless he thought they were correct, accurate,

24 reliable. I mean, from a public health perspective, he

25 finds -- and he'll testify to the foundation under -- that at

1    Rule 803.18, that these are the type of articles that would be

2    relied upon by a person in the field of public health, or

3    someone who's doing the evaluations of these safety needs for

4    the products, or health hazards based on it.  He'll testify

5    that those are reliable articles.  So he will say that.

6         But he's not offering the testimony for the -- these

7    things being true, that they actually happened.  That's the

8    limiting instruction.

9         They're only being offered to show what a company

10   should have known, been aware of.  Not that any of this was

11   true.  I mean, there is obviously a great deal of debate about

12   the truth of these cases, when you get down to, as your Honor

13   was talking about with the defense, what's -- what's the other

14   side of the story?

15        And in terms of there are articles that the defense

16   will cite that might question this.  But I will say as a

17   general matter, at the end of these cases, the juries I have

18   repeatedly seen found that everybody should have known about it

19   when you have this kind of testimony.  Every company.  So the

20   defense will usually go with the fact that they want everybody

21   on the verdict form, including the non-trial defendants, to

22   reduce liability.  And basically everybody should have known.

23   That's the typical defense.

24        Now, I will say when you get to Owens-Illinois, there

25   is probably a different picture.  They want to say that before

1    they got out of the business, that the -- 1959, that there was

2    no sufficient knowledge of the dangers.  So with respect to

3    Owens-Illinois, there will be definitely a significant dispute

4    about what the jury should decide based on the literature.

5         But the literature is the literature.  And Dr.

6    Castleman will not be talking about materials he considers to

7    be unreliable.

8         THE COURT:  Okay.

9         MR. McCOY:  One other thing, Judge.  There is a case

10   that I think should also be considered here, and that's this

11   Smith case, Seventh Circuit case.  It's one we cite in our

12   brief, a 2000 opinion where the Court talks about, even though

13   the experts weren't qualified in the specific field of

14   automotive design, that still -- because their testimony would

15   be relevant to the fact issue in the case, that it was abuse of

16   discretion to exclude those people.

17        So I only point that out just given the controversy

18   which was presented at least in the motion.  I didn't hear

19   argument about Dr. Castleman's credentials.

20        THE COURT:  Thank you.

21        MR. WATSON:  Your Honor, three primary points on

22   rebuttal.  The first is, I heard something very inconsistent in

23   terms of what Mr. McCoy was going to offer about Dr.

24   Castleman's testimony is whether he was going to offer opinion

25   about what the defendants knew, should have known, or whether

1    he's going to be limited to the published literature.  If he is

2    limited to the published literature, he is excluded from the

3    corporate documents.

4          Then Mr. McCoy later looped around and said that

5    the -- that Dr. Castleman would discuss the corporate

6    documents.  There is no foundation for Dr. Castleman to talk

7    about the internal corporate documents of any defendant.  He

8    does not have firsthand knowledge of those documents.  In fact,

9    he's also refused to read the employees' testimony about the

10   significance of internal corporate documents.

11         So if the Court is accepting Mr. McCoy's statement

12   that Dr. Castleman will be limited in some respect, he should

13   be excluded from reading, reviewing, relying on, offering any

14   opinion about the internal corporate documents.

15         The second thing is, your Honor, in terms of the

16   selection of documents, you asked me about whether selection

17   bias comes off -- often in cross-examination.  It does.  And

18   the selection bias occurs in what the expert's ultimate opinion

19   is.  So the lost profits would have been X.  Well, if you

20   didn't consider this annual report, your calculation of lost

21   profits would be different.

22         Dr. Castleman's opinion is the selection of the

23   document.  He is not reaching a further opinion on which you

24   are cross-examining him about changing his philosophy.  The

25   selection of the document is the opinion itself, which is

1    unique and different from saying, selection bias in terms of an
2    expert reaching a different issue and ultimate opinion, and
3    potentially different permutation, if he would have considered
4    additional documents.

5         The ultimate opinion is this document is significant,
6    important.  And I have selected out of the thousands of other
7    documents.  And because I have selected, it's important.

8         And the final thing, if I can switch over, your Honor,
9    to the last Daubert issue in this case is the relevance of Dr.
10   Castleman's testimony.  And if you look at slide 18 before you,
11   if you switched over, take Dr. Castleman's word for it.

12        In the Neal case, when you were asked if you were --
13   your testimony, you thought you could give opinions, did you
14   say, I think it really doesn't aid the jury a great deal to
15   know what I think about this stuff.

16        THE COURT:  Thank you.

17        Okay.  Before moving on to the final set of arguments
18   with regard to the Longo slash MAS experiments, I want to take
19   a short recess.  Furthermore, with regard to the arguments, we
20   have continued to review the motions since I issued the agenda.
21   And what I'd like to do is, I am going to further limit the
22   argument time.  So defendants' collective argument with regard
23   to that matter should be limited to ten minutes.  Plaintiff's
24   argument to ten, and defense rebuttal to two.  I don't think I
25   need any more than that with regard to that issue.

1        All right.  So let's take a five-minute recess.

2     (Brief recess.)

3        THE COURT:  Let's proceed with the motion regarding

4  Longo slash I don't know whether it's M-A-S or MAS.

5        MR. CASMERE:  I believe it's MAS, your Honor.  Edward

6  Casmere on behalf of Owens-Illinois, your Honor.  We have

7  allocated approximately eight minutes to two minutes for other

8  counsel.

9        The motion is with respect to the Longo/MAS

10  videotapes.  And the witness that's relevant is this Mr.

11  Templin.  But it's the same issue.  And to be clear that the

12  quantitative data coming out of those studies is not at issue.

13  The actual numbers, the microscopic analysis, I look forward to

14  cross-examination on those.  These videos are litigation-

15  generated generic dust dramatizations.  They have --

16        THE COURT:  So you have seen them, right?

17        MR. CASMERE:  Many times.

18        THE COURT:  So describe them to me.

19        MR. CASMERE:  I believe we submitted them.  But it's

20  basically a -- depending on the video, but they're relatively

21  similar.  They are in a black enclosed what they call

22  containment chamber.  And they have individuals wearing a

23  variety of different respiratory protections.  Sometimes they

24  are in space suits with full face mask respirators.  And they

25  put a variety of products through there with high intensity

1   theatrical lighting at different angles.

2              And there is actually a picture in our brief on page 2

3   or 3 of a screen shot of one of the videos.  And it's -- they

4   cut, manipulate the products.  And then they turn the light on

5   and off.  And it's similar to driving through a snow and

6   flicking your high beams on and off.  It's essentially what it

7   is.  But it's the entire black background to highlight the

8   distraction or difference between the materials.

9              I call it a torture chamber.  They are gross

10  dramatizations.  They are not in any way designed to simulate

11  the work that's done.  There is nothing about the videos that

12  take into account the work history.  These were done decades

13  ago generically for the litigation.

14             The most important thing is that everything you see on

15  those videos is not relevant.  You cannot see respirable

16  asbestos fibers on those videos.  Dr. Lambertus Hesselink,

17  who's a physics professor, an optics professor, at Stanford,

18  who submitted an affidavit to my motion, has analyzed these

19  things and says, it's physically impossible to see light

20  scatter from the individual respirable asbestos fibers.

21             What you see in those videos are, for example, in the

22  insulation product, 85 perfection of that product is a white

23  calcium silicate material.  So you see that being released into

24  the air.  You can see glomerations of different things that are

25  in the air.  But in terms of respirable asbestos fibers, it is

1    physically impossible to see them with the naked eye.  You

2    cannot see light scatter off of them.

3           Aside from that, what Dr. Hesselink has done is, he's

4    looked at the camera that they used to capture this.  And he

5    says, the camera, the optics on the camera, are incapable by

6    orders of magnitude to detect light and record it that could

7    come off of any fiber that's that small.  And to put all of

8    this into perspective, your Honor, in order to do the

9    microscopic evaluations, the counts where they get eight fibers

10   per cubic centimeter, which is basically a sugar cube, they

11   count it.  They get eight individual asbestos fibers.

12          They have to use a microscope to see those fibers.

13   They have to magnify those images thousands -- 500 to a

14   thousand times in order to make it visible on a microscope.

15   That's a technology where you take something and you blow it

16   up.  This videotape shrinks an image from a full-size room onto

17   a videotape which you then see on a screen.  So the technology

18   is all wrong.

19          And that testimony from Dr. Hesselink is completely

20   unrebutted.  It's not addressed by their papers at all.  It's

21   physically -- the laws of physics say, you cannot see what he

22   says that you see.

23          Now, so they have no probative value.  What they put

24   them in for is because they are grotesque.  They are.  They are

25   in a torture chamber of these, and they bring the products

1    through, create as much dust as possible, for no reason other

2    than to create dust.

3         And then if you want to know actually if there is

4    asbestos exposure, you have to take it under a microscope.  And

5    I think most importantly, what Mr. Templin will admit and what

6    Dr. Longo has admitted numerous times is, if you took an

7    asbestos-free insulation product that's similar to the product

8    that my company made with asbestos, they all admit it would

9    look exactly the same on the video.  There is no question in

10   this case that cutting insulation products creates dust.  There

11   is no question in this case that cutting insulation products

12   releases asbestos fibers.

13        I look forward to cross-examining their witness on the

14   actual quantitative data.  That's something that I can work

15   with.  You cannot cross-examine somebody on something you

16   cannot see.  Now, when you look at the video, the immediate

17   reaction is, oh, my goodness.  Look how much they are being

18   exposed to.  And the fact of the matter is, when you look at

19   the videos, there is zero exposure that you can see.  And if

20   it's a non-asbestos product, it's going to look exactly the

21   same.  And Mr. Templin admits that.

22        He also admits, you can't -- you can't do anything.

23   You can't quantitate.  You can't see fibers.  You can't see the

24   stuff that gets reflected.

25        I think that gives me eight minutes, your Honor, and

1   I -- oh, no, I have a couple more minutes.  So let me look

2   through my notes and see if your Honor has any questions.

3          THE COURT:  You need not use all your time.

4          MR. CASMERE:  Okay.  I'll take that as an opportunity

5   to sit down, your Honor.

6          THE COURT:  Thank you.

7          MR. FUSCO:  Your Honor, David Fusco.  Just couple

8   things to add.

9          First I will note that Mr. Templin, as being the

10  witness that plaintiffs intend to call at this point, changes

11  the issue a bit from when the motions were filed.  Mr. Templin

12  did not participate in the preparation of any of these videos

13  or many of the MAS written studies.  For that reason,

14  appropriate time at trial, before the evidence is presented to

15  jury, we will seek to exclude his reliance on studies that he

16  didn't participate in, he has no firsthand knowledge about, and

17  we will have no ability to cross-examine him on the data.

18          As it relates to our client on the gasket packing

19  allegation, Dr. Longo only published one study in the

20  scientific literature.  And we will move to limit Mr. Templin

21  to that study as something if he wants to rely on it that he

22  certainly he can as part of public literature.  But all the

23  unpublished studies and videos he can't lay the foundation for

24  them.  So he shouldn't be able to discuss them at all in the

25  first place.

1        As it relates to the videos themselves, I would just

2   add to Mr. Casmere's discussion, obviously as noted in the

3   briefing, that MAS has done a number of these studies on a

4   number of products, including gaskets and packing, and even one

5   study that targeted the Crane Co. valves, even though Dr. Longo

6   and Mr. Hatfield specifically admit that the gaskets and

7   packing removed had nothing to do with Crane Co. valves, were

8   designed for litigation in response to questions about Crane

9   Co.

10        Putting aside the prejudice of that study in and of

11   itself, all these studies suffer from serious deficiencies.

12   And if Mr. Templin is allowed to rely on or discuss them, we

13   will seek to limit them, exclude them, for those reasons.

14        But I just want to refer the Court too as it relates

15   to the videos and the data and the unreliability of the data

16   that's discussed in those studies to the United States

17   Bankruptcy Court, Western District of North Carolina's decision

18   from earlier this year in 2014.  I'm not sure if your Honor is

19   aware.  Garlock was one of the country's largest gasket

20   manufacturers, went bankruptcy, went through the bankruptcy

21   litigation in North Carolina.  It's a 17-day trial.  Dr. Longo

22   testified.  Dr. Hesselink testified.  Numerous other experts

23   testified.

24        The Judge ruled in that decision, reached numerous

25   findings.  And I have a copy of the decision that I can provide

1  to your Honor if you like it, because it is not in the -- it

2  has not been published yet. So I'll bring that up after I

3  conclude, if your Honor would like.

4         But the point that I'd like to make is that the Judge

5  reached the decision basically there were glaring problems with

6  the studies, and the gasket studies suffered from a list of

7  deficiencies that rendered them useless. Talk about the

8  numerous errors, basic errors, in the studies, the problems as

9  Mr. Casmere talked about with the videos. They're basically

10  carried out in a way the Court described to produce the highest

11  possible results and overdramatize the process.

12         The studies also have numerous sampling-technique

13  problems. They didn't follow government standards or industry

14  standards in performing the work. And I think that the Court

15  said it best when it described Dr. Longo's studies as pseudo-

16  science as best and quoted that Dr. Hesselink's process is

17  fully documented, and it is repeatable by other scientists who

18  might want to test it. By contrast, the results from Dr.

19  Longo's study cannot be repeated even by his own staff.

20         Those comments were going to the gasket packing

21  studies that he relied on and the videos. And for the videos

22  in specific, the same errors exist in the gasket packing videos

23  as the -- as the insulation videos. So we refer the Court to

24  that opinion when considering the import of Dr. Hesselink's

25  testimony.

1      If -- your Honor, if you would like to --

2           THE COURT:  You can leave it right there.  Thank you.

3           Mr. McCoy?  They have you doing all the work today,

4    Mr. McCoy.

5           MR. McCOY:  Yes.  They did all of it for me, so I am

6    ready, bottom line.  Team effort around our office.

7           So, Judge, the motion to exclude the videotape

8    demonstrations, which as Mr. Casmere said they are not asking

9    to exclude the data that resulted from the measurements taken.

10   And the videotapes are actual materials of the type that was

11   used by Mr. Krik.  And he will testify also that those are

12   representative of how it looked when he was working.

13          But the key is that the jury can't comprehend the kind

14   of dust we're talking about unless you see these videos.  And

15   that's the whole point of it.  They are demonstrative of what

16   really went on.  And it's not the kind of dust that people

17   think of when they are vacuuming their house or their car or

18   anything like that.  These conditions rarely exist in today's

19   working world.

20          THE COURT:  How do you address or how do you respond

21   to defendants' argument that what you are seeing is not the

22   asbestos that's at issue?  What you are seeing is a lot of --

23   there may be a lot of dust.  There may be a lot of other things

24   in the air.  But it's not really relevant to this case because

25   it's not asbestos.

1      MR. McCOY:  That's -- because part of it is asbestos.

2  That's why it's relevant.  And this has to be linked up with

3  the other expert testimony.  And the experts will explain how

4  within these particles that you see in the air there is a

5  percentage of asbestos fibers.  The products, as Mr. Parker's

6  report said earlier, the gaskets, are about 90 to 95 percent

7  asbestos.  And that's mostly asbestos from those and from the

8  thermal systems insulation which is the Kaylo, and where he is

9  actually -- Dr. Longo is cutting Kaylo block, which is what

10 specifically Mr. Krik used in the -- in the demonstration.  The

11 Kaylo block is anywhere from 15 to 20 percent asbestos.

12     So the experts will explain that.  And what's

13 important in these cases, Judge, is that you're not only

14 exposed because you're right there doing the cutting and

15 sawing, but because other people around you are doing it and

16 because these particles stay suspended in the air.  And that's

17 part of what you see.  And --

18     THE COURT:  But, Mr. McCoy, if you can't see the

19 asbestos in the videos, then, you know, let's say an expert

20 testifies that, well, even if you can't see it it's still

21 there.  Assuming for the purpose of argument that's the case,

22 then why are the videos helpful at all?

23     MR. McCOY:  Because they show conditions that people

24 can't appreciate based on household dust and car dust and

25 things like that.  What -- what you're looking at is what the

1    conditions actually look like.  I mean --

2            THE COURT:  But the conditions -- I mean, it's not all

3    true, right?  Because Mr. Krik didn't work in a black room.  He

4    didn't work in an environment with these lights.  You know, he

5    didn't work in an environment with a camera going.  And so they

6    are not attempting to recreate, for lack of a better word, the

7    circumstances that Mr. Krik faced when he was doing the work.

8            MR. McCOY:  It is.  You're right, Judge.  I mean,

9    those conditions with the black light and so on aren't what Mr.

10   Krik was working under.

11           THE COURT:  Or even the volume of the room.

12   Presumably Mr. Krik was working in a -- I don't know.  Was he

13   working in a much larger room than --

14           MR. McCOY:  Ship compartments, small areas.  And the

15   point of it is, no matter how big the area is, too, this stuff

16   just hangs in the air.  That's part -- that's part of the

17   nature of these fibers, and that will be linked up.  If the --

18   the recommendations for how to do these kinds of

19   demonstrations, we can't do one in the courtroom.  We can't

20   come in here and cut asbestos fibers loose in the courtroom

21   here.  It's got to be done in a laboratory setting.

22           But it says right here in the EPA recommendations on

23   this, which we attached to Mr. Longo's response affidavit with

24   our brief, it says that videotape production, lighting,

25   whenever possible -- this is the EPA's recommendation --

1    whenever possible the activity will be videotaped using tender

2    lighting so that a direct visual indication of dust particle

3    exposure can be observed.  Use a high-powered beam divergent

4    spotlight in a relatively dark area.  Aim the light beam across

5    the area where the dust will be generated.

6         Dr. Longo was following the procedure protocol

7    recommended by the EPA when you are doing these kinds of

8    demonstration videotapes of asbestos exposures.  So, you know,

9    what you see is more clearly defined by that methodology.  But

10   you see the particles in the air which contain asbestos.  From

11   a standpoint of what do you do with that testimony, because

12   like you said, it doesn't show the asbestos fiber, Mr. Casmere

13   is right.  Yourself, you can't see it.  They are invisible.

14        What you do is, you have another expert who comes in

15   there and explains to the jury, if you can see this kind of

16   visible dust in the air, then you got gillions and gillions of

17   asbestos fibers surrounding it that you can't see.  And that's

18   the point of it.

19        If you can see the dust, you know you've exceeded any

20   standards that would be safe, considered safe levels, according

21   to the defense experts.  And that's part of our presentation.

22        Now, that -- that's essential, though, for the jury to

23   understand how much particles there are so you can better

24   appreciate how much asbestos fibers there really are from the

25   expert testimony about what happens when you can't see visible

1    dust from asbestos-containing materials.

2            And the respirable nature of these particles is very

3    important too.  In other words, they show how these tiny things

4    are in the breathing zone.  And back then people weren't

5    wearing the kinds of masks that they had to wear when they did

6    the videotape demonstration.  But that just shows how much

7    people are really inhaling.

8            And so along with these bigger particles that can be

9    seen, they are inhaling smaller -- zillions of these smaller

10   fibers that can't be seen.  And that's the -- that's the

11   combined expert testimony with that demonstration and Mr. Krik

12   saying, yeah, that's what it looked like in the air.

13           The -- I also point out the Thacker case, Judge, which

14   is the Illinois Supreme Court decision, which emphasizes, you

15   know, that the witnesses were able to describe the mechanics of

16   asbestos movement, and that they had the haze and the fiber

17   drift that went on.  So this is part of that same testimony

18   that a lay jury can figure out from that kind of exposure

19   demonstration that how much is in the air shows how much

20   would -- drifted to different areas.

21           And this is true where at Mobil he worked right beside

22   a lot of people besides himself who were moving pipe covering,

23   where he did that in the Navy with the Owens-Illinois product,

24   where he -- where he removed gaskets.  And you can see, again,

25   there is visible dust created from this, which means there is

1    zillions of asbestos fibers present based on the other expert

2    testimony.

3            That's the only way we can demonstrate these things.

4    We can't do it without -- right here in the courtroom.  We

5    can't expose these jurors.  We have to rely on these

6    experiments.

7            THE COURT:  Okay.

8            MR. McCOY:  Again, for the limited purpose, Judge, of

9    being demonstrative testimony, that's what they are there for.

10           MR. CASMERE:  Can do it in less than two minutes, your

11   Honor.

12           Mr. Krik talks about dust created from all these

13   different products.  And I don't think Mr. McCoy intended to do

14   this, but to the extent there was the impression by the Court

15   that the Thacker decision from the Supreme Court of Illinois

16   was saying that these Longo videos are good, that's not what

17   they are talking about.  They are talking about the lay

18   witnesses' testimony in those cases about seeing haze in their

19   workplace.

20           There are asbestos filters in these studies that

21   absorb and take air monitors from around the room.  That's the

22   quantitative data that we can talk about.  So to the extent

23   that there is an issue of how much is there, where it is,

24   that's in the quantitative data.

25           Your Honor was right on that the conditions here are

1    nothing like the conditions of Mr. Krik's exposure.  Things

2    like the volume of the room, the air flow, temperature,

3    humidity, all these things impact how these things move.  We

4    can cross-examine on that when we have the statistics, when we

5    have the quantitative data.  But there is nothing about these

6    studies that are similar to what Mr. Krik did.

7            Third, the EPA thing that Mr. McCoy was referring to

8    doesn't recommend that these videos be taken for quantitative

9    analysis.  That's not what those are about.  That's just

10   incorrect.

11           THE COURT:  What were they for?

12           MR. CASMERE:  It's to describe -- so if you're doing a

13   study and if you're going to videotape it, this is how you

14   videotape it.  And they are to show particularly in areas -- I

15   think it's a Libby, Montana, EPA document that they're talking

16   about.  In areas where you cannot tell if there is any dust

17   that's created whatsoever, these videos can show that there is

18   dust that's in fact created by the manipulation of whatever it

19   is.  There is lots of the things, especially products that are

20   supposedly encapsulated or that people will say, my product

21   doesn't put off any dust at all.  Well, then maybe you have a

22   relevant -- then maybe there is some relevance to that.

23           But in a product where you can see the dust with your

24   naked eye, I mean, that's not relevant.  But the EPA documents,

25   if you are going to do this, this is how you do it.  And then

1    you can show that dust is created.  And then you use the

2    quantitative data.  But there is no question in this case about

3    dust being created.

4          Finally, it is the dust that -- it's the asbestos

5    fiber concentration that matters, and you can't see it.  And I

6    believe that when the Court watches the videos, I believe that

7    it will be abundantly clear to the Court what's going on and

8    why they want to use them.

9          Thank you.

10         MR. MORRIS:  Your Honor, with the Court's permission,

11   30 seconds as it pertains to Mobil?  Because Mr. McCoy just

12   mentioned Mobil.

13         THE COURT:  Go ahead.

14         MR. MORRIS:  Your Honor, Pat Morris on behalf of

15   Mobil.

16         The -- Mr. McCoy did not disclose Mr. Templin or this

17   video against Mobil.  So if this was a close call as it

18   pertains to the co-defendants, which I don't think it is, I

19   think that the substantial prejudice to Mobil of this video, of

20   this theory that there is fibers hanging in the air, as he just

21   said, that there were workers working next to Mobil, this is

22   not in the final pretrial order as being admissible against us

23   or disclosed against us.  So to the extent that it is purported

24   to be uses in that context, even with a limiting instruction,

25   Judge, it would be so unfairly prejudicial too, for exactly the

1    reason he wants to use it.  He wants to say that there were

2    fibers hanging in the air at Mobil.

3              THE COURT:  Thank you, counsel.

4              All right.  Thank you for the arguments today.  They

5    were helpful.  As far as timing goes and the overall case, I

6    anticipate that we will be ruling, issuing a ruling -- sorry

7    it's bit late in the day -- with regard to all the motions as

8    well as the pending motion to exclude in the next two weeks.

9    Okay.

10             So then what does that mean for the rest of the case?

11   As you may or may not anticipate, or maybe you expect it, I

12   still have significant concerns about the pretrial order.

13   Okay.  But I understand that the parties want to see the

14   rulings on the Daubert motions and the motions to exclude

15   before taking another attempt at revising the pretrial order to

16   the extent revision is necessary.

17             And some revision is going to be necessary, even if,

18   let's say, everyone stays.  The final pretrial order still

19   needs to be revised because again I think that a significant

20   amount of work still needs to be done with regard to that,

21   particularly in light of the fact that, you know, as I sit down

22   and think about how is this case going to be tried to a jury,

23   how is the evidence going to come in, what is the overall

24   evidence going to look like?  And also, what are the

25   instructions to the jury going to look like?  And how are those

1    instructions to be made understandable to the jury so they can

2    take it with them in their deliberations?

3        Those are some of the things that are in my mind as we

4    proceed, particularly with regard to the pretrial order.  So

5    that said, once I issue the rulings with regard to the Daubert

6    motions and the motion to exclude, we will set a pretrial

7    conference, basically a status hearing.  And at that point we

8    will talk further about whether and what sort of revisions will

9    be necessary for the pretrial order.  And we will set a

10   schedule at that point in time.

11       All right.  Are there any questions at this point?

12       MR. McCOY:  Mr. Krik is not getting any younger.  Just

13   my comment.

14       MR. CASMERE:  I don't think that was a question.  But

15   I do have a question, your Honor.  Will -- at that point will

16   we start to discuss potential trial dates?

17       THE COURT:  Yes.

18       MR. CASMERE:  Okay.  Thank you.

19       MR. BABIUCH:  I have one as well, your Honor.  Prior

20   to striking the April 28 trial date, you had instituted a

21   deadline of April 10 for the deposition of Dr. Weill, one of

22   Weil-McLain's medical experts in the case.  I was going to file

23   a motion.  I can still go ahead and do so asking for a

24   continuance of that date, but wanted to bring it up now as

25   well.

1    THE COURT:  Why do you need a continuance?  Why can't

2  you just get that done?  Isn't it scheduled?

3    MR. BABIUCH:  Even working on his schedule, it's

4  absolutely crazy.  I've been asking him for dates.  We had one

5  we thought was going to work.  Something came up, didn't end up

6  working.  I can get it done as soon as possible.  I keep

7  badgering him about that.

8    But I think that at least in terms or our end, lot of

9  the experts -- expert work that we have from Dr. Sawyer in

10 other areas is now being funneled to him.  And his schedule

11 is -- just doesn't have very many openings.  I'll continue to

12 work on that.  Like I said, I can file a motion if you like as

13 well.

14    THE COURT:  Mr. McCoy?

15    MR. McCOY:  I don't have any objection as long as we

16 have an opportunity before -- you know, 30 days before trial or

17 something.

18    THE COURT:  I will give you 30 more days to get that

19 done.

20    Anything else?

21    MR. McCOY:  Nothing, Judge.

22    THE COURT:  Thank you.

23    MR. CASMERE:  Thank you, your Honor.

24   (Which were all the proceedings had at the hearing of the

25     within cause on the day and date hereof.)

1                              CERTIFICATE

2          I HEREBY CERTIFY that the foregoing is a true, correct

3  and complete transcript of the proceedings had at the hearing

4  of the aforementioned cause on the day and date hereof.

5

6   /s/Alexandra Roth                         8/4/2014
   _____     _____
7   Official Court Reporter                    Date
   U.S. District Court
8   Northern District of Illinois
   Eastern Division
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25