# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES KRIK,            )
   Plaintiff,       )
vs.                      ) Case No.
BP AMOCO CHEMICAL COMPANY, et al., ) 10-cv-7435
   Defendants.      )
_____)

DEPOSITION OF PHILIP JOHN TEMPLIN, CIH
NOVEMBER 1, 2013

REPORTED BY:
JEFF LaMAR, C.S.R. No. 640
Notary Public

Page 3

I N D E X (Continued)

EXHIBITS                                         PAGE
11 - Kaylo IV DVD                                  22
12 - Gasket Removal IV Work Practice Data CD       23
13 - Kaylo III DVD                                 23

Page 2

INDEX

TESTIMONY OF PHILIP JOHN TEMPLIN, CIH        PAGE
Examination by Mr. Moir                      6,91,94
Examination by Mr. Milott                    69,91
Examination by Mr. Turner                    78
Examination by Mr. Chung                     88

EXHIBITS                                     PAGE
1 - Notice of Deposition                      6
2 - Vitae for Philip John Templin, CIH        7
3 - List of Cases in Which Philip John Templin,  8
   CIH, Has Testified at Trial or By Deposition
   Within the Preceding Four Years
4 - Letters to the Editor                     8
5 - Affidavit of William E. Longo             10
6 - MDHS 82, The dust lamp, dated March 1997  11
7 - Kaylo III, A Work Practice Study, dated   11
   October 2006
8 - Kaylo IV, A Work Practice Study, dated    11
   April 2008
9 - Gasket Removal Study IV, Scraping, Hand Wire  11
   Brushing and Electric Wire Brushing Work
   Practice Study, dated 05/14/2001
10 - Kaylo Block Work Practice Study          12

Page 4

THE DEPOSITION OF PHILIP JOHN TEMPLIN, CIH,
was taken on behalf of Defendant Owens-Illinois, Inc.,
at the Courtyard Boise Downtown, 222 South Broadway
Avenue, Boise, Idaho, commencing at 9:06 a.m. on
November 1, 2013, before Jeff LaMar, Certified
Shorthand Reporter and Notary Public within and for the
State of Idaho, in the above-entitled matter.

APPEARANCES:
For Plaintiff:
   (Present Telephonically)
   CASCINO VAUGHN LAW OFFICES
   BY MR. JIN-HO CHUNG
   220 South Ashland Avenue
   Chicago, Illinois 60607

For Crane Co.:
   (Present Telephonically)
   GUNTY & McCARTHY
   BY MR. STEPHEN K. MILOTT
   150 South Wacker Drive, Suite 1025
   Chicago, Illinois 60606
///
///
///

Page 5

1 I N D E X (Continued)
2
3 For ExxonMobil Corp:
4 (Present Telephonically)
5 JOHNSON & BELL, LTD.
6 BY MR. DAVID F. FANNING
7 33 West Monroe Street, Suite 2700
8 Chicago, Illinois 60603
9
10 For Owens-Illinois, Inc.:
11 QUILLING SELANDER LOWNDS WINSLETT & MOSER
12 BY MR. PETER MOIR
13 2001 Bryan Street, Suite 1800
14 Dallas, Texas 75201
15
16 For Weil-McLain:
17 (Present Telephonically)
18 SEGAL, McCAMBRIDGE, SINGER & MAHONEY
19 BY MR. CAMERON TURNER
20 233 South Wacker Drive, Suite 5500
21 Chicago, Illinois 60606
22
23
24
25

Page 6

1  PHILIP JOHN TEMPLIN, CIH,
2 first duly sworn to tell the truth relating to said
3 cause, testified as follows:
4
5  EXAMINATION
6 BY MR. MOIR:
7  Q. Can you please state your name.
8  A. Sure. My full name is Philip John Templin.
9  Q. And Mr. Templin, you understand you've been
10 hired to serve as an expert witness by the plaintiffs
11 in the Charles Krik case?
12  A. Yes, that's my understanding.
13  (Exhibit 1 marked.)
14  Q. (BY MR. MOIR): Okay. I'm handing you
15 what's been marked as Exhibit 1. It's the Notice of
16 Deposition in this case.
17  Have you seen a copy of that?
18  A. I'm pretty sure I have. But let me just
19 take a quick look and verify that for you.
20  (Reviews.)
21  Yes, I have.
22  Q. Part of the deposition notice includes a
23 deposition rider that lists several categories of
24 documents that you were asked to bring to the
25 deposition. It's on pages 4, 5, and 6. It's got 21

Page 7

1 different categories of documents that you were asked
2 to bring to the deposition.
3  Did you bring any of those documents with
4 you?
5  A. Those that I had available to me, yes, I
6 did.
7  Q. Okay. And what do you have that you
8 brought to the deposition that were responsive to the
9 document rider or the deposition rider?
10  A. Let's see. CV.
11  Q. Okay.
12  A. Current, of course.
13  I'm not sure if this was requested or not,
14 but I brought it anyway. It's a list of testimony for
15 the last four years.
16  Q. Okay.
17  A. A copy of publications. I think that's it.
18  Q. You brought other documents with you.
19  Are they generic documents? Are they
20 documents that you were provided -- let me break that
21 up. Let me go back and do a couple housekeeping...
22  (Exhibit 2 marked.)
23  Q. (BY MR. MOIR): Exhibit 2 is your current
24 CV; is that correct?
25  A. Yes, sir, it is.

Page 8

1  (Exhibit 3 marked.)
2  Q. (BY MR. MOIR): And then Exhibit 3 is a
3 list of cases that you've testified in by trial or at
4 deposition within the last four years?
5  A. Actually, at this point it's the last five
6 years. I haven't had a chance to purge it yet.
7  Q. Okay. So that's the list of testimony
8 you've given over the last five years, Exhibit 3?
9  A. That is since January of 2009, yes.
10  (Exhibit 4 marked.)
11  Q. (BY MR. MOIR): And then Exhibit 4 is the
12 publication, which is a letter to the editor that you
13 coauthored with William Longo and Richard Hatfield,
14 among others?
15  A. Correct.
16  Q. And this is from September/October 2003
17 entitled "Asbestos Exposures from Gasket Removal."
18  A. That's correct.
19  Q. And it's in response to an article that was
20 published entitled "Airborne Fiber Exposure Assessment
21 of Dry Asbestos Containing Gaskets and Packings Found
22 in Intact, Industrial, and Maritime Fittings"; is that
23 right?
24  A. Yes.
25  Q. Okay. You also obviously have with you

Page 9

1  some additional documents that after reviewing the
2  deposition notice you didn't feel were responsive to
3  the deposition notice; is that correct?
4     A. I would say --
5     MR. CHUNG: Form.
6     THE WITNESS: I'm sorry. Did somebody try to
7  object?
8     MR. MOIR: Yeah. I think it was an objection to
9  form.
10    MR. CHUNG: Yeah.
11    THE WITNESS: I think that's largely accurate.
12 What I do have is an affidavit that Dr. Longo prepared
13 related to Tyndall lighting and copies -- or at least
14 copies of the data that I would be relying on of three
15 studies. When I say "studies," I mean studies
16 performed by MAS. And those specifically are
17 Kaylo III, Kaylo IV, Gasket Removal IV.
18        One of these I would say is at least
19 some -- I also brought another one. Kaylo Block Work
20 Practice Study. I don't think it's on the list of
21 things that have been produced, but it's got some
22 additional --
23    TELEPHONIC DEFENSE COUNSEL: Excuse my
24 interruption, but is it possible to move the speaker
25 closer to the deponent?

Page 10

1     MR. MOIR: It's about as close as it can get.
2  It's right between the three of us.
3     THE WITNESS: I can talk louder.
4     TELEPHONIC DEFENSE COUNSEL: Thank you, sir.
5     THE WITNESS: Not a problem.
6        And this, I suppose, is somewhat responsive
7  to at least one of the categories, and that's the MDHS
8  dust lamp method, MDHS 82, method for detection of
9  hazardous substances, which relies on Tyndall lighting
10 for its detection capabilities.
11    Q. (BY MR. MOIR): Okay. Can I mark these,
12 just so that I'm clear on what we have, the documents
13 that you've brought with you that -- as I understand
14 it, these are documents that you will rely on to some
15 extent for your opinions in this case; is that correct?
16    A. In one way, shape, or form, or maybe more,
17 yes.
18    MR. MOIR: Okay. Great.
19       (Exhibit 5 marked.)
20    Q. (BY MR. MOIR): So the first is going to be
21 as Exhibit 5, is going to be the affidavit of William
22 Longo regarding Tyndall lighting; is that right?
23    A. Yes, sir.
24    Q. Okay. And this is an affidavit that was
25 signed by him, dated September 11, 2013; is that right?

Page 11

1     A. Yes.
2     MR. MOIR: Okay. Then the next document is the
3  MDHS Methods for Determination of Hazardous Substances,
4  82, the dust lamp.
5        (Exhibit 6 marked.)
6     Q. (BY MR. MOIR): And we'll mark that as
7  Exhibit 6; is that right?
8     A. Yes.
9        (Exhibit 7 marked.)
10    Q. (BY MR. MOIR): Okay. Exhibit 7 is the
11 summary section up through section 2 of the Kaylo III
12 study by MAS; is that right?
13    A. Yes.
14       (Exhibit 8 marked.)
15    Q. (BY MR. MOIR): Exhibit 8 is the Kaylo IV
16 Work Practice Study.
17       Again, this is up through -- it looks like
18 it's section 1 and then section 2; is that right?
19    A. Yes, it is.
20       (Exhibit 9 marked.)
21    Q. (BY MR. MOIR): Okay. And then Exhibit 9
22 is the Gasket Removal Study IV. Again, this is up
23 through -- well, at least it goes through the 7402
24 analysis Table 1 page of Gasket IV study of MAS;
25 correct?

Page 12

1     A. That's correct.
2     Q. That will be marked as Exhibit 9.
3        (Exhibit 10 marked.)
4     Q. (BY MR. MOIR): And then the last document
5  is the Kaylo Block Work Practice Study.
6        And this looks like the only thing we have
7  in here is the protocol, and then the air results from
8  the Kaylo Block Work Practice Study, the asbestos air
9  analysis results; is that right?
10    A. Yes, it is.
11    Q. Okay. And these are the documents that you
12 have that relate to your opinions in this case; is that
13 correct?
14    MR. CHUNG: Object to form.
15    THE WITNESS: Yeah. Insofar as they pertain to
16 the subject matter that I understand that I'm going to
17 be asked to address, that's correct.
18    Q. (BY MR. MOIR): Okay. And why don't you
19 tell me -- and by the way, the portions of the Kaylo
20 Block Work Practice Study by MAS that you brought with
21 you to the deposition is what I've marked as
22 Exhibit 10; is that right?
23    A. Correct.
24    Q. Okay. Now, just a second ago you said
25 these pertain to what you understand you've been asked

Page 13

1  to address in this case.
2       Why don't you tell us what it is that you
3  understand you've been asked to address in this case.
4       A.  Very briefly, the MAS studies that we've
5  just discussed, with the exception of that last one,
6  the data they contain, and what their import would be
7  to me as -- as an industrial hygienist.
8       Q.  And have you been provided with any
9  information or depositions pertaining specifically to
10 Charles Krik?
11      MR. CHUNG: Before the witness answers, I'm
12 going to caution him not to disclose information or
13 conversations with counsel for the plaintiff, except as
14 it pertains to the final report that was prepared by
15 MAS or Mr. Templin in this case.
16      Go ahead.
17      Q.  (BY MR. MOIR): If you can answer the
18 question.
19      A.  Yes, I can answer the question.
20      Q.  Sure.
21      A.  Maybe I better have it read back.
22      (The record was read as follows:
23      "QUESTION: Have you been provided with any
24 information or depositions pertaining
25 specifically to Charles Krik?")

Page 14

1       THE WITNESS: No, sir.
2       Q.  (BY MR. MOIR): Okay.  So as we sit here in
3  this deposition in the Krik case, you have no
4  information regarding Charles Krik himself that you've
5  received in this case; is that correct?
6       MR. CHUNG: Object to form.  Misstates the
7  testimony.
8         Go ahead.
9       THE WITNESS: Beyond a general understanding
10 that Mr. Krik was a career pipefitter.  I have nothing
11 more specific than that.
12      Q.  (BY MR. MOIR): Okay.  So as you sit here
13 today, your only understanding that is specific to
14 Mr. Krik is that he was a career pipefitter; is that
15 correct?
16      A.  Yes, that is.
17      Q.  And other than a general understanding of
18 what a career pipefitter might do, you have no
19 information specific to Mr. Krik as to the types of
20 materials that he himself testified he worked with or
21 worked around that would have contained any asbestos;
22 is that correct?
23      A.  As phrased, yes.
24      MR. CHUNG: Object to form.
25      Q.  (BY MR. MOIR): You certainly have not

Page 15

1  reviewed any deposition testimony of Mr. Krik or any
2  interrogatory answers by Mr. Krik; is that right?
3       A.  Yes, it is.
4       Q.  There was a reference in the objection to a
5  final report.
6       Have you been asked, Mr. Templin, to
7  prepare a report setting forth your opinions in this
8  case?
9       A.  No such request has been made of me to
10 date.
11      Q.  Okay.  Is it -- well, so I'm trying to
12 understand, then, what your opinions would be
13 regarding -- in this case, in the Krik case, what your
14 opinions would be -- and I say that as kind of an
15 introductory statement to, are your opinions, then, in
16 the Krik case going to be the opinions generally based
17 on the results of the MAS studies that you have brought
18 with you to the deposition?
19      A.  As I understand it, I think that would be a
20 reasonably accurate description of what my role here
21 will be.
22      Q.  Okay.  So it's your understanding, as you
23 sit here today, that you will be asked to testify about
24 the results of the MAS studies that you brought with
25 you today in terms of what those studies showed in

Page 16

1  terms of exposure levels from the manipulation of the
2  Kaylo pipe covering and the gasket-removal studies done
3  by MAS; is that correct?
4       A.  I would say --
5       MR. CHUNG: Object to form.
6       THE WITNESS: Sorry.  I keep jumping in.
7       Q.  (BY MR. MOIR): He's objecting to form.  Go
8  ahead.
9       A.  That's what I thought.
10      MR. CHUNG: If I may do one procedural thing.
11 Because there might be objections, Mr. Templin, if you
12 could just wait one or two seconds.
13      MR. MOIR: That's fine.  We'll do that, Jin-Ho.
14      MR. CHUNG: Okay.  Thank you.
15      Q.  (BY MR. MOIR): Go ahead.
16      A.  I would say that's accurate as far as it
17 goes, but I would also expect to testify that these
18 data are representative of the sorts of exposures that
19 I would expect to see from a career pipefitter who was
20 working with or around asbestos containing pipe or
21 block insulation or asbestos-containing gaskets.
22      MR. MILOTT: I'm sorry.  Could I have the
23 question and answer repeated, please.  I apologize for
24 this interference.
25      (The record was read as follows:

Page 17

1  "QUESTION: So it's your understanding, as
2  you sit here today, that you will be asked to
3  testify about the results of the MAS studies
4  that you brought with you today in terms of what
5  those studies showed in terms of exposure levels
6  from the manipulation of the Kaylo pipe covering
7  and the gasket-removal studies done by MAS; is
8  that correct?
9  "ANSWER: I would say that's accurate as
10  far as it goes, but I would also expect to
11  testify that these data are representative of
12  the sorts of exposures that I would expect to
13  see from a career pipefitter who was working
14  with or around asbestos containing pipe or block
15  insulation or asbestos-containing gaskets.")
16  MR. MILOTT: I'll move to strike the
17  nonresponsive part of that answer. This is Milott.
18  MR. FANNING: Fanning. I join.
19  MR. MOIR: Just so that we're clear, so we don't
20  have a bunch of joining, counsel for plaintiff and
21  counsel for defendants on the phone, is it acceptable
22  if an objection by one defendant does not need to be
23  specifically joined by all the other defendants unless
24  they -- and it's presumed that they join in those
25  objections unless they specifically opt out? Is that

Page 18

1  acceptable?
2  TELEPHONIC DEFENSE COUNSEL: An objection by one
3  is an objection for all, except if it doesn't pertain.
4  How is that?
5  MR. MOIR: That's fine.
6  Is that okay with you, counsel for
7  plaintiff?
8  MR. CHUNG: It's fine. Although I'm not -- it's
9  fine as far as it goes. I'm not going to be held
10  responsible, however, for what pertains or does not
11  pertain, so --
12  TELEPHONIC DEFENSE COUNSEL: Don't worry it,
13  Counsel. We can do that ourselves.
14  MR. CHUNG: Definitely. I'm not doing that for
15  you, obviously. That's fine.
16  Q. (BY MR. MOIR): And so that I understand
17  it, what you've just testified to is that you will
18  offer an opinion or you expect to offer the opinion
19  that the types of exposure levels measured in the MAS
20  studies that you've brought with you to this deposition
21  are, in your opinion, representative of the types of
22  exposures that might be experienced by a pipefitter
23  using these products or working around others using
24  these products; is that fair?
25  A. Exactly.

Page 19

1  Q. Okay.
2  MR. FANNING: Objection to form and to the scope
3  of the question. And let me lodge a general objection
4  with respect to the scope of the deposition in terms of
5  the lack of a Rule 26 expert report. Thank you.
6  THE COURT REPORTER: Was that Mr. Chung that
7  just made that objection?
8  MR. MOIR: No. That was a defendant.
9  MR. CHUNG: I think, Counsel, the procedure --
10  maybe you joined late. The procedure is that if it's
11  not me, Jin-Ho Chung, counsel for the plaintiff, making
12  the objection, anyone else making objections should
13  state who they are so the record is clear.
14  MR. MOIR: Or just say "defendant."
15  MR. CHUNG: That last objection was from
16  Defendant Fanning.
17  MR. FANNING: Thank you.
18  MR. MOIR: And I will try to -- and I think
19  Mr. Templin will also try to pause between the question
20  and answer so that whoever wants to lodge an objection
21  can do so.
22  Q. Now, the MDHS study, the dust lamp,
23  Exhibit 6, this is -- why did you bring this exhibit
24  with you?
25  A. Well --

Page 20

1  Q. Or document.
2  A. Just to be clear --
3  MR. CHUNG: Object to form.
4  THE WITNESS: Just to be clear, it's not a
5  study. It's a method that's employed by the British
6  Occupational Health Society for particulate matter
7  specifically. And it basically is documentary evidence
8  of the reliability and the utility of Tyndall lighting
9  in evaluating airborne particulate matter for
10  occupational exposure and, of course, control
11  alternative assessments.
12  Q. (BY MR. MOIR): With respect to the purpose
13  of the Tyndall lighting that was used in the MAS
14  studies, do you agree with the statements in
15  Dr. Longo's affidavit, Exhibit 5?
16  A. Having been through it, I didn't see
17  anything that struck me as problematic or out of the
18  ordinary.
19  Q. Now, you did not participate in any of the
20  tests that you've brought with you here today; is that
21  right?
22  A. Other studies that we have done I've
23  participated in. But these specific three studies, I
24  did not directly participate in, although I did provide
25  some input into the design of Gasket Study IV.

Page 21

1    Q.  Okay.  And with respect to the Kaylo III,
2  Kaylo IV Work Practice Study, and the Kaylo Block Work
3  Practice Study, you did not participate or provide any
4  input into any of those studies; is that right?
5    A.  Yes.
6    MR. CHUNG:  Object to form.
7    THE WITNESS:  Yes, that's correct.
8    Q.  (BY MR. MOIR):  Okay.  And you were not
9  present when those studies were conducted; is that
10 correct?
11   A.  Well, not physically present at the
12 location where they were performed, that's correct.
13   Q.  Okay.  And you agree that obviously all of
14 the studies that you brought with you were done many
15 years before the Krik case itself was filed; correct?
16 They were not -- let's leave it at "correct."  That is
17 right?
18   A.  From memory -- or I shouldn't even say from
19 memory.  I'm not sure when the Krik case was filed.  I
20 don't think I have that information.
21   Q.  In any event, none of those studies were
22 conducted for purposes of re-creating the work
23 conditions of Charles Krik; correct?
24   MR. CHUNG:  Object to form.  Assumes facts not
25 in evidence.

Page 22

1    THE WITNESS:  I think it would be an accurate
2  statement to say that they were not designed with
3  Mr. Krik specifically in mind or re-creating in some
4  level of great detail his working environments.
5    Q.  (BY MR. MOIR):  Okay.  By the way, with
6  respect to the videos of the testing, you have not
7  brought any of those with you; is that right?
8    A.  No, that is not right.  I do have the
9  videos.
10   Q.  You brought them with you?
11   A.  I did.
12   Q.  Okay.  Which -- well, you've produced some
13 documents and tendered them here, but you don't have --
14 do you have the videos with you?
15   A.  Actually, I do.  That was an oversight on
16 my part, or maybe a misinterpretation of what you were
17 asking.  But yes, I do have the videos.
18   Q.  What videos did you bring with you?
19   A.  IV, Gasket IV; Kaylo III; and Kaylo IV.
20   Q.  Okay.
21   A.  There we go.
22   MR. MOIR:  What are we up to?
23      (Exhibit 11 marked.)
24   Q.  (BY MR. MOIR):  So Exhibit 11 is the
25 Kaylo IV DVD; is that right?  And the work practice

Page 23

1  data CD for Kaylo IV; correct?
2    A.  Yes, that's correct.
3       (Exhibit 12 marked.)
4    Q.  (BY MR. MOIR):  Exhibit 12 is the Gasket
5  Removal IV DVD and Gasket Removal IV work practice data
6  CD; correct?
7    A.  Yes.
8       (Exhibit 13 marked.)
9    Q.  (BY MR. MOIR):  And then 13 is Kaylo III
10 DVD and Kaylo III work practice data CD; correct?
11   A.  Yes.
12   Q.  Okay.
13   MR. CHUNG:  Exhibit 3, Kaylo III, did you say?
14   MR. MOIR:  13 is Kaylo III.
15   MR. CHUNG:  Okay.  Thank you.
16   MR. MOIR:  Okay.
17   Q.  Now, in order to be respirable, do you
18 agree that asbestos fibers need to be, at least
19 according to the EPA, smaller than 3 microns?
20   A.  Whether according to the EPA or not, I
21 would say as a general proposition -- and when you say
22 "3 microns," I take it you mean in diameter?
23   Q.  Yes.
24   A.  Is that --
25   Q.  Yes.

Page 24

1    A.  I think it's generally understood and
2  accepted in the industrial hygiene community that
3  that's about right.
4    Q.  Okay.  Now, what is your understanding as
5  to what size the particles have to be in order to
6  scatter light from Tyndall lighting in terms of
7  diameter?
8    A.  That can literally be almost any size down
9  to a molecular size will scatter light in such a manner
10 as can be visualized under Tyndall lighting.
11   Q.  And what's your basis for saying that?
12   A.  Well, not to be flippant, this is serious.
13 If you were to go outside, today at least, and look up
14 and see that the sky is blue, which you would, that's
15 an example of the Tyndall scattering effect that's
16 caused by nitrogen molecules.
17   Q.  But in terms of observing in the conditions
18 in which the MAS studies were done, what are the size
19 of the particles that are reflecting the light in the
20 Tyndall lighting in the condition which the MAS studies
21 were conducted?
22   MR. CHUNG:  Asked and answered.
23   Q.  (BY MR. MOIR):  If you know.
24   A.  Reflecting or --
25   Q.  Scattering light, yes.

Page 77

1  dust was found to be asbestos?  Can you tell me an
2  answer to that question.
3      A.  If you'll bear with me, I think I can.
4      Q.  Okay.  I will.  Thank you.
5      A.  (Reviews.)
6          For the most part, they were in excess of
7  90 percent.  One was as high as 100 percent, another
8  was as low as 50 percent.
9      Q.  Thank you, sir.
10         You've personally never issued a written
11 report regarding testing of any product in this case;
12 is that correct?
13         MR. CHUNG:  Object to form.
14     Q.  (BY MR. MILOTT):  You can answer, sir.
15     A.  Specifically related to testing of these
16 products and issuing a report thereon, I think you're
17 correct.
18     Q.  You've never issued any written report
19 regarding opinions to be rendered at trial in this
20 case; is that correct?
21     A.  Yes, it is.
22     Q.  Give me one second, please.
23         As far as you know, no other employee or
24 owner of Material Analytic Services has issued a
25 written report regarding testing of any product or of

Page 78

1  opinions to be rendered at trial in this case; is that
2  correct?
3          MR. CHUNG:  Object to form.
4          THE WITNESS:  I don't know whether that's been
5  done or not.
6      Q.  (BY MR. MILOTT):  You didn't perform any
7  tests on any product manufactured by Crane Company in
8  this case; is that correct?
9      A.  I have not done so, that's correct.
10     Q.  And as far as you know, MAS, the company by
11 whom you're employed, they did not perform any tests on
12 any product manufactured by Crane Company; is that
13 correct?
14     A.  For this case or ever?
15     Q.  For this case.
16     A.  For this case, I couldn't say one way or
17 the other.
18         MR. MILOTT:  Thank you, sir.  I have nothing
19 further.
20
21              EXAMINATION
22 BY MR. TURNER:
23     Q.  Mr. Templin, hi.  This is Cameron Turner.
24         Can you hear me okay?
25     A.  Sure.  I can.

Page 79

1      Q.  My client in the case is Weil-McLain.  And
2  my first question for you is whether you have any
3  experience or particular familiarity with cast iron
4  sectional boilers used in commercial and residential
5  settings?
6      A.  Very generally, yes, I do.
7      Q.  Okay.  Can you just kind of describe that
8  for me.
9      A.  Certainly.  I mean cast iron sectional
10 boilers are typically put together in the field.  The
11 sections are joined with gaskets.  The doors, hand
12 holes, if there are some, would be gasketed.  And
13 typically a boiler of that sort would have some thermal
14 insulation, possibly refractory material associated
15 with it.
16     Q.  What is the basis for your knowledge about
17 cast iron sectional boilers?
18     A.  Basically, just a recurring theme in some
19 of the asbestos litigation I've been involved with, as
20 well as some things that I've looked at outside of
21 litigation in terms of identifying asbestos-containing
22 materials in systems and components in buildings and
23 other settings.
24     Q.  Okay.  With respect to your encounters with
25 cast iron sectional boilers outside of your consulting

Page 80

1  work, when did that occur?
2      A.  There's one particular episode that I
3  recall from I believe it was the late 1980s.
4      Q.  Do you recall where that was?
5      A.  Yes.  The California Club in downtown
6  Los Angeles.
7      Q.  Other than that, outside of your consulting
8  work in litigation, do you recall any other instances
9  where you've come across cast iron sectional boilers in
10 your professional career?
11     A.  Well, there are a number of such.  But in
12 terms of being able to describe them in the level of
13 detail I just provided, I wouldn't be able to.
14     Q.  Okay.  Other than that, though, your
15 understanding of cast iron sectional boilers has come
16 from reading testimony and whatnot in conjunction with
17 your work as a consultant; is that fair to say?
18         MR. CHUNG:  Object to form.
19         THE WITNESS:  Well, I mean testimony and other
20 forms of information, interrogatory responses and the
21 like, yes.
22     Q.  (BY MR. TURNER):  Okay.  Would you consider
23 yourself an expert in the engineering of cast iron
24 sectional boilers?
25         MR. CHUNG:  Object to form.

Page 93

1  for any combination of material and work activity that
2  gave rise to asbestos exposures, the subset of which
3  obviously is work with and removal of
4  asbestos-containing gaskets.
5      Q. (BY MR. MILOTT): What standard are you
6  talking about as far as the 1950s? What was the
7  standard for exposure in the 1950s?
8      MR. CHUNG: Asked and answered.
9      THE WITNESS: 5 million particles per cubic
10 foot.
11     Q. (BY MR. MILOTT): And what was the standard
12 for exposure to asbestos in the 1960s?
13     **A. Up until 1968, the same.**
14     Q. Okay. And where did those standards arise
15 from? Who promulgated those standards?
16     **A. As I said, various states and commonwealths**
17 **in the United States promulgated those standards.**
18 **California would be one. Texas would be one.**
19 **Pennsylvania would be one. And that's not an**
20 **all-inclusive list by any means.**
21     Q. Of the 5 million parts that you mentioned,
22 who promulgated that standard?
23     **A. That standard would be found in all of the**
24 **aforementioned jurisdictions from that time frame.**
25     MR. MILOTT: Okay. Thank you, sir. Nothing

Page 94

1  further.
2      MR. MOIR: Actually, I do have a couple more.
3
4         FURTHER EXAMINATION
5  BY MR. MOIR:
6      Q. I wanted to follow up on talking about the
7  light-scattering issue.
8         You would agree that you're not an expert
9  in light-scattering techniques and what it takes to
10 generate enough light from Tyndall lighting scattering
11 off of particles or molecules in order to be visible to
12 the human eye; would you agree with that?
13     MR. CHUNG: Object to form. Assumes facts.
14     THE WITNESS: Not to bandy words with you, but I
15 mean it depends on what the definition of an expert is.
16 If it's the --
17     Q. (BY MR. MOIR): That's not your field of
18 specialty; would you agree with that?
19     **A. That, I'll agree with.**
20     Q. Okay. Now, you would also agree that it is
21 your opinion at least, as you understand it, that the
22 principles of light scattering from molecules from
23 smoke or fog, as you understand it, are the same as
24 light scattering from particles, solid particles, such
25 as from generated during the work practice studies?

Page 95

1      **A. Correct.**
2      MR. MOIR: Okay. That's all I have. Thank you.
3      THE COURT REPORTER: Are we done, Counsel?
4      MR. MOIR: Yeah.
5      MR. CHUNG: I'm done.
6      TELEPHONIC DEFENSE COUNSEL: I think so.
7      TELEPHONIC DEFENSE COUNSEL: What about
8  signature?
9      THE WITNESS: How big a hurry are you guys in?
10     MR. MOIR: Not.
11     THE WITNESS: I would like to read and sign.
12        (Deposition concluded at 11:20 a.m.)
13        (Signature requested.)
14            -oOo-

Page 96

1     CERTIFICATE OF PHILIP JOHN TEMPLIN, CIH
2
3     I, PHILIP JOHN TEMPLIN, CIH, being first duly
4  sworn, depose and say:
5     That I am the witness named in the foregoing
6  deposition; that I have read said deposition and know
7  the contents thereof; that the questions contained
8  therein were propounded to me; and that the answers
9  contained therein are true and correct, except for any
10 changes that I may have listed on the Errata Sheet
11 attached hereto.
12     DATED this ____ day of _____ 20___.
13
14     CHANGES ON ERRATA SHEET   YES___ NO ___
15
16 _____
17 PHILIP JOHN TEMPLIN, CIH
18 SUBSCRIBED AND SWORN to before me this
19 ____ day of _____ 20___.
20
21
22
23
    _____
    NAME OF NOTARY PUBLIC
24  RESIDING AT _____
25  MY COMMISSION EXPIRES_____