UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARLES KRIK, ) | |
|     Plaintiff, ) | |
| ) | Case No. 10-cv-7435 |
| v. ) | Judge Manish S. Shah |
| OWENS-ILLINOIS, INC. *et al.*, ) | |
|     Defendants. ) | |

PLAINTIFF'S MOTION FOR A NEW TRIAL

Plaintiff moves for a new trial pursuant to Fed. R. Civ. P. 59(a). The grounds for a new trial are:
- Improper conduct by defense counsel in juror investigation
- Exclusion of causation testimony

The Court can grant a motion for a new trial when "the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (U.S. 1940). "A new trial may be granted where 'the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party.'" *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1367 (7th Cir. 1996) (quoting *Winger v. Winger*, 82 F.3d 140, 143 (7th Cir. 1996)).

A.    Use Of A Private Investigator To Investigate A Sitting Juror During Trial

Interference with the jury's essential function deprives Charles Krik of a fair trial and is grounds for ordering a new trial under Rule 59(a) of the Federal Rules of Civil Procedure.

    1.    Facts.

The day after the jury was impaneled, juror McGregor, passed a note to the judge stating that, though she did not know the Plaintiff personally, she attended a birthday party in 2014 for Bob Scamen whom Ms. McGregor described as "a good friend of mine" who was a "former

1

pipefitter," which was the trade of the Plaintiff. (Ex.9 at 108:18-23.)[1] The Court disclosed this to the parties and Mr. Krik was examined by the Court. Krik did not think he knew the pipefitter or had attended his birthday party. (Ex.9 at 109:21 – 110:2.)

The Court conducted further voir dire of Ms. McGregor confirming that she was "not sure that [she] even encountered Mr. Krik" at the party. (Ex.9 at 114:14-20.) The Court concluded, over Defendants' motion to strike her for cause and for a mistrial, that "Ms. McGregor can be a fair and impartial juror." (Ex.9 at 114:21 – 115:12.) After the rulings by the court, defense counsel made no request of the court to conduct further investigation. Defendants then conducted a secret investigation not known to the court and Plaintiff. (Ex.10 at 2:18-24.)

On May 14, 2015, the Court notified Plaintiff's counsel of a statement made by Ms. McGregor, when the Court was privately speaking to the jurors following the trial. (Ex.10 at 2:18 – 3:3.) Counsel for Mobil admitted he had requested the investigation: "Yeah, it was done at our request. It was our investigator. Our client asked us to have the investigator done." (Ex.10 at 5:11-13.)[2] Mobil's attorney stated he had considered the legality and prudence of this conduct, contending he was "unaware of any prohibition" (Ex.10 at 3:15-17, 22-25, 4:1, 4:11-13.) Mobil's counsel conceded there were "risks" in this activity and it had "the potential to create an external impact on a sitting juror." (Ex.10 at 4:15-25, 5:1-7, 14-23.) OI's counsel acknowledged his awareness of the ongoing investigation of the juror during trial. (Ex.10 at 6:1-10.) At no time prior to the hearing that took place on May 14, 2015 did Defendants or their

---

[1] Ex.9 is a portion of the *Krik* trial transcript. This motion cites to the trial transcript page number as opposed to the exhibit page number. Other exhibits that cite in the same way include Ex.1, Ex.2, Ex.6, Ex.8, Ex.10, Ex.12, Ex.13, Ex.20, and Ex.21.

[2] For example Mobil's corporate in-house counsel Bedouin L. Joseph, from Houston, TX, was present everyday in court at the trial. (Ex.8 at 2.)

2

counsel ever inform the Court or the Plaintiff's attorney that they had hired a private investigator to conduct an investigation of a sitting juror during the trial.

### 2. Relevant Decisional Law.

The seminal case dealing with private investigators investigating sitting jurors during trial is *Sinclair v. United States*, 279 U.S. 749 (1929), where the defendants retained private investigators to shadow the jurors during the trial. The Supreme Court in *Sinclair* condemned the practice of hiring private detectives to shadow jurors, despite the fact that no juror was actually approached by the detectives or even aware of the surveillance:

> The mere suspicion that he, his family, and friends are being subjected to surveillance by such persons is enough to destroy the equilibrium of the average juror and render impossible the exercise of calm judgment upon patient consideration. If those fit for juries understand that they may be freely subjected to treatment like that here disclosed, they will either shun the burdens of the service or perform it with disquiet and disgust. Trial by capable juries, in important cases, probably would become an impossibility…. We can discover no reason for emasculating the power of courts to protect themselves against this odious thing.

*Sinclair*, 279 U.S. at 765.

It was the activity itself – *and the risks that it entailed* – that prompted the *Sinclair* court's condemnation of the use of private investigators during trial to probe into the affairs of sitting jurors. The court did not bottom its conclusion on the jurors' actual knowledge that they were being subjected to surveillance.[3] Instead, the court emphasized that because the "reasonable tendency of the acts done" would be to destroy the "equilibrium of the average juror" and remove the space for calm decision-making, the acts were an "odious" contravention of the right

---

[3] In *Sinclair*, there was no evidence that the jurors had actual knowledge of having been subjected to shadowing by private investigators. *See Sinclair, supra*, 279 U.S. at 758-759

to a fair trial.[4] One commentator has observed that the above-quoted language from the Supreme Court's decision in *Sinclair* is properly construed to condemn investigative actions directed to the acquaintances of jurors when it is reasonable to assume the jurors will learn of the inquiries: Okun, *Investigation of Jurors*, 56 Geo. L.J. 839, at 856-857. (attached as Ex.14.) Because it is almost inevitable that a private investigator's inquiries to acquaintances will be reported to the juror, courts and commentators have repeatedly treated the use of private investigators to conduct interviews with the friends and acquaintances of jurors as tantamount to direct contact with the jurors themselves – a strictly prohibited activity.

    The reasoning of the *Sinclair* court has been embraced in more recent decisions of the federal courts. For example, in *U.S. v. White*, 78 F. Supp. 2d 1025, 1027-1028 (D.S.D. 1999), the trial judge struck a jury panel and continued a trial to put a new jury panel in place when he discovered the defendant had hired a private investigation firm to question neighbors of prospective jurors. The *White* court observed that the use of private investigators to probe into the affairs of jurors, in situations where a juror or the jurors are likely to learn about the investigation, carried with it the "likely" probability of destroying what the *Sinclair* court called the "equilibrium of the average juror" and the jury's "exercise of calm judgment upon patient consideration" essential for a fair trial. Explaining the rationale that animated the *Sinclair* court's decision and the scope of its reach, the court stated that this subversion of the jury's capacity to function as intended is caused by the <u>high probability</u> that jurors will either feel <u>intimidated</u> or <u>resentful</u> when learning that they are being subjected to a private investigation.

---

[4] *Sinclair*, *supra*, 279 U.S. at 764 ("The reasonable tendency of the acts done is the proper criterion. Neither the actual effect produced upon the juror's mind nor his consciousness of extraneous influence was an essential element of the offense.").

While some circuits have relied on *Remmer v. United States*, 350 U.S. 377 (1956),[5] to impose a "presumption of prejudice" whenever direct or indirect third party contacts with jurors take place during trial, the Seventh Circuit has relied upon more recent Supreme Court decisions, *see Smith v. Phillips*, 455 U.S. 209 (1982), and *United States v. Olano*, 507 U.S. 725 (1993), to conclude that "not all suggestions of potential intrusion upon a jury deserve a presumption of prejudice" but that "there are at least some instances of intrusion upon a jury which call for a presumption of prejudice." *Hall v. Zenk*, 692 F.3d 793, 801 (7th Cir. 2012). As discussed below, the evidence here of an improper communication which reached Ms. McGregor forecloses the need for further hearing by the court.

Though this Circuit has not mandated use of a taxonomy to classify the types of intrusions, *see*, *e.g.*, *Middleby Corp. v. Hussman Corp.*, No. 90 C 2744, 1992 U.S. Dist. LEXIS 19730, at *25-26 (N.D. Ill. Dec. 23, 1992) (emphasizing the "flexibility" required in the Seventh Circuit to ascertain on the basis of "all relevant facts" whether the communication entailed a "reasonable possibility" of affecting the jury), it is useful to observe that "[c]laims that an ex parte communication with a jury improperly influenced its decision generally fall into one of three categories: (1) the remark conveyed information to the jury that was not in the trial record; (2) the remark informed the jury how it should decide the case; or (3) it negatively affected the deliberative process." *Whelan v. Teledyne Metalworking Prods.*, No. 01-1316, 2006 U.S. Dist.

---

[5] *See Remmer v. U.S.*, 347 U.S. 227, 229 (1954) ("The sending of an F. B. I. agent in the midst of a trial to investigate a juror as to his conduct is bound to impress the juror and is very apt to do so unduly. A juror must feel free to exercise his functions without the F. B. I. or anyone else looking over his shoulder. The integrity of jury proceedings must not be jeopardized by unauthorized invasions."). The *Remmer* court held that "[i]n a criminal case any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties." *Id.* at 229.

LEXIS 1908, at *27 (W.D. Pa. Jan. 6, 2006) (citing *Manley v. AmBase Corp.*, 337 F.3d 237, 252 (2d Cir. 2003).

> 3. **Investigation Of A Sitting Juror By a Private Investigator Hired By a Party During Trial Is Unfair**

Mobil's investigation of the juror had prejudicial adverse effects on the deliberative process of the jury. This is a case in which a presumption of prejudice can properly be applied. The reasoning of the courts in such cases as *Sinclair*, *Remmer*, and *White*, all cited above, demonstrates that a juror's knowledge of a private investigator probing into the truthfulness of answers to questions in voir dire carries a "reasonable tendency" of destroying the "equilibrium of the average juror." *Sinclair*, *supra*, 279 U.S. at 765. It is fundamental that during a trial jurors are to be insulated from outside influences that may "disturb the full and untrammeled exercise of deliberate and unbiased judgment" which is the hallmark characteristic of the fair and impartial jury. *Rubenstein v. U. S.*, 227 F.2d 638, 642 (10th Cir. 1955). "[Our] system of trial by jury presupposes that the jurors be accorded a virtual vacuum wherein they are exposed only to those matters which the presiding judge deems proper for their consideration." *U.S. v. Harry Barfield Co.*, 359 F.2d 120, 124 (5th Cir. 1966). *See also Owen v. Duckworth*, 727 F.2d 643, 648 (7th Cir. 1984) ("Any contact between third parties and jurors regarding an ongoing trial, outside the trial forum, raises serious questions concerning the continued impartiality of the jurors.") (citing *Patterson v. Colorado*, 205 U.S. 454, 462 (1907)).

Courts understand that it is to be expected that the jurors will promptly learn from those acquaintances that they are under investigation. *United States v. White*, 78 F. Supp. 2d 1025, 1028 (D.S.D. 1999) (noting the likelihood that acquaintances will tell the juror about the investigation); Okun, *Investigation of Jurors By Counsel: Its Impact on the Decisional Process*, 56 Geo. L.J. 839, 857 (1968) (One may "properly assume that in a great many instances

interviewees will feel inclined, if not obligated, to inform the prospective juror" of the investigation.). The natural reactions of a sitting juror under surveillance by a party include feelings of being intimidated and deep resentment. *White*, *supra*, 78 F. Supp. 2d at 1027; *Sinclair*, *supra*, 270 U.S. at 765; *Kiernan v. Van Schaik*, 347 F.2d 775, 780 (3d Cir. 1965). When this occurs no fair trial can be had.

This case involves more than only the *risk* of a tainted juror like *Sinclair*, where there was no evidence of the jurors' actual knowledge of the surveillance during trial, or *Remmer*, where the defendant first learned he had been subjected to an investigation by reading a newspaper article after trial, or *White*, where there was only proof that the prospective jurors *might* learn of the investigation. Here, Ms McGregor was *fully aware* she was being investigated due to answers she gave during jury selection by defense counsel looking at her face throughout the pendency of the two week trial. Such a direct emotional connection carries over into the jury's deliberations and raises further concerns to the juror that investigation will be continued as a result of her actions as a deliberating juror if the verdict rendered is not favorable to the investigating party, i.e, the Defendants.

Having heard Ms. McGregor describe the "good friend" in her note to the judge read in open court, Defendants were fully aware they were contacting a close personal friend when they launched their investigation. Defendants knew they were engaging in conduct that would very likely result in direct communications to that juror, when the "good friend" did what was to be expected – contact Ms. McGregor to tell her she was being subjected to critical examination by a private investigator. Yet, despite this knowledge which Defendants, their trial attorneys, and their corporate in-house counsel (who appeared daily at trial) unquestionably had, they all kept silent as to their activities in probing Ms. McGregor through the use of a private investigator.

7

The act by Defendants, and their trial and corporate counsel of *concealing* their misconduct each and every day that they appeared before the Court for trial is reprehensible. As the court stated in *Rakes v. United States*, 169 F.2d 739, 745 (4th Cir. 1948):

> The inviolability of the jury room from outside influence of any sort, actual or potential, is a prime necessity in the administration of justice. That unqualified rule requires that if a person, whether on the jury or not, knows of such outside influence, or an attempt at it, he must at once report this information to the court.

Defendants concealed conduct which they knew was not authorized by legal authority and carried the "risk" of exactly what happened in that McGregor was subjected during the trial to communications through an investigation which probed into her participation in the jury process and her veracity in answering voir dire questions. If this Court were to approve of this misbehavior, it would be endorsing a practice of the "[s]ecret" and "unauthorized" investigation of jurors that, as the court stated in *Gideon v. United States*, 52 F.2d 427, 429 (8th Cir. 1931), is " open to the danger of many and serious abuses, and entrenches upon the broad ground of a fair trial." We respectfully submit that this is not a result to be embraced.

The conclusion must be reached that this case presents one of those "instances of intrusion upon a jury which call for a presumption of prejudice." *Hall*, *supra*, 692 F.3d at 801. The presumption is properly applied here on the authority of *Remmer* and the Seventh Circuit cases that recognize the continuing vitality of the *Remmer* presumption in appropriate cases. The presumption of prejudice cannot credibly be rebutted. A new trial is warranted.

Even if assessing this case without applying a presumption, it is clear that the totality of the circumstances concerning the jury tampering disclosed at the May 14, 2015 hearing justify a finding that the Defendants' conduct intruded upon the deliberative process of this jury. Defendants intruded on the process by subjecting one of the jurors to outside influences. A juror in her position would have been affected in a variety of ways, including:

- believing that if she sided with the Defendants in the deliberations she would not have been harassed by further private investigator inquiries into her life and conduct.
- being fearful of further invasions of her privacy through the Defendants' continued probing into her personal affairs, contrary to the Court's indication that her privacy concerns would indeed be respected.
- being intimidated by the private investigation of her because it concerned truth of her voir dire testimony and the investigator was commissioned by a party an apparent incentive to disprove her account.
- being distracted by the implications of an ongoing investigation into her truthfulness being conducted throughout the trial by counsel looking her in the eye every day.
- believing the investigation was being done with the authorization and under the direction of the court.
- being intimidated by the knowledge the Defendants may have learned personal information or embarrassing information about her in the course of their investigation and then revealing it to others if the verdict was unfavorable.
- an average juror, surprised to learn that private investigators had been unleashed on her during a trial, could be reasonably expected to be deeply resentful of such conduct.
- believing that mere interaction with a single pipefitter was something that was highly improper, thus tending to prejudice her against the Plaintiff who shared that status.
- believing the Court also inquired of Mr. Krik as to his interaction with Ms. McGregor, calling his credibility into question into through the investigation.

In this case, the communication to the juror by her "good friend" that a private investigator hired by Defendants was investigating the truthfulness of her testimony given on *voir dire* by the judge involves the third category of improper influence – communications to a juror that carry the potential for "negatively affecting the deliberative process." The evidence here is that although the investigator did not speak directly to Ms. McGregor, she made the direct connection that courtroom counsel for Defendants, who were scrutinizing her daily at trial, were simultaneously sending a message to her by investigating her through her "good friend." The question before this Court is framed under the Federal Rules of Evidence in terms of evidence which can be elicited from a juror when inquiring into the "validity of the verdict." In this context the evidence which can be elicited is limited to whether "an outside influence was improperly brought to bear on any juror." Fed. R. Evid. 606(b)(2). Here Ms. McGregor provided such testimony to the Court by saying she received notice during trial of the defense

9

investigator's communication about her to a close friend. A communication of this type was improper and was brought to bear on her as a sitting juror. This inquiry is an objective one – was Ms. McGregor aware of the communication by the defense investigator and was the communication improper. No subjective evaluation or evidence of the impact on her actual thoughts and feelings as a juror is needed or even permitted under Fed R. Evid. 606(b)(1). From the evidence of the improper communication having reached Ms. McGregor, the Court should find the communication affected the fairness of trial. *See Middleby Corp.*, *supra*, 1992 U.S. Dist. LEXIS 19730, at *24 ("Without the ability to examine the jury's thought processes, the inference of an effect on the verdict is unavoidable.").[6]

The unauthorized and secret investigation during trial of her "good friend" about voir dire testimony of the juror is an intolerable action which threatens the fundamental integrity of the jury system. It injects a host of extraneous concerns, fears, feelings of intimidation, resentments, distractions, and beliefs that have no place in a fair trial. It is not a defense that Defendants singled out only one juror for this intrusion.[7] It is well-recognized that a single juror may strongly influence an entire jury panel.[8] A remedy must be provided whenever this occurs.

**B.      Exclusion of causation testimony.**

---

[6] *See also Owen v. Duckworth*, 727 F.2d 643, 646 (7th Cir. 1984) ("A determination of jury prejudice is complicated in the federal courts by the proscription against questioning jurors directly about the effect of the outside contact on their deliberations."); *and see Mayhue v. St. Francis Hosp., Inc.*, 969 F.2d 919, 923-924 (10th Cir. 1992) ("A trial judge will rarely be able to ascertain the actual prejudicial impact of a jury's exposure to external influences because a juror cannot testify regarding the subjective effect of such influences during a Rule 606(b) hearing. The trial judge must, therefore, confirm or rebut the presumption of prejudice by objectively weighing all of the facts and circumstances of the case.").

[7] We do not know if Defendants and their counsel conducted investigations of other jurors. It is possible that they did. We also do not at this time know whether Ms. McGregor told the other jurors that she was the subject of an investigation being conducted by private investigators.

[8] Okun, *Investigation of Jurors By Counsel*, 56 Geo. L.J. 839, at 860 & N.98 (1968) ("It is generally acknowledged that a single juror may strongly influence an entire panel."). (Ex.14)

The jury verdict was based on finding tobacco smoking was the sole proximate cause of Krik's lung cancer. (Ex.11.) The medical evidence of asbestos as a cause was obviously the primary issue to the jury and was central to Plaintiff's case. Although defense medical experts presented opinions about smoking as the sole cause, Plaintiff's only medical expert – Dr. Arthur Frank - on the subject of causation specific to Krik was not allowed to testify to his opinion about attributing asbestos or synergism with tobacco as other causes of Krik's lung cancer. Plaintiff was also not allowed to present through his expert the body of scientific literature that gives the methodology for attributing asbestos as a cause based on factors such as work history, latency, duration of exposure, and presence of diagnostic markers set forth in scientific literature such as the Helsinki Consensus Statement (Helsinki Criteria). The application of such methodology was supported by evidence such as Krik's extensive history of asbestos exposure and medical evidence of underlying markers of asbestos exposure. (Ex.2 at 224-39; Ex.20 at 901-28, 966-84; Ex.21 at 1171-88.) The exclusion of Dr. Frank's testimony was improper under the standards of FRE 702 and *Daubert*. *Manpower Inc. v. Ins. Co. of Pa.*, 732 F.3d 796 (7th Cir. 2013) Other authority was presented in earlier motion briefing which is incorporated below.

Other prejudice resulted from sustaining Defendants' objections which made the Helsinki Criteria look irrelevant or invalid to the jury. The rulings made Dr. Frank appear to be a witness who the court deemed to lack proper qualification or scientific basis for his testimony or to be able to express a medical judgment about Krik's specific condition.

Besides the rulings at trial, pretrial motions and orders were made in this case which limited admission of Plaintiff's medical causation testimony. (Docket ## 79, 279, 303, 313, 314, 328, 330.)[9] Plaintiff adopts and incorporates its briefing and argument on admission of medical causation testimony. (Docket ## 79, 279, 303, 313, 314, 328, 330; Ex. 16; Ex. 17; Ex. 18; Ex.

---

[9] Citation includes exhibits associated with cited documents.

19.)[10]  Plaintiff renews as the basis for the new trial motion the objections and arguments as reflected in these documents.  Furthermore, Plaintiff reasserts arguments in the filings above that granting the *motion in limine* regarding causation testimony is dispositive in light of the jury verdict.

Failure to admit expert medical causation testimony when such evidence is a primary component of the case is reversible error.  In *Walker*, the Court of Appeals for the Seventh Circuit found that exclusion of expert testimony that "formed a substantial part" of the Plaintiff's case "was not harmless error." *Walker v. Soo Line R.R.*, 208 F.3d 581, 592 (7th Cir. Ill. 2000).  In *Walker*, the Plaintiff sought to introduce expert testimony to establish a lightning strike caused a particular condition.  *Id.* at 584.  In *Laski,* an unpublished opinion, the Court of Appeals for the Sixth Circuit found the trial court abused its discretion by excluding expert medical causation testimony which was also central to the case.  *Laski v. Bellwood*, 1997 U.S. App. LEXIS 34117, *21, *9 (6th Cir. Mich. Nov. 26, 1997).  In both *Walker* and *Laski* the jury heard some evidence about causation that related to Plaintiff's case, but exclusion of the primary witness was found to be decisive.

The following are instances where medical causation evidence was improperly excluded leading to lack of fairness in the trial.

**Dr. Arthur Frank:**  Testimony concerning the scientific methodology for attribution of the lung cancer to asbestos exposure was not admitted by this Court.  (Ex.1 at 209-10; Ex.2 at 240-43, 246-47, 252-54, 258-81; Ex.13 at 1679-83, 1711-12.)  Testimony specific to the cause of Krik's lung cancer was excluded.  (Ex.1 at 209; Ex.1 at 210; Ex.2 at 240; Ex.2 at 240.)

Non-exhaustive examples of such questioning include the following:

---

[10] Citation includes exhibits associated with cited documents.

Q. If 90% of the lung cancers are caused by smoking, does that mean that Mr. Krik's was -- lung cancer was only caused by smoking?
A. That --
MR. CASMERE: Objection, Your Honor.
THE COURT: The objection is sustained.
(Ex.1 at 209.)

Q. Okay. And how do you go about attributing the cause of lung cancer in Mr. Krik?
MR. CASMERE: Objection, Your Honor.
THE COURT: Sustained.
(Ex.2 at 240.)

Plaintiff's hypothetical causation questions based on evidence of Krik's exposures as to the specific Mobil and OI evidence were also improperly stricken. (Ex.2 at 252-53; Ex.2 at 253.) Defense counsel objected to the hypothetical questions, and this Court sustained the objections. (Ex.2 at 253; Ex.2 at 253.) Judge Shah explained why he sustained the objections to the hypothetical questions in sidebar. (Ex.2 at 253-54.)

Plaintiff attempted to introduce Helsinki Criteria, a methodology for attribution based on history of asbestos exposure and the presence of other diagnostic indicia of exposure.[11] (Ex.2 at 240-243.) The objection to the Helsinki Criteria was improperly sustained. (Ex.2 at 242.) The Court then instructed the jury to "not consider" the Helsinki Critieria, (Ex.2 at 247.)

During a sidebar the Court stated: "this witness's causation opinion is significantly limited. . . . I've yet to see an opinion from Dr. Frank that would be admissible." (Ex.2 at 246.) The court was referring to earlier pretrial hearings and rulings relating to testimony of Dr. Frank, which Plaintiff adopts and incorporates above in this brief.

In addition to the questions to which objections were sustained, Plaintiff proffered causation evidence outside the presence of the jury several times:

---

[11] Helsinki Criteria is attached as Ex.3, Ex.4, and Ex.5.

- Plaintiff proffered testimony on medical causation and "methodology for attributing causation." (Ex.2 at 258- 81.) The proffer included Dr. Frank's reliance on the Helsinki Criteria, differential diagnosis, "cell culture, studies, organ culture studies, whole animal studies, case reports, case series, human epidemiology," consideration of Krik's history as an individual, Bradford Hill Criteria, and government agency statements. (Ex.2 at 258-70; Ex.3; Ex.4; Ex.5) Plaintiff's proffer also contained hypotheticals and corresponding questions based on Krik's exposures to OI products and at Mobil in this case that Dr. Frank said were substantial contributing causes. (Ex.2 at 270-72, 280.) Defendants conducted voir dire examinations. (Ex.2 at 272-79.) The Court adhered to its ruling articulated in an earlier sidebar that the evidence would not be admitted. (Ex.2 at 280.) (The sidebar referenced is at page 253-58 of Ex.2.)

- Following the close of the defense testimony, Plaintiff again proffered Dr. Frank's testimony based on testimony by defense experts providing foundation for admission and the need for rebuttal – see discussion below. (Ex.13 at 1679-83, 1711-12.) The Court adhered to its prior rulings and did not allow Dr. Frank's testimony to be introduced. (Ex.13 at 1683.)

Exclusion of the proffered testimony which was central to Plaintiff's case also made the trial unfair to Krik. The unfairness in excluding plaintiff's primary medical evidence was compounded by admission of testimony of defense experts.

**Dr. Andrew Ghio:** Defense medical causation expert Dr. Ghio provided additional foundation for admission of the Helsinki Criteria. The criteria were discussed in his expert report, acknowledged on cross-examination, and conceded to be "state-of-the-art criteria for their diagnosis and attribution with respect to asbestosis." (Ex.7 at 3; Ex.6 at 1367-78, 1369-71,

14

1382-83.) The trial was unfair to Krik when the jury heard Dr. Ghio opine smoking was the only cause only cause while admitting to the scientific basis for the opinion Dr. Frank could not provide.

**Dr. Mark Wick:** Dr. Wick attacked the Helsinki Criteria methodology about using work history of asbestos exposure as "unscientific" and "flawed." (Ex.12 at 1541-42.)   Without the testimony of Dr. Frank, plaintiff was unfairly deprived of a witness to challenge the opinions of Dr. Wick that only pathological findings could be used for attribution of lung cancer to asbestos.

### Relief Requested

This Court should grant the following relief:

1. a new trial,

2. admit all causation testimony and other testimony of Dr. Frank tendered by proffer or stricken by sustaining objections including without limitation testimony about cumulative exposure, attribution, specific exposures to Mobil and OI

3. allow testimony of Dr. Brody about cumulative exposures and risk.

4. award costs to plaintiff and deny costs to the defense.

5. award Plaintiff attorney fees for the filing this motion and the trial.

6. grant any other relief it deems necessary.

Dated: May 29, 2015

/S/   Robert  G. McCoy
Attorney for Plaintiff
Robert G. McCoy
Cascino Vaughan Law Offices, Ltd.
220 South Ashland Ave.
Chicago, IL 60607
(312) 944-0600
bmccoy@cvlo.com