## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CHARLES KRIK, | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 10-cv-7435 |
| v. | ) | |
| | ) | Judge Manish S. Shah |
| CRANE CO. *et al.*, | ) | |
| Defendants. | ) | |

## EXXONMOBIL OIL CORPORATION'S RESPONSE TO PLAINTIFF'S MOTION FOR A NEW TRIAL

EXXONMOBIL OIL CORPORATION hereby submits the following as a response to Plaintiff's Motion for a New Trial (ECF No. 399).

## I.    INTRODUCTION

In his motion, Plaintiff makes two arguments for a new trial: (1) improper juror investigation, and (2) exclusion of causation evidence.   Neither argument has any merit.

ExxonMobil interviewed a friend of Juror McGregor about a birthday party that both Plaintiff, Charles Krik, and Mrs. McGregor may have attended. Plaintiff offers a parade of hypothetical suggestions about the potential impact this had on the on the jury, but does not have evidence of how this substantially prejudiced him. The interview is perfectly acceptable and permissible when considered in the context demanded by the Seventh Circuit.  It has long been the rule that proper investigations may be made as long as the lawyer does not actually approach those summoned for jury service. A lawyer may investigate prospective jurors to uncover any basis for challenge as long as she does not communicate with jurors or their family members, or conduct a vexatious or harassing investigation.  *See* American College of Trial Lawyers, Annotated Code of Trial Conduct, Rule 19(b) (2005).   The modern rule is that lawyers are perhaps obligated to investigate jurors and failure to do so may result in waiver. See ABA Formal Opinion 466.

Second, the Court was correct in recognizing that Dr. Frank's "cumulative exposure" testimony was already-rejected "any exposure" testimony operating under an alias. The Court was likewise correct in excluding it under *Daubert*. Accordingly, Plaintiff's Motion for a New Trial should be denied.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 59, a verdict determined to be "against the weight of the evidence" should only warrant a new trial "when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." Fed. R. Civ. P. 59(a)(1). *Latino v. Kaizer,* 58 F.3d 310, 315 (7th Cir. 1995). The court should not set aside a jury verdict if a reasonable basis exists in the record to support the verdict, viewing the evidence in the light most favorable to the prevailing party, and leaving issues of credibility and weight of evidence to the jury. *See Carter v. Moore,* 165 F.3d 1071, 1079 (7th Cir. Ill. 1998). In the context of improper influence on a juror, a new trial is warranted if a party likely suffered "substantial prejudice" as a result of the jury's exposure to the extraneous information. *United States v. Gilsenan*, 949 F.2d 90, 95 (3d Cir. 1991). It is the party seeking the new trial who bears the burden of demonstrating the likelihood of prejudice. *See Waldorf v. Shuta*, 3 F.3d 705, 710 (3d Cir. 1993).

## III.    FACTUAL BACKGROUND

The trial of this matter began on April 20, 2015. On the morning of April 21, 2015, one of the jurors in this matter, Ms. Loid, passed a note to this Court indicating that her fiancé surprised her with an expense-paid trip to Disney, which was set to occur the following week, the second week of trial. *See* Trial Proceedings, April 21, 2015, ("Exhibit A") pg. 105, lines 18-25. By the time of this note, the jury already consisted of only seven remaining jurors. The Court noted that had this information about the trip been known during jury selection, the Court's

inclination would have been to exclude Ms. Loid for cause, given her inability to sit for the second week of what was expected by all to be a two-week trial  *See* id., pg. 106, lines 1-10. However, the Court decided to hold off on excusing Ms. Loid immediately.

On that same day, April 21, 2015, another juror in this matter (and ultimately one of the six deliberating jurors), a Mrs. McGregor, passed a note to the Court stating that although she had not mentioned it before the jury was empaneled, it was possible that she had previously encountered the Plaintiff himself in a social situation, because she and Mr. Krik potentially shared a common friend:

> 18.    "Judge Shah, while I do not know Mr.
> 19   Krik personally, we might have been at a birthday party for a
> 20   former pipefitter and a good friend of mine last year.  His
> 21   name is Bob Scamen," S-c-a-m-e-n.  "I just wanted you to be
> 22   aware of this.  I did not think about this until the ride home
> 23   last night."

Trial Proceedings, April 21, 2015, pg. 108.  It is not disputed that the loss of these two jurors at any time after the second day of trial would have resulted in a mistrial.  *See* Fed. R. Civ. P. 48. The Court then sought, through an interview of the Plaintiff, to determine whether Plaintiff actually did attend the birthday party.  Like much of his trial testimony, Mr. Krik's response was equivocal, stating, "if he had a birthday party, I don't think I was at it," but immediately interjected: "not to my knowledge anyway, I think." *Id*. at pg. 110, lines 1-4.  The Court then interviewed Mrs. McGregor and asked whether she was sure that Mr. Krik was at the birthday party in question; she responded that she was not sure.  *See* id., at pg. 114, lines 17.  The Court asked if there was anything about her association with pipefitters that would influence her ability to view the evidence in this case within the four walls of this court and follow the instructions of law that the Court would give to her at the end of the trial, and she responded: "No. I mean, I'd be fine with that."  Id., pg. 114-15, lines 24-25, 1-4.    Mrs. McGregor offered no other

information detailing the nature of her relationship with Mr. Scamen, or what information about his career as a pipefitter she may have received from him during the course of their friendship, or whether he had discussed with her his own work at the locations where Mr. Krik also worked.

With the potential that the dismissal of another juror would result in a mistrial, Mobil retained an investigator to speak not with the juror, but with Mr. Scamen, about this birthday party. The focus pertained to the Plaintiff himself, Mr. Krik, and whether Mr. Krik had a personal relationship with Mr. Scamen -- as he and Mr. Scamen had many jobs sites in common. Mr. Scamen reported to the investigator that Charles Krik's name sounded very familiar, but he would neither confirm nor deny whether the Plaintiff was at Mr. Scamen's birthday party. That was the end of the inquiry.

At the status conference of May 14, 2015, this Court explained that "The juror who you'll recall sent us a note the first day of trial that she had attended a birthday party with a pipefitter, when I was talking to the jurors after the trial, she mentioned to me that an investigator on the part of, she understood, the defense had gone out and interviewed the friend who was the host of that birthday party, and that she learned that an investigator had talked to her friend." Transcript of Proceedings, May 14, 2015, ("Exhibit B") pg. 2, lines 18-25.

## IV.  ARGUMENT

### A.  There is No Evidence to Find Any Reasonable Suspicion of Substantial Prejudice and No Factual or Legal Basis to Impeach the Jury's Verdict

### 1.  Plaintiff Has No Legal Basis to Allow the Court to Impeach the Verdict

Here, a juror's extrajudicial post-trial comment to the Court about the fact of a conversation between her friend and an investigator is insufficient to set aside the jury's verdict. The jury returned a verdict by way of a special interrogatory on May 1, 2015 finding that smoking was the sole proximate cause of Plaintiff's injuries. When polled about her verdict the juror in question stated: "THE CLERK:  Patricia McGregor, was this and is this now your

- 4 -

verdict? JUROR McGREGOR: Yes." Trial Proceedings, May 1, 2015, "Exhibit C," pg. 2008, lines 22-24.

The parties are bound by the verdict, unless there was substantial prejudice arising from "extraneous prejudicial information improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any particular jury." Fed. R. Evid. 606(b); *see also Carson v. Polley*, 689 F.2d 562, 581 (5th Cir.1982). Here, Plaintiff offers a number of speculative thoughts about the manner in which the fact of an investigator speaking to a third-party *could* have influenced the verdict, *see* Plaintiff's Motion for a New Trial, May 29, 2015 (ECF#399), pg. 9, but there is no factual support for any of these theories. The Court has no obligation to give any credence to this possibility until the party challenging the verdict "has made a colorable showing of taint." *United States v. Lanas*, 324 F.3d 894, 904 (7th Cir. 2003); *see also Delvaux v. Ford Motor Co.*, 764 F.2d 469, 471 (7th Cir. 1985). The jury is insulated from probing about the manner in which it reached its verdict. *Moylan v. Meadow Club, Inc.*, 979 F.2d 1246, 1250 n.4 (7th Cir. 1992) ("a jury's verdict cannot be impeached by extrajudicial statements of the jurors").

This protection extends to each of the components of deliberation, including arguments, statements, discussions, mental and emotional reactions, votes, and any other feature of the process. Indeed, even if the juror's statements had been offered in the form of an affidavit this would still be insufficient because testimony or affidavits of jurors have been held incompetent to show a compromise verdict. *See University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 547 (5th Cir.1974); *Woods v. Lowery*, 297 F.2d 827, 828 (5th Cir.), cert. denied, 371 U.S. 844, 83 S. Ct. 74, 9 L. Ed. 2d 79 (1962). Without any evidence of actual prejudice, Plaintiff argues for a presumption. As support for the application of that legal proposition, Plaintiff cites criminal cases, rooted in the Constitutional Sixth Amendment right to an impartial jury trial, that

involve direct contact with a juror. However, even in the criminal context, the majority trend in the Federal Circuits is that there is no presumption of prejudice amid an allegation of extraneous contact with a juror. *See United States v. Sylvester*, 143 F.3d 923, 934 (5th Cir. 1998) ("We agree that the *Remmer* presumption of prejudice cannot survive *Phillips* and *Olano*.)

The Seventh Circuit has squarely sided with this trend. *See Wisehart v. Davis,* 408 F.3d 321 (7th Cir. Ind. 2005). In *Wisehart*, a sitting jury member was told by an unidentified third person that one of the days of trial had to be cancelled because the criminal defendant was to take a polygraph test, and that after the polygraph, the trial continued, with the juror having never learned the results. *See id*. 408 F.3d at 326. The criminal defendant argued that there was a presumption of prejudice pursuant to *Remmer v. United States*, which states "in a criminal cases, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about a matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial. The presumption is not conclusive, but the burden rests on the Government to establish that such contact with the jury was harmless." *Id*. 408 F.3d at 326. Judge Posner correctly rejected this automatic-presumption-of-prejudice argument, explaining:

> Ripped from its context, the [*Remmer*] statement is difficult to take seriously, because it is so easy to imagine situations in which a "private communication ... with a juror during a trial about the matter pending before the jury" would not create a rational presumption of prejudice. Suppose a juror's spouse said to the juror, "I saw you on television in the jury box, and you looked great." That would be a private communication concerning the case, but it would not be suggestive of jury tampering. General language does not decide particular cases, as Holmes liked to say. Judges expect their pronunciamentos to be read in context, which in *Remmer,* as the Court went on to explain, involved "the sending of an F.B.I. agent in the midst of a trial to investigate a juror as to his conduct"—something that "is bound to impress the juror and is very apt to do so unduly. A juror must feel free to exercise his functions without the F.B.I. or anyone else looking over his shoulder."

*Id*. Judge Posner went on to add "How much inquiry is necessary (perhaps very little, or even none) depends on how likely was the extraneous communication to contaminate the jury's

deliberations." *Id.*, at 326. Judge Posner has stated elsewhere that with respect to what inquiry might be needed to adequately assess any actual prejudice, "adequacy is a function of the probability of bias; the greater that probability, the more searching the inquiry needed to make reasonably sure that an unbiased jury is impaneled." *Oswald v. Bertrand,* 374 F.3d 475,480 (7th Cir. Wis. 2004). *See also United States v. Williams-Davis,* 90 F.3d 490, (D.C. Cir. 1996) (holding that a telephone call between a dismissed alternate juror and a seated juror about the case was trivial on its face, especially where the extrajudicial information tended to support the position of the movant). It is also apparent to consider the actual information conveyed to the juror. As one court observed, "To start, it is obvious that, for there to be any possibility of prejudice, the extraneous information must relate to one of the elements of the case that was decided against the party moving for a new trial." *United States v. Lloyd,* 269 F.3d 228, 239 (3d Cir. N.J. 2001).

In light of Seventh Circuit case law demanding context, Plaintiff's request for a presumption of prejudice should be rejected outright. The information conveyed to Juror McGregor here – that a Mobil investigator asked *Bob Scamen* about *Charles Krik's* attendance at *Mr. Scamen's* birthday party – is plainly not suggestive of jury tampering. First, it was not targeted at Juror McGregor or any other juror. Second, it had nothing to do with any element of the case. Third, the fact that an investigator spoke to a stranger to the lawsuit has a very low probability of contaminating the jury's deliberations. The information plainly falls short of creating a rational presumption of prejudice. On the scale of "I saw you on television in the jury box" to "sending the F.B.I. to investigate a juror directly", ExxonMobil's action in sending an investigator to talk to Bob Scamen about Charles Krik and a birthday party rates much, much closer to the former. A presumption of prejudice in this case would not be consistent with Seventh Circuit law.

The cases that Plaintiff cites arise from juror contact that is completely different in nature and degree and wholly distinguishable from the contact at issue here. For example, in *Remmer v. United States*, 347 U.S. 227 (U.S. 1954), an unnamed person attempted to bribe a juror and remarked to him that he could profit by bringing in a verdict favorable to the defendant. The Court allowed for additional inquiry as to the impact this may have had on the juror. *See id.* 347 U.S. at 230. Eighty-six years ago in another case cited by Plaintiff, *Sinclair v. United States*, a criminal defendant then on trial hired a detective agency "To spy upon said jurors and each of them, to bribe, intimidate and influence said jurors and each of them, and to do anything calculated to interfere with and impede said jurors and each of them in the unbiased discharge of their duties in the trial of said cause …" (among other things). *Sinclair*, 279 U.S. at 752. Plaintiff's reliance upon *United States v. White* is similarly unavailing. 78 F. Supp. 2d 1025 (D.S.D. 1999). The court in *White* explicitly based its decision, in part, upon the fact that this was a criminal matter involving two defendants, where "in a criminal drug case such as this, it is not farfetched to expect jurors to feel intimidated by or prejudiced toward a defendant who, they learn, has conducted an investigation of their personal lives by interviewing their next-door neighbors." *Id. Rakes v. United States* is also inapposite. *See Rakes,* 169 F.2d 739 (4th Cir. Va. 1948). It involved a criminal defendant who submitted post-conviction affidavits from jurors suggesting that they would not have convicted some of the criminal defendants if they had known another defendant would also be found not guilty. The court's opinion castigated the practice of closely scrutinizing the jury's deliberative process through direct contact with the jury members regarding their deliberative process. *See id.*, at 745-46.

In the *instant* case, there is no similarity to any of the cases referred to in Plaintiff's Motion, most notably because Plaintiff relies on criminal and habeas cases that impose a presumption of prejudice against the Government. Moreover, the factual scenarios described in

these cases are entirely different in every important respect. Here, a seated juror received information from a third-party that the third-party had been contacted by an investigator. No other information reached the juror. None of this information pertained to any element in the underlying matter. The scope of the underlying investigation was not the juror herself, but rather, upon the Plaintiff and the veracity of his testimony regarding his presence at a birthday party for and his relationship with a nonparty to this case.

During the trial and again before deliberations, the Court issued numerous instructions to the jury which clearly set forth the evidence to be considered, to the exclusion of all other information. *See e.g.,* Trial Proceedings, April 30, 2015, pg. 1937, (Exhibit D) lines 14-16 ("You have two duties as a jury. Your first duty is to decide the facts from the evidence in this case. This is your job, and yours alone."); *id.*, pg. 1938, lines 11-12 ("The evidence consists of the testimony of the witnesses, the exhibits admitted in evidence, and stipulations."); *id.*, pg. 1939, lines 1-6 ("Second, anything that you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded. This includes any press, radio, internet or television reports you may have seen or heard. Such reports are not evidence and your verdict must not be influenced in any way by such publicity.") There is no evidence that they did anything else. Accordingly, a new trial in this matter is not warranted.

2.      **Defendants are Entitled to and Perhaps Obligated to Investigate and Present Implied or Actual Jury Bias**

"Actual bias is 'bias in fact.'" *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997) (*citing United States v. Wood*, 299 U.S. 123, 133 (U.S. 1936) "A juror is found by the judge to be partial either because the juror admits impartiality . . . or the judge finds actual partiality based upon the juror's voir dire answers." *Torres*, 128 F.3d at 43.

But there is another type of bias: "implied" bias. Courts imply bias "when there are similarities between the personal experiences of the juror and the issues being litigated. Significantly, courts imply bias "where repeated lies in voir dire imply that the juror concealed material facts in order to secure a spot on the particular jury." *Fields v. Brown*, 503 F.3d 755, 770 (9th Cir. 2007) (*citing Dyer v. Calderon*, 151 F.3d 970, 982 (9th Cir. 1998) (en banc) ). "A juror . . . who lies materially and repeatedly in response to legitimate inquiries about her background introduces destructive uncertainties into the process." *Dyer*, 151 F.3d at 983. *See also* Paula L. Hannaford, Safeguarding Juror Privacy: A New Framework For Court Policies and Procedures, 85 JUDICATURE 18, 22 (2001), note 26, at 23 ("[a] number of empirical studies have found that pros-pective [sic] jurors often fail to disclose sensitive information when directed to do so in open court as part of the jury selection process").

It has long been the rule that proper investigations may be made by the lawyer as long as the lawyer does not actually approach those summoned for jury service. *See* James C. McCready, Challenging Jurors, 58 DICK. L. REV. 384, 385 (1954). A lawyer may investigate prospective jurors to uncover any basis for challenge as long as she does not communicate with jurors or their family members, or conduct a vexatious or harassing investigation. *See* American College of Trial Lawyers, Annotated Code of Trial Conduct, Rule 19(b) (2005). For example, in ABA Formal Opinion 466, the Committee concluded that an attorney may review a juror's social media presence; an attorney may undertake that review even if the social media website issues a notice to the juror that the attorney viewed his social media profile; and an attorney may not request private access to a juror's social media profile.

Not only are lawyers entitled to investigate jurors, in some instances, there is an obligation to do so. *See Burden v. CSX Transp.*, Inc., No. 08-CV-04, 2011 WL 3793664, at *9 (S.D. Ill. Aug. 24, 2011) (denying motion for new trial in workplace injury case on ground that

defendant had waived its objections after an online search revealed that two jurors had previously litigated workplace injury cases, because "the basis of the objections might have been known or discovered through the exercise of reasonable diligence"); N.Y.C. Bar Ass'n Comm. on Prof 1 & Judicial Ethics, Formal Op. 2012-02, supra note 132, § I. ("The standards of competence and diligence may require doing everything reasonably possible to learn about the jurors who will sit in judgment on a case").   Waiver can result from not performing an adequate investigation of actual or implied jury bias.  For example, in *United States v. Daugerdas,* 867 F. Supp. 2d 445, 479 (S.D.N.Y. 2012) the court explained that:

> Ultimately, a defendant waives his right to an impartial jury if defense counsel were aware of the evidence giving rise to the motion for a new trial or failed to exercise reasonable diligence in discovering that evidence." Further, "litigants and their counsel must act with reasonable diligence based on information about juror misconduct in their possession, or they will be deemed to have waived their right to an impartial jury based on the challenged juror misconduct….The waiver doctrine "exists to ensure that the Court receives information in time to make inquiries, remedy potential prejudices, and save all concerned the time, expense, and efforts of a retrial. A waiver standard predicated solely on actual knowledge, to a 100% certainty, would result in retrials where defense attorneys had substantial information of juror misconduct that put them on reasonable notice that the Court should be notified and additional inquiry undertaken." *Id.*, 867 F. Supp. 2d at 482-483.

Because bias can be difficult to uncover, some courts have explained that litigants are obligated to review personal information about potential jurors and to bring potential juror biases to the attention of the trial court early in the *voir dire* stage.  For example, in *Johnson v. McCullough*, 306 S.W.3d 551 (Mo. 2010), the Missouri Supreme Court held that "[A] party must use reasonable efforts to examine the litigation history on Case.net of those jurors selected but not empaneled and present to the trial court any relevant information prior to trial" and the court directed the lower courts "to ensure the parties have an opportunity to make a timely search [of the court's online docketing system regarding each potential juror] prior to the jury being empaneled and shall provide the means to do so, if counsel indicates that such means are not

reasonably otherwise available." *McCullough*, 306 S.W.3d at 558-559. Most courts have *disagreed* that background checks of jurors are improper. *See generally* Penelope Pillsbury Campbell, Criminal Background Checks of Prospective Jurors: A Necessity or an Intrusion?, 20 DCBA BRIEF, Jan. 2008, at 16, 16-26.

The ABA recognizes that background checks like this will be so prevalent that it encourages courts to so advise jurors. The modern approach now suggested by the ABA proposes that "judges should consider advising jurors during the orientation process that their backgrounds will be of interest to the litigants and that the lawyers in the case may investigate their backgrounds, including review of their ESM and websites." ABA 466, supra note 16, at 3. *See also* Thaddeus Hoffmeister, Applying Rules of Discovery to Information Uncovered About Jurors, 59 UCLA L. REV. DISCOURSE 28, 36 (2011) (arguing that "worries over privacy may be lessened somewhat if jurors are told ahead of time that their backgrounds will be researched and why the search is being done"); *see also* ABA 466, *supra* note 16, at 3 n.4 ("Judges also may choose to work with local jury commissioners to ensure that jurors are advised during jury orientation that they may properly be investigated by lawyers in the case to which they are assigned").

In the *instant* case, the investigation was far less intrusive than a background check. Mobil did nothing more than to follow up on the discrete investigation. This was pursuant to a juror's notification of a potential source of bias, a personal relationship with a person who may have been friends with the Plaintiff. She was concerned that the judge and the parties may not have known that she may have had personal contact in a private social setting with the Plaintiff. Had this information been presented during the *voir dire*, the parties would have been able to pose a directed set of inquiries on the issue of actual or implied bias. Because the juror withheld

this information during *voir dire*, (albeit apparently innocently) Mobil had no option other than to engage in very limited investigation of a nonparty.

There is no evidence indicating or even suggesting that any person associated with Mobil directed any communication or correspondence to the juror or engaged in any action to convey information about the case that could reasonably be expected to have any impact on any juror's impartial deliberations or that it caused any prejudice, let alone substantial prejudice, to Plaintiff. The investigation was limited to the nonparty's relationship with the Plaintiff, and did not delve into any aspect of the juror or her personality or any other trait. The information that reached the juror was innocuous and was limited in scope to the very issue which she herself brought to the attention of the Court. There was no discussion of the merits of the case or any of its elements. There is no evidence that any information ever reached the juror that would have any bearing on any material fact or legal element affecting the deliberative process. In short, there is no evidence of record to even suggest any intention to tamper with a witness, or that any such tampering occurred. Accordingly, Plaintiff's Motion for a New Trial should be denied.

### B. This Court's Rulings regarding the Admissibility of Causation Testimony were Correct

The issue of the inadmissibility of Plaintiff's causation testimony through Dr. Frank has been extensively briefed and argued.[1] Plaintiff presents absolutely no new arguments to support the admissibility of any causation testimony. To the contrary, Plaintiff's proffer underscored and

---

[1] *See*, *e.g* Defendant ExxonMobil Oil Corporation's Daubert Motion to Bar Testimony of Arthur Frank, M.D. and Frank Parker, August 23, 2013 (ECF #76); Defendant ExxonMobil Oil Corporation's Reply to Plaintiff's Response to Daubert Motion to Bar Testimony of Arthur Frank and Frank Parker, October 4, 2013 (ECF#89): Mobil's Motion in Limine to Exclude and Limit Testimony of Arthur Frank – Causation, February 21, 2014 (ECF#208); Court Order on Daubert Motions, December 22, 2014 (ECF#314); Defendants' Joint Response to Plaintiff's Additional Brief Concerning the Testimony of Dr. Frank, March 30, 2015 (ECF #329), and Transcripts of Proceedings dated April 8, 2014, March 9, 2015, and April 9, 2015, which are incorporated by reference hereto.

reinforced beyond any doubt that Dr. Frank's causation testimony was based upon an insufficient and faulty methodology.

Dr. Frank admitted that in using his "methodology" to attribute the claimed injury to any specific exposure episode, he would opine that any exposure, no matter how slight, would be in his opinion a cause of the claimed injury:

> Q.  Doctor, your opinions or your answers to those
> 2   hypotheticals would be the same if the hypothetical was that he
> 3   was exposed in that manner on a single occasion, correct?
> 4   A.  Yes, sir.

Trial Proceedings, April 21, 2015, ("Exhibit E") pg. 273, lines 1-4.  Dr. Frank continued:

> 8   Q.  That's the beauty of the hypothetical.  If the hypothetical
> 9   was one minute of exposure, your answer would be yes?
> 10  A.  It would add to the cumulative exposure.
> 11  Q.  And it would be a substantial contributing factor to that
> 12  person's ultimate disease?
> 13  A.  As I understand science, I would have to say yes.

Trial Proceedings, April 21, 2015, pg. 274, lines 8-9.  Further:

> Q.  And that would be true regardless of the dose, duration, or
> 25   intensity?
> 1   A.  If there is documentation above background, it adds to
> 2   someone's cumulative exposure that they wouldn't have otherwise
> 3   had.

Trial Proceedings, April 21, 2015, pg. 274-275, lines 25; 1-3.

This Court ruled in the face of a nearly identical proffer that Dr. Frank was barred from giving any causation opinion at trial because the foundation for whatever opinion he would give is the inadmissible "any exposure" theory.   The Court was crystal clear: "that theory is not admissible, and that can't be the foundation for the jury hearing an expert opine as to causation." Hr'g Tr. 7:25-8:2, Mar. 9, 2015, ECF No. 328-16.   The Court later reiterated, "Dr. Frank's causation opinion is based on an each-and-every-exposure opinion, which cannot be evidence that this jury considers when hearing about causation." *Id.* at 10:8-11. The Court was correct in noting that Dr. Frank's causation opinion — whether labeled "any" or "each and every" or

"cumulative" exposure — is based on the idea, as he puts it, "'the only exposure to a product that is not a substantial contributing factor is the exposure to a product that did not occur.'" Hr'g Tr. 4:21-25, Apr. 8, 2014, ECF No. 328-14 (quoting Frank Dep. 12:19-25, June 5, 2012).

As the Court explained, Plaintiff "relies upon the 'Any Exposure' theory and argues that a single exposure to asbestos is enough and every additional exposure contributed as well." *Krik v. Crane Co.*, --- F. Supp. 3d ----, 2014 WL 7330901, at *4 (N.D. Ill. Dec. 22, 2014). Because this "any exposure" theory of causation is not based upon sufficient facts or data, is not the product of reliable principles and methods, and contradicts the causation standard of maritime and Illinois law, the Court barred "any expert testimony espousing the 'Any Exposure' theory at trial." *Id.* at *6. The Court's 14-page memorandum opinion and the numerous cited decisions focus on the basis of the causation opinion. That basis — the only disclosed basis for the causation opinion — fails the standards of Federal Rule of Evidence 702 and *Daubert*, and contradicts the causation standard of maritime and Illinois law. *Krik*, 2014 WL 7330901, at *4-6; *see also* Hr'g Tr. 5:8-10, Mar. 9, 2015, ECF No. 328-16 ("He cannot give them methodology to apply when they determine the facts of this case to the law of causation.").

In short, Plaintiff presents the same faulty argument that this Court, and many others around the country, have categorically rejected. [2]

---

[2] *See, e.g., Comardelle v. Pa. Gen. Ins. Co.*, 2015 U.S. Dist. LEXIS 624 (E.D. La. Jan. 5, 2015); *Bostic v. Georgia-Pacific Corp.*, 439 S.W.3d 332 (Tex. 2014) (rejecting the "Helsinki Conference" as a basis for a proffered causation opinion); *Betz v. Pneumo Abex, LLC*, 44 A.3d 27, 58 (Pa. 2012) ("In terms of the Helsinki criteria, created under the auspices of the Finish Ministry of Social Affairs and Health, Appellants observe that participation in the conference was selective; the purpose was to fashion a recommended compensation scheme unto itself, not to provide a measure of legal causation appropriate to longstanding requirements of Pennsylvania tort law; and, in any event, the conference reports do not state anywhere that every exposure to asbestos, regardless of dose, is causative"); *Butler v. Union Carbide Corp.*, 712 S.E.2d 537 (2011) ("the Helsinki Criteria were not formulated with compliance with the Daubert test in mind nor does it supplant it"); *Smith v. Kelly-Moore Paint Co., Inc.*, 307 S.W.3d 829, 839 (Tex. App. 2010).

# V.    CONCLUSION

Wherefore, for all the reasons stated above, this Court should deny Plaintiff's Motion for a New Trial.

Dated: June 24, 2015

Respectfully submitted,

/s/ H. Patrick Morris
H. Patrick Morris – IL Bar #6187083
David F. Fanning – IL Bar #6274895
Attorneys for ExxonMobil Oil Corporation
Johnson & Bell, Ltd.
33 W. Monroe St., Suite 2700
Chicago, IL  60603
Telephone:  312/372-0770
Fax:  312/372-9818
morrisp@jbltd.com
fanningd@jbltd.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 24, 2015, the foregoing was filed with the Clerk of the Court for the United States District Court for the Northern District of Illinois using the CM/ECF system, which will send notification of such filing upon all parties who have appeared.

By /s/ H. Patrick Morris
H. Patrick Morris – IL Bar #6187083
David F. Fanning – IL Bar #6274895
Attorneys for ExxonMobil Oil Corporation
Johnson & Bell, Ltd
33 West Monroe St., Suite 2700
Chicago IL   60603
morrisp@jbltd.com

- 16 -