**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES KRIK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 10-cv-7435 |
| v. | ) | |
| | ) | Judge Manish S. Shah |
| OWENS-ILLINOIS, INC. *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR A NEW TRIAL**

Plaintiff submits this Reply Brief in support of his motion for a new trial, and states:

**I.  Jury Tampering.**

Defendants filed briefs that mischaracterize applicable law, claim support from a series of inapposite and inaccurately described citations, side-step the correct legal analysis governing jury tampering within this Circuit, advance assertions directly contradicted by their lawyers' statements in open court, and ignore the most grave issues raised in plaintiff's motion. Defendants have failed to defend their conduct.  A new trial is warranted.

**A.  Three Overarching Points.**

**1.    Mobil's Proposed "Rules Of The Road" Are Legally And Ethically Unsupportable.**

Though highly improper conduct of this type was sometimes seen a century ago,[1] it has been roundly condemned for the last eighty years especially when occurring during trial.[2]  When

---

[1] One must look to the nefarious practices in the first decade of the last century to find precedent.  *See* Thaddeus Hoffmeister, *Investigating Jurors in the Digital Age: One Click at a Time*, 60 Kan. L. Rev. 611, 617 (2012) (describing Clarence Darrow's use of investigators in the 1907 trial of Bill Haywood).

[2] *See* Joshua Okun, *Investigation of Jurors By Counsel: Its Impact on the Decisional Process*, 56 Geo. L.J. 839, 856, 865 (1968) ("Out-of-courtroom contact with jurors very rarely occurs after the commencement of trial, but when it does the courts have generally condemned the practice…. [T]he courts are primarily alarmed by interference during the course of a trial, a very well-founded concern.").

this issue was first raised on May 14, 2015 the Court expressed the view that it would be potentially appropriate to "lay rules of the road" about "these kinds of investigations occurring in trials."[3] Mobil has offered the Court its "rules of the road" – and they consist of these:

- It is "perfectly acceptable and permissible" to secretly conduct an investigation of a juror during trial, behind the back of the sitting judge and without notice to the opposing party. Mobil Brief at 1.

- "As long as the lawyer does not actually approach those summoned for jury service," the attorney can use private investigators to contact a juror's closest friends while that juror is sitting and deliberating at trial. *Id.* at 1.

- It is the "modern rule" that lawyers are "obligated" to investigate jurors in just this way. *Id.* at 1, 9-11.

- The failure to do so may result in a "waiver" of the rights of the lawyer's client, such that it may be said to be malpractice to fail to secretly investigate jurors during trial. *Id.* at 1.

- A federal district judge's decision to conduct voir dire himself in open court and before the parties cannot interfere with the right of a party during trial to secretly conduct further investigation of jurors, and when the judge denies a request for exclusion, the party "ha[s] no other option other than to engage" in a secret investigation to prove the judge's decision wrong. *Id.* at 13.

- Should the secret use of a private investigator ever be disclosed, the judge is barred from conducting a hearing to objectively assess the impact because the circumstances of the interference are "insulated from probing." *Id.* at 1.

The arguments of Mobil, shared by Owens-Illinois, would be farcical,[4] were they not in the context of one of the most fundamental concerns bottoming a fair trial system. The essence of this misconduct derives from the Court's decision that Mrs. McGregor could be a fair and impartial juror, defendants' disagreement with that decision, and the willingness of an attorney to follow a client's instructions, regardless of whether doing so amounts to a contempt of the Court.

---

[3] Cite to transcript of May 14, 2015 through ECF at 8:4-11.

[4] They stand as peculiarly striking examples of the defense mechanisms of "rationalization" (convincing oneself that no wrong was done through false reasoning) and " reaction formation" (converting behavior believed to be unacceptable into its opposite because the true belief causes anxiety), as described by psychologists and psychiatrists. *See, e.g.*, Robert B. White, M.D., and Robert M. Gilliland, M.D., ELEMENTS OF PSYCHOPATHOLOGY – THE MECHANISMS OF DEFENSE 57, 61 (1975).

Following receipt of her note about attending a pipefitter's birthday party, this Court entertained arguments from the parties' counsel and conducted renewed voir dire as to Mrs. McGregor. The Court heard the objections of counsel for Mobil, who argued there was a "question about the fairness and impartiality" of Mrs. McGregor that would remain "an open question that we just don't know without being able to talk to her even now,"[5] and counsel for Owens-Illinois, who argued leaving Mrs. McGregor on the jury would be "a huge disadvantage for us and it's prejudicial."[6] On the basis of his further questioning of the juror, the Court stated: "I am satisfied that Ms. McGregor can be a fair and impartial juror, and I'm going to keep her seated on the jury."[7] Both defendants then moved to excuse Mrs. McGregor for cause.[8] When these motions were denied, both defendants moved for a mistrial.[9] Those motions were also denied.[10]

The decision to keep Mrs. McGregor on the jury was one the Court was empowered to make. After the objections by Mobil and Owens-Illinois had been overruled, after their motions to excuse for cause were denied, and after their motions for a mistrial were denied, the matter was decided. Once the matter was decided, the defendants certainly had the right to request reconsideration of the rulings. Neither defendant did so. And, once a matter of this nature has been decided by a federal district judge, the parties are bound to accept and abide by it. But,

[5] Case: 1:10-cv-07435, Doc. No. 399-10, filed May 29, 2015, at 111:7-10 (page and line citations are to the page and line numbers of the court reporter's transcript).

[6] Case: 1:10-cv-07435, Doc. No. 399-10, filed May 29, 2015, at 110:20-21.

[7] Case: 1:10-cv-07435, Doc. No. 399-10, filed May 29, 2015, at 115:10-12.

[8] Case: 1:10-cv-07435, Doc. No. 399-10, filed May 29, 2015, at 115:19-21, 24-25

[9] Case: 1:10-cv-07435, Doc. No. 399-10, filed May 29, 2015, at 116:24 – 117:4.

[10] Case: 1:10-cv-07435, Doc. No. 399-10, filed May 29, 2015, at 117:5-8.

Mobil's counsel told this Court at the May 14, 2015 hearing what happened next. When asked

by the Court if a defendant hired a private investigator, the lawyer for Mobil stated:

> "Yeah, it was done at our request. It was our investigator. Our client asked us
> to have the investigator done."

Case 1:10-cv-07435, Doc. 399-11, filed May 29, 2015, at 5:11-13.

Nothing is enshrined in law more deeply than the principle that the attorney is not the

mere servile functionary of the client. The ethical rules are many which hold that a lawyer is not

at liberty to do anything his client instructs. When Mobil's lawyers received this instruction

from their client – a blatantly improper demand to challenge a judge's ruling by launching an

investigation of a sitting juror during an ongoing trial through hiring a private investigator to

question her "close friend,"[11] Mobil's counsel did not come before the Court to request

permission to do so. Mobil's counsel did not tell their client that they were officers of the court

first, and that they had to raise this matter with the judge, and seek guidance from the Court as to

whether his ruling on void dire could be challenged in this way. Instead, Mobil's attorneys did

what their client demanded: they went ahead and hired a private investigator "to have the

investigation done." Case 1:10-cv-07435, Doc. 399-11, filed May 29, 2015, at 5:12-13.

Mobil did not agree with the Court's decision on who should sit on the jury. Mobil decided to

act so as to circumvent that decision. And Mobil's lawyers proceeded to act as directed, because

their client "asked us to." Id. at 5:12.

Owens-Illinois' counsel knew what was being done. Owens-Illinois, like Mobil, aimed

to circumvent a judge's ruling through the private investigation of a member of the jury

---

[11] During the trial, on April 21, 2015, the Court read to defendants Mrs. McGregor's note in which she
stated that Bob Scamen, whose birthday party she had attended, was her "good friend." Case: 1:10-cv-
07435, Doc. No. 399-10, filed May 29, 2015, at 108:20. In arguing against the Court's decision to keep
Mrs. McGregor as a jury, the defendants' lawyers stressed the closeness of her relationship with Mr.
Scamen. *See id.* at 115:17.

defendants had unsuccessfully argued should be removed.[12]  Owens-Illinois stood to benefit

from the misconduct because inclusion of the juror was purportedly a "huge disadvantage" and

"prejudicial."  Owens-Illinois' counsel allowed the investigation to be done by keeping it a

secret.  They aided and abetted, and acted as knowing accomplices, to the misconduct.  Two

further "rules of the road" can now be gleaned from the defendants' presentations:

- When a client is dissatisfied with a ruling by a federal district judge as to who may sit on the jury empaneled by that judge, and when the client instructs his lawyer to circumvent the court's ruling by hiring a private investigator to interrogate the juror's closest friends, the lawyer *must* proceed secretly to do so even though his conduct is contemptuous of the court's ruling and authority.

- When a party's counsel engages in this conduct, a co-party's counsel with full knowledge of the actions may aid and abet them by keeping silent, ensuring the judge and the opposing party cannot know or interfere, whenever the co-party stands to benefit from the conduct.

Plaintiff respectfully maintains that the rules of the road offered by defendants have never

been recognized as permissible standards of conduct by any court.  They should not be accepted

by the United States District Court for the Northern District of Illinois.  A new trial should be

directed in this case.

**2.      If The Actions Were "Proper" And "Obligatory," Why Were They Concealed And Why Was The Decision To Keep Them Secret Not Explained In Defendants' Briefs?**

In the opening brief, plaintiff was clear in condemning defendants' concealment,

describing it as "reprehensible" while quoting the observation in *Rakes v. United States*, 169

F.2d 739, 745 (4th Cir. 1948):

> The inviolability of the jury room from outside influence of any sort, actual or potential, is a prime necessity in the administration of justice. That unqualified

---

[12] Owens-Illinois' lawyer argued had he known Mrs. McGregor "was friends with a pipefitter, close enough to go to his [Mr. Scamen's] birthday party, we would have investigated that" by requesting more questions to be made by the judge on voir dire.  Case: 1:10-cv-07435, Doc. No. 399-10, filed May 29, 2015, at 115:15-18.

rule requires that if a person, whether on the jury or not, knows of such outside influence, or an attempt at it, he must at once report this information to the court.

Mobil offered 13 pages of briefing on the jury tampering issue, while Owens presented 8. Yet, nowhere in these 21 pages of argument did either defendant explain to the Court why they kept their investigation of the juror secret.

The silence on this issue is deafening. In the face of an issue raised by plaintiff of asserted "reprehensible" conduct, the decision to remain silent – the failure to muster any response at all – is inculpatory. They said nothing because there is no legitimate explanation for their conduct – behavior that breaches the "unqualified rule" that when a trial lawyer knows of potential interference with a sitting juror he must immediately bring it to the court's attention.[13]

### 3. The Admissions Of Defendants' Counsel In Open Court On May 14, 2015 Radically Conflict With The Assertions Being Made To This Court In Defendants' Briefs.

In presenting their responsive briefs, defendants were careful to erect the pretense that the investigation had nothing really to do with a sitting juror. Mobil termed what it did as a "limited investigation of a nonparty," while asserting that it "never directed any communication or correspondence to the juror." Mobil Brief at 13. Mobil called its investigation "far less intrusive than a background check." *Id.* at 12. Owens-Illinois called the conduct a mere "follow-up inquiry with a third-party." OI Brief at 1. But in open court the defendants' heard from the reading by the judge of the juror's note that this so-called "third party" was in fact a "good

---

[13] Most every day at trial, sometimes several times a day, the issue of whether to excuse Ms. Loid (with an arranged holiday) came up, and Mobil's counsel admitted this was a juror defendants "were arguing strenuously to keep." Case 1:10-cv-07435, Doc. 399-11, filed May 29, 2015, at 4:3. Excusing her would have left six jurors. The removal of Mrs. McGregor would have resulted in a mistrial. The issue of whether Mrs. McGregor might be excused – and concealed activity that could potentially result in her being excused – was directly relevant at the numerous sidebars conducted on the status of Ms. Loid *virtually each and every day* at this trial. Yet, defendants at all times chose to keep silent.

friend" of Mrs. McGregor.[14]    The statements of Mobil's counsel in open court directly

contradict this contrived construction of defendants' conduct.  Far from being an innocuous

"check" that posed no risk of interfering with a sitting juror, defendants' counsel *admitted* at the

May 14, 2015 hearing that there was a very real risk the juror would receive direct

communications informing her that she was being subjected to a private investigator's inquiries.

Counsel for Mobil stated at that hearing:

> The one thing that did come up in connection with the investigation that we
> thought about is whether we should have the investigator say to, you know,
> this friend [Bob Scamen] if she said anything, ***and we recognized there was a
> risk of doing that***.  ***I can't talk to you about that***.   And we decided at that
> point that we were into an area no case has ever addressed, so we decided to
> just leave that alone, ***recognizing that if he did go to her and talk to her and
> she found that was some sort of adverse invasion of her privacy, that was a
> risk we were recognizing and taking***.[15]

Just as has been observed by courts[16] and commentators,[17] whenever a private

investigator is set upon a juror's close friends, there is a substantial probability that the juror will

learn about it because they will be told by that friend.  This is the risk that has been recognized

repeatedly as grounds for treating this conduct as condemnable.  The "mere suspicion that he, his

---

[14] Case: 1:10-cv-07435, Doc. No. 399-10, filed May 29, 2015, at 108:20.

[15] Case 1:10-cv-07435, Doc. 399-11, filed May 29, 2015, at 5:14-23 ( italics added).

[16] *See U.S. v. White*, 78 F. Supp. 2d 1025, 1027-1028 (D.S.D. 1999), where the trial judge struck a jury
panel and continued a trial for the purpose of putting a new jury panel in place when he discovered the
defendant had hired a private investigation firm to question neighbors of prospective jurors.  The court
observed that the rationale of *Sinclair v. United States*, 279 U.S. 749, 765 (1929), which condemned as
"odious" the use of private investigators to surveil sitting jurors "extends to the pre-trial investigation of
prospective jurors through their acquaintances *when it is reasonable to assume that the jurors may learn
of the investigation*."  *White*, 78 F. Supp. 2d at 1027 (italics added).

[17] *See* Joshua Okun, *Investigation of Jurors By Counsel: Its Impact on the Decisional Process*, 56 Geo.
L.J. 839, 856, 865 (1968)  (One may "properly assume that in a great many instances interviewees will
feel inclined, if not obligated, to inform the prospective juror" of the investigation.); Note & Comment,
*Researching Jurors on the Internet: The Ills of Putting Jurors on Trial and the Need to Shift the Focus
Back to the Defendant*, 34 U. La Verne L. Rev. 251, 262 (2013) ("Questioning a neighbor is highly
intrusive, and the neighbor can potentially alert the juror to the questioning.  A situation like this could
leave a juror feeling intimidated or resentful.") (footnotes omitted).

family, and friends are being subjected to surveillance is enough to destroy the equilibrium of the average juror and render impossible the exercise of calm judgment upon patient consideration," as the court observed in *Sinclair v. United States*, 279 U.S. 749, 765 (1929). The "reasonable tendency" of an investigation of a juror through private investigators "is to intimidate at least some jurors who learn about the investigation." *U.S. v. White*, 78 F. Supp. 2d 1025, 1027-1028 (D.S.D. 1999). Mobil's counsel admitted there was a risk of interfering with Mrs. McGregor because he knew Mr. Scamen could "go to her and talk to her" about the investigation. There was "no question" that Mobil fully knew these risks, and it chose to run them. This is part of the colloquy between the Court and Mobil's attorney:

> Court: And I don't – I am not suggesting one way or another whether it was appropriate or not appropriate. What gave me some pause is the risk that conducting an investigation like that during the course of a trial has the potential to create an external –
>
> Mobil: No question about it.
>
> Court: – impact on a sitting juror.[18]

### B. A New Trial Should Be Ordered.

**1.    Mrs. McGregor Learned Of Defendants' Use Of A Private Investigator To Investigate Her During The Trial, And The Presumption That This Affected The Jury's Deliberative Process Is Unavoidable.**

It is undeniable that the juror in this case learned from her "good friend" that she was being investigated by a private investigator hired by one of the defendants during trial. She informed the Court about it. In our view, this fact establishes a *presumption of prejudice* that warrants a new trial. Judges have repeatedly observed that a juror's knowledge that she is being subjected to the inquiries of a private investigator during trial causes feelings of intimidation and resentment that undermine the deliberative process of the jury. *Sinclair v. United States*, 279

---

[18] Case: 1:10-cv-07435, Doc. No. 399-10, filed May 29, 2015, at 4:15-25, 5:1-7, 14-23. Owens' counsel acknowledged his awareness of this investigation of the juror. *Id.* at 6:1-10.

U.S. 749, 765 (1929);  *Remmer v. United States*, 350 U.S. 377, 382 (1956);  *Gold v. United States*, 352 U.S. 985, 985 (1957); *U.S. v. White*, 78 F. Supp. 2d 1025, 1027-1028 (D.S.D. 1999). The only reason that there are not more cases on this topic is that modern lawyers would never dream of doing this, and the activity is extremely rare, almost unheard of.

Inaccurately contending that the "presumption of prejudice" recognized in *Remmer v. United States*, 350 U.S. 377 (1956),[19] does not apply in a civil case,[20] Mobil argues that there is a "trend" away from the teachings of *Remmer* in the Seventh Circuit.  Mobil Brief at 6.  Besides citing a Fifth Circuit case, Mobil rests its argument on Judge Posner's observations in *Wisehart v. Davis*, 408 F.3d 321, 326 (7th Cir. 2005).[21]  But the Seventh Circuit has made clear following the 2005 decision in *Wisehart* that in appropriate circumstances the presumption can be applied. The court in *Hall v. Zenk*, 692 F.3d 793, 801 (7th Cir. 2012), explained that "[w]e have interpreted Supreme Court case law as establishing that the *Remmer* presumption is, in fact, vital, though its use should not be automatic regardless of the level of prejudicial impact that is likely to flow from a given intrusion."  The *Hall* court relied in part on this observation by the Supreme Court in *United States v. Olano*, 507 U.S. 725, 739 (1993): "There may be cases where an

---

[19] *Remmer* involved an unidentified man approaching a juror during trial and remarking that anyone who returned a favorable verdict for the defendant could profit.  The juror reported this to the trial judge who informed the prosecuting attorneys.  *Remmer v. U.S.*, 347 U.S. 227, 228 (1954).  Thereafter, an FBI agent investigated and concluded that the remark was made in jest.  Nothing further was done, and the defendant and his lawyer first learned of the FBI's investigation of the juror and the incident by reading a newspaper account of it after the trial. *Id.*  The *Remmer* court held that "[i]n a criminal case any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties."  *Id.* at 229.

[20] Though *Remmer* was a criminal case, the so-called "*Remmer* presumption" and the requirement of a "*Remmer* hearing" are applied in civil cases as well.  *See, e.g.*, *Haley v. Blue Ridge Transfer Co., Inc.*, 802 F.2d 1532, 1535 (4th Cir. 1986) (noting that *Remmer* was a civil case but finding that the "doctrine of presumed prejudice has been applied no less forcefully in civil cases").

[21] The *Wisehart* court found that a *Remmer* hearing was required ten years after the conclusion of a trial when the defendant obtained an affidavit from a juror stating that a third party told the juror the trial was delayed a day so that the defendant could take a polygraph test.  *Wisehart*, *supra*, 408 F.3d at 326.

intrusion should be presumed prejudicial, but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's deliberations and thereby its verdict?" *Hall*, 692 F,3d at 801. Because it is impermissible under Fed. R. Evid. 606(b) to ask a juror how an extraneous influence affected her deliberations, this inquiry of what impact the extraneous influence had on the deliberative process of the jury proceeds *inferentially* and consists of the court asking what effect would the intrusion – here, a communication from a good friend that the juror was being investigated by a private investigator hired by one of the parties during trial – have on a reasonable person in the position of the juror. It is an objective standard, an inquiry into the probable reaction of a reasonable person under the circumstances. *See*, *e.g.*, *Middleby Corp. v. Hussman Corp.*, No. 90 C 2744, 1992 U.S. Dist. LEXIS 19730, at *24 (N.D. Ill. Dec. 23, 1992) ("Without the ability to examine the jury's thought processes, the inference of an effect on the verdict is unavoidable."). Applied here, the inference that a reasonable person would have had her equilibrium affected by knowledge that she was being subjected to a private investigator's snooping during trial is unavoidable.

**2.      Assessing How A Reasonable Person In Mrs. McGregor's Situation Would Be Affected Is The Focus Of The Analytical Inquiry That This Court Must Perform, And Defendants Failed To Address That Issue At All.**

The defendants side-stepped the appropriate analytical approach by just ignoring it. They fled the important inquiry into the probable impact on a reasonable person in the juror's position by turning a blind eye to plaintiff's detailed description of the numerous ways this interference with the juror would clearly intrude upon the deliberative process of any average juror. Defendants dismissed these issues in a conclusory manner by calling them "a parade of hypothetical suggestions" and "rank speculation." Mobil Brief at 1, OI Brief at 1. Instead, they are exactly the issues before this Court – ones the Court must analyze.

Failing to argue the points, defendants conceded the reality that an average juror would have been affected in a variety of ways, including these:

- A juror in the position of Ms. McGregor would have believed that if she sided with the defendants in the deliberations she would not have been harassed and beset by further private investigator inquiries into her life and conduct.[22]

- A typical juror subjected to an investigation like that directed against Ms. McGregor during this trial would be fearful of further invasions of her privacy through the defendants' continued probing into her personal affairs, and she would be unsure about the Court's indication that her privacy concerns would indeed be respected.

- A reasonable juror in Ms. McGregor's position would be intimidated by the private investigation of her because it in part focused on the reliability of testimony she gave under oath and because the investigation was being conducted by a party with an apparent incentive to disprove her account who had control over the investigator.

- A typical juror would be distracted by the implications of an ongoing investigation into her truthfulness being conducted throughout the trial, and, in light of the trial judge's apparent complete control of the proceedings including the *voir dire*,[23] she might be distracted by the reasonable belief that the behind-the-scenes investigation of her was being done with the authorization and under the direction of the court.

- An average juror would have been intimidated by the knowledge that the defendants had hired a private investigator to examine her conduct due to an understandable fear of defendants finding highly personal information or embarrassing information about her in the course of their investigation and then revealing it to others.

- An average juror, surprised to learn that private investigators had been unleashed on her during a trial, could be reasonably expected to be deeply resentful of such

---

[22] It is important to remember that the principle underlying Fed. R. Evid. 606(b)'s proscription against the questioning of jurors about their deliberations is grounded in the realization that, if it were not for this prohibition, "jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of misconduct which might establish misconduct sufficient to set aside a verdict." *Haugh v. Jones & Laughlin Steel Co.*, 949 F.2d 914, 918 (7th Cir. 1992) (quoting *McDonald v. Pless*, 238 U.S. 264, 267 (1915)). Knowledge of that on the part of jurors would render the jury system unworkable, since fear of ongoing harassment by the losing party would dominate the jurors' minds. This same principle, and this same fear, are applicable when a juror during trial knows that a party's private investigators are investigating her and may continue to do so.

[23] The trial judge in this case controlled all aspects of trial in the manner customary for federal trial judges, including the *voir dire*, requiring questions to be submitted to him by counsel for the parties, and asking the questions himself. Given this apparent level of control, a juror in Ms. McGregor's position could reasonably have assumed that the defendants' use of private investigators to probe into her affairs was done either at the direction or with the authority of the Court, and could have further assumed that it was adversarial in nature – an aim to find something wrong she had done – because she was never informed about it by the defendants or the Court, but instead by a friend.

conduct. While it may be true that the resentment could take the form of animosity toward the defendants, whom she correctly believed were behind the intrusion, it is also true that the resentment may have led to a bitter cast of mind that detached from the proceedings entirely, thus prejudicing all parties concerned in the trial.

- A typical juror in Ms. McGregor's position may have been led to believe that mere interaction with a single pipefitter was something that was highly improper, thus tending to prejudice her in regards to the plaintiff who shared that status.

- An average juror might well have assumed that the Court would have inquired of Mr. Krik as to his interaction with Ms. McGregor, and that the plaintiff's credibility – which was of critical importance to such issues as exposure to defendant-specific products – was in doubt.

### 3.     The Authorities Cited By Defendants Were Mischaracterized And Are Not Supportive Of Their Argument.

Mobil cites a law review article to argue that investigations can be made of a juror "as long as the lawyer does not actually approach those summoned for jury service, in an effort to suggest to this Court there is authority that an investigation of a juror during trial through a private investigator is proper. Mobil Brief at 10. The three-page essay published at 58 Dickinson Law Review 384-386 (1954) by James C. McCready says no such thing. The essay makes no mention of the use of private investigators and does not discuss at all the subject of investigating sitting jurors during a trial. In fact, Mr. McCready makes clear that once empaneled the jurors can only be scrutinized by evaluating their appearance and demeanor.[24]

Mobil also relies upon ABA Formal Opinion 466, citing it repeatedly in its brief. Mobil Brief at 1, 12. In fact, the ethical opinion, which concerns what a lawyer may and may not do in regards to a juror's internet presence, brands conduct of the type engaged in by Mobil in this case – communicating to a juror through another - as unethical. It reads in part:

---

*See* 58 Dickinson Law Rev. 384, at 385:

> If no investigation of the jurors is made prior to the day of trial, counsel must depend upon a close observation of the jurors' personal appearance, demeanor, manner in which jurors respond to questions, and draw therefrom their intelligence and mental alertness, their manner in looking at things in general, their likely prejudices and the powers of perception and dissemination.

> Unless limited by law or court order, a lawyer may review a juror's or potential juror's Internet presence, which may include postings by the juror or potential juror in advance of and during a trial, *but a lawyer may not communicate directly <u>or through another</u> with a juror or potential juror.*

ABA Formal Opinion 466, at 1 (italics and underscoring added). This frivolous citation was used to argue to this Court that the "modern rule" is that litigants may engaged in the conduct now before this Court for scrutiny.

Mobil also relied upon American College of Trial Lawyers, Annotated Code of Trial Conduct, Rule 19(b) (2005), in an effort to convince this Court that its outrageous conduct should be condoned. But, that Code brands what Mobil did in this case unethical, reading in part at 19.5, entitled "Communications with Jurors During Trial," as follows:

> Paragraph 19(d), which is derived from Model Code DR 7-108(B), advises lawyers *not to communicate*, *either directly or indirectly*, *with jurors during trial*. *See also* Model Rule 3.5(b); Model Code EC 7-29 ("There should be no extrajudicial communication with veniremen prior to trial or with jurors during trial by or on behalf of a lawyer connected with the case. Furthermore, a lawyer who is not connected with the case should not communicate with or cause another to communicate with a venireman or a juror about the case."). [Emphasis added.][25]

Mobil cited no authority to this Court to support what it has done. It has only mischaracterized the items it cited, while supplying further evidence of its blatant misconduct.

Owens-Illinois fared no better. The cases it cited at page 5 of its brief are inapposite. In *Delvaux v. Ford Motor Co.*, 764 F.2d 469, 471-73 (7th Cir. 1985), there was no contact with a juror.[26] In *United States v. Delatorre*, 572 F. Supp. 2d 967, 993-94 (N.D. Ill. 2008), there was no

---

[25] Paragraph 19(b) itself does not say that lawyers are free to set their private investigators on jurors. Instead, it makes clear that direct or "indirect" communications to jurors are prohibited, reading in part: "a lawyer may investigate the prospective jurors to ascertain any basis for challenge, provided there is no communication with them, direct or indirect, or with any member of their families."

[26] The court wrote at 764 F.2d 472 that "all the plaintiff has shown, the wife of a juror apparently had casual conversation with the wife of an investigator for the defendant, and with counsel for both sides. No direct contact with a *juror* has been shown." [Emphasis original.]

evidence of any communication to the juror.[27]  In *Taylor v. Nat'l R.R. Passenger Corp.*, 868 F.

Supp. 479, 484 (E.D.N.Y. 1994), a case where the court recognized that the "test is an objective

one, and is measured by reference to the 'probable effect' an extraneous source likely had on the

'hypothetical average juror,'" *id.* at 483, there was no evidence that a communication to a juror's

mother was conveyed to the juror since the "juror stated that she had not discussed any of the

evidence adduced at trial nor any other specifics of the case with her mother." *Id.* at 484.  In

*Dennis v. General Elec.Corp.*, 762 F.2d 365, 367 (4th Cir. 1985), an attorney *in an argument to*

*a jury* referred with good humor to a cartoon the jury members had distributed that satirized

lawyers and there was absolutely "no clandestine communication by [the lawyer] with the jury."

*Id.* at 367.  And, in *Thompson v. Office & Prof. Employees Int'l Union*, 74 F.3d 1492, 1510 (6th

Cir. 1996), when the "foreman of the jury was walking towards the front of a restaurant to pay

his bill," the plaintiff asked him, "how is the food?" The juror responded, "tolerable." *Id.* at

1509.  Those were the only words exchanged between the juror and plaintiff.  *Id.*

　　In none of the cases cited by Owens-Illinois did a litigant hire a private investigator to

conduct a clandestine investigation of a sitting juror during trial, with the intent of overturning a

decision by the trial judge on who should sit on the jury, and with the result that during trial the

juror learned of the investigation from a close friend.  That is the case we have here.

## II.  Conclusion.

　　Plaintiff submits that there is an adequate record before the Court demonstrating

improper jury tampering that warrants ordering a new trial.[28]

---

[27] The court wrote, at 572 F. Supp. 2d 993-994, "that Juror 79 reported recognizing one or more family members on the train or at a store during trial, but there is no evidence that they spoke to each other or interacted in any way."

[28] If the Court believes that further hearings on this issue of the defendant's jury tampering are necessary, it clearly has the discretion to order them.

14

With the aim of protecting those who serve on juries, investigation into the capacity of their members to be fair and impartial is currently conducted under the strict supervision of the judge, in open court, before all of the parties, and with no authorization for a party's secret probing through the forays of private investigators. Such unauthorized investigations – whether they be aimed at the jurors directly or indirectly through their friends and acquaintances – threaten to intimidate or provoke the resentment of jurors who learn of the investigation, as happened in this case. They invariably invade and disturb what the court in *U.S. v. Harry Barfield Co.*, 359 F.2d 120, 124 (5th Cir. 1966), called a protective "vacuum" in which jurors are to decide a case solely on what is presented to them in open court. They represent a deliberate interference with the jury function and disturb the full and untrammeled exercise of deliberate and unbiased judgment that every litigant has a right to expect when his case is tried.

That impermissible interference with the jury's essential function is what occurred in this case. It serves as grounds for ordering a new trial under Fed.R.Civ.P. 59(a).


Dated: July 9, 2015

/S/   Robert  G. McCoy
Attorney for Plaintiff
Robert G. McCoy
Cascino Vaughan Law Offices, Ltd.
220 South Ashland Ave.
Chicago, IL 60607
(312) 944-0600
bmccoy@cvlo.com